UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| FINANCIAL PACIFIC LEASING, INC., | NO. |
| Plaintiff, | COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES |
| v. | JURY DEMAND |
| R.V.I. AMERICA INSURANCE CO., | |
| Defendant. | |

Plaintiff Financial Pacific Leasing, Inc. ("Financial Pacific") alleges for its Complaint as follows:

## I.  INTRODUCTION

1.      This is an insurance coverage dispute.  Financial Pacific seeks (a) damages for R.V.I. American Insurance Company's ("RVI") breach of the subject insurance policy; (b) a declaratory judgment, pursuant to 28 U.S.C. § 2201, adjudicating the respective rights, duties, and obligations of the parties under a the subject policy, specifically with respect to a justiciable controversy over the calculation of the "End of Term Value" as defined by the insurance policy;

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 1

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

and (c) damages for RVI's breach of its duties of good faith and fair dealing and its violation of the Washington Consumer Protection Act.

2.      Financial Pacific is an asset-based lender, providing equipment leases and financing to commercial customers. Established in 1975, Financial Pacific originates and services a portfolio of equipment leases and equipment finance agreements. Included in Financial Pacific's portfolio is the equipment that is the subject of this action: 150 railcars leased to Haliburton Company in 2015 for a five-year term. Based on an original cost of $81,500 per railcar, Financial Pacific expected a residual value of $61,000 per railcar at the end of the five-year lease. To protect itself from the risk that the actual value of the railcars at the end of the lease term would be significantly lower than the expected residual value, Financial Pacific purchased "residual value insurance" from Defendant RVI.

3.      RVI marketed and sold a Master Residual Value Insurance Policy to Financial Pacific to cover the fortuitous decline in value of the insured assets because of changes in market conditions. RVI's policy explicitly states that its purpose is to cover "**LOSS INCURRED BY THE INSURED DUE TO A FORTUITOUS DECLINE IN VALUE OF A CLASS OF ASSET TO WHICH THE INSURED EQUIPMENT BELONGS CAUSED BY CHANGES IN MARKET CONDITIONS WHEN SUCH EQUIPMENT IS USED AND MAINTAINED AS INTENDED.**" RVI has similarly represented the purpose of its residual value insurance in litigation before the U.S. Tax Court, which noted that the insurance is intended to protect "against the risk that the actual value of the asset upon termination of the lease would be significantly lower than the expected value." *R.V.I. Guar. Co., Ltd. & Subsidiaries v. C.I.R.*, 145 T.C. 209, 210 (2015). Pursuant to its policy, RVI agreed to pay Financial Pacific if the value of the insured railcars

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 2

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

dropped below the "Insured Value", which was set at approximately 60% of the original equipment cost (or approximately $51,815 per railcar).

4.      As a result of economic market conditions, there has been a dramatic decrease in demand for the insured railcars, with the fair market value of the railcars having plummeted to $28,000 or less. While this fortuitous decline in value of the railcars is precisely what RVI's policy is intended to cover, RVI contends that the calculation of "End of Term Value" not only results in no covered loss under its policy for the insured railcars, but could *never* result in a covered loss. RVI's position would render coverage under its policy illusory and completely deny Financial Pacific the coverage for which it bargained.

## II.  THE PARTIES

5.      Financial Pacific is a Washington Corporation with its principal place of business located at 3455 S. 344th Way, Federal Way, Washington 98001.

6.      RVI is an insurance company incorporated under the laws of Connecticut with its principal place of business in Stamford, Connecticut. RVI is authorized to engage in the business of insurance in the state of Washington and at all relevant times was issuing insurance policies to Washington insureds.

## III.  VENUE AND JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is complete diversity between the parties.

8.      RVI issued the subject insurance policy for delivery to Financial Pacific in Washington and otherwise conducts business in Washington. This Court thus has personal jurisdiction over RVI.

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 3

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in King County, Washington.

10.      This Court may grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## IV.  FACTUAL BACKGROUND

**A.      The RVI Policy**

11.      Financial Pacific is an insured under a Master Residual Value Insurance Policy issued by RVI, Policy No. 01-01-30-1365 (the "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit A.

12.      The opening paragraph of Policy explains the purpose of the coverage afforded, stating that it is:

> **AN INDEMNITY AGAINST LOSS INCURRED BY THE INSURED DUE TO A FORTUITOUS DECLINE IN VALUE OF A CLASS OF ASSET TO WHICH THE INSURED EQUIPMENT BELONGS CAUSED BY CHANGES IN MARKET CONDITIONS WHEN SUCH EQUIPMENT IS USED AND MAINTAINED AS INTENDED.**

(emphasis in original).

13.      Article I provides the following insuring agreement:

> Subject to all Declarations, exclusions and other terms and conditions hereof, the Company shall indemnify the Insured as of the Lease Termination Date against Loss, if any, which shall be payable on the Settlement Date, in respect of all Units subject to a lease.

14.      "Loss" is defined by the Policy as "with respect to a Lease, the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease exceeds the sum of the End of Term Value thereof on the Lease Termination Date, as determined in accordance with Article V., reduced by the deductible."

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 4

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

15.     Pursuant to a separate premium paid in or about September 2015, RVI agreed to insure one hundred and fifty (150) 2015 Greenbriar 3,250 Cu. Ft. Covered Hopper railcars leased by Financial Pacific to Haliburton Corporation (the "Haliburton Units") under the Policy. The "Follow-On Declarations" issued by RVI for the Haliburton Units is attached hereto as Exhibit B.

16.     The Haliburton Units were leased for a five-year term with a "Lease Termination Date" of August 31, 2020.

17.     The original equipment cost of the Haliburton Units was $12,225,000 ($81,500 per railcar).

18.     Financial Pacific's expected value of the Haliburton Units upon lease termination, or "Booked Residual Value," was $9,150,000 ($61,000 per railcar).

19.     The "Insured Value" of the Haliburton Units under the Policy is $7,772,262 ($51,815.08 per railcar).

20.     Pursuant to Article I of the Policy, RVI agreed to pay Financial Pacific for the amount that the "End of Term Value" of the Haliburton Units fell below the Insured Value of $51,815.08 per railcar as of the August 31, 2020 lease termination.

21.     The Policy defines "End of Term Value" as the greater of:

(a)     The Appraised Value of the Unit determined under the direction of the Company but at the Insured's expense, by a Qualified Inspector/Appraiser selected and approved by the Company;

(b)     The Sale Proceeds with respect to the Unit in the event the Insured has sold the Unit; provided, however, that the Insured shall have obtained the Company's prior written consent to such sale;

(c)     The Approved Guide Published Value with respect to the Unit in the event that there is a publication that qualifies as an Approved Guide with respect to the Unit.

22.     The Master Policy defines "Appraised Value" as follows:

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 5

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

Appraised Value: with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)     as of the Lease Termination Date;

(ii)    by a Qualified Inspector/Appraiser in accordance with Section 5.02(a) or Section 6.0l(b)(ii), as applicable;

(iii)   with respect to Section 5.02(a), on the basis that such Unit complies with all standards set forth in the Equipment Portfolio Return Conditions Endorsement but with respect to Section 6.0l(b)(ii), on the basis of such Unit being in its existing condition;

(iv)    without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(v)     highest and best use without regard to quantity, location or country of registration of such Unit.

23.     An Endorsement D issued along with the Follow-On Declarations for the Haliburton Units purports to modify the definition of "Appraised Value" to the following:

Appraised Value (Reproduction Cost New): with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)     by the cost of substituting another asset of comparable utility;

(ii)    on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 6

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e. "reproduction cost new" basis);

(iii)   as of the applicable Lease Termination Date;

(iv)   by a Qualified Appraiser in accordance with Section 5.02 hereof;

(v)   on the basis that such Unit complies with all standards set forth in the Return Condition Endorsement;

(vi)   without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(vii)   without regard to quantity, location or country of registration of such Unit.

**B.      Market conditions have caused the value of the Haliburton Units to drop far below the Insured Value.**

24.      C112 Covered Hoppers are specialized railcars used mainly for the transportation of "frac sand" (sand used in hydraulic fracturing to facilitate the production of oil and natural gas), cement, and non-metallic minerals and earths.

25.      From 2010 to 2018, the preferred frac sand was white silica sand sourced from Minnesota, Wisconsin, and Illinois, which was shipped via C112 Covered Hoppers to Texas for use in oil wells.

26.      Frac sand accounts for over one-half and in some cases two-thirds of loadings for C112 Covered Hoppers.

27.      In 2010, the C112 Covered Hoppers market consisted of approximately 55,000 cars.

28.      After the development of hydraulic fracturing, the market for C112 Covered Hoppers boomed, and 80,000 new cars were built in the next 10 years.

COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES - 7

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA 98101
206.467.6477

29.     The current estimated size of the C112 Covered Hoppers fleet is 121,000.

30.     Frac sand use is highly dependent on energy prices, particularly crude oil.

31.     After a drop in oil prices in 2016, there was a dramatic decrease in demand for frac sand and a corresponding dramatic decrease in demand for C112 Covered Hoppers.

32.     The frac sand market has been further impacted since 2018 by the use of in-basin (locally sourced) brown sand for use in hydraulic fracturing in Texas. Because in-basin sand can be delivered to the wellhead for one-third or less of the cost of white silica sand, the production of white silica sand has been devastated.

33.     As of August 1, 2020, over 50,000 C112 Covered Hoppers in the market had been in storage for more than 60 days, despite being serviceable.

34.     Many of the large lessees of C112 Covered Hoppers are facing, or have declared, bankruptcy.

35.     As a result, the secondary sale market for C112 Covered Hoppers is essentially non-existent and—as a result of the development of in-basin sand—the frac sand market is expected to remain severely depressed even if energy prices recover.

36.     As of the Haliburton lease termination date of August 31, 2020, the fair market value of the Haliburton Units had dropped to $28,000 per unit or less.

**C.     Financial Pacific's claim under the RVI Policy**

37.     Because the value of the Haliburton Units had fallen far below the Policy's Insured Value (as a result of a fortuitous decline in the value of C112 Covered Hoppers caused by changes in market conditions), Financial Pacific submitted a Preliminary Notice of Claim and Notice of Claim to RVI in accordance with § 5.01 of the Policy.

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 8

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

38.     Financial Pacific's Notice of Claim identified an End of Term Value of $28,000 per unit for the Haliburton Units, resulting in a covered loss of $3,572,262.

39.     Because two of the Haliburton Units were declared a total loss prior to the termination of the Haliburton lease, Financial Pacific subsequently informed RVI that its claim was limited to 148 Haliburton Units, for a total covered loss of $3,524,631.84.

40.     In response to Financial Pacific's Notice of Claim, RVI responded with its own determination of the End of Term Value of the Haliburton Units, calculating it to be between $67,500 to $69,500 per unit for the Haliburton Units, which would result in no covered loss.

41.     RVI's calculation of the End of Term Value of the Haliburton Units is based on an improper interpretation and/or application of Endorsement D's Appraised Value (Reproduction Cost New).

42.     Specifically, RVI's calculation of the End of Term Value does not take into account the actual market value of the Haliburton Units based on the depressed market conditions, but rather applies a straight-line depreciation of 3.1% per year.

43.     At the end of the five-year lease term of the Haliburton Units, RVI thus contends that the End of Term Value is approximately 84.5% of the original equipment cost.

44.     Alternatively, RVI has contended that if the End of Term Value is calculated on the Approved Guide Published Value (rather than on the Appraised Value), the End of Term Value of the Haliburton Units would also be higher than Insured Value.

45.     Because the Insured Value of the Haliburton Units at the end of the five-year lease term is 60% of the original equipment cost, there could never be a covered loss under RVI's calculation of the End of Term Value.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

46.     The Policy's definition of Insured Value—specifically including Endorsement D's definition of Appraised Value (Reproduction Cost New)—is ambiguous and RVI's interpretation of Insured Value would defeat the purpose of the insurance provided by the Policy.

47.     Pursuant to § 5.03 of the Policy, Financial Pacific timely objected to RVI's calculation of the End of Term Value, noting that RVI's position renders coverage under the Policy illusory and fails to provide Financial Pacific with the coverage for which it bargained.

## V.  FIRST CAUSE OF ACTION:  BREACH OF CONTRACT

48.     Financial Pacific repeats the allegations stated in paragraphs 1 through 47.

49.     Financial Pacific has fulfilled its obligations under the Policy and has satisfied all conditions precedent.

50.     RVI has breached the Policy by failing to pay for the loss incurred by Financial Pacific for the decline in value of the Haliburton Units caused by changes in market conditions.

51.     As a result of RVI's breach of the Policy, Financial Pacific has suffered and will continue to suffer damages in an amount to be determined at trial.

## VI.  SECOND CAUSE OF ACTION:  DECLARATORY JUDGMENT

52.     Financial Pacific repeats the allegations stated in paragraphs 1 through 51.

53.     There is an actual and justiciable controversy between Financial Pacific and RVI as to the calculation of covered Loss under the Policy.

54.     Financial Pacific is entitled to declaratory relief holding that: (i) the determination of End of Term Value under the Policy is ambiguous and must be construed to accomplish the purpose of the insurance purchased; (ii) alternatively, RVI's calculation of End of Term Value and covered Loss would render coverage under the Policy illusory and is therefore unenforceable; and

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 10

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

(iii) RVI is entitled to coverage for the amount by which the sum of the Insured Values of the Haliburton Units exceeds the fair market value of the units at the Lease Termination Date.

## VII.  THIRD CAUSE OF ACTION:  INSURANCE BAD FAITH

55.     Financial Pacific repeats the allegations stated in paragraphs 1 through 54.

56.     RVI owes Financial Pacific duties of good faith and fair dealing.  Pursuant to that duty, RVI is obliged to refrain from, among other things: (a) denying coverage based on unreasonable, frivolous, or unfounded interpretations of the Policy; and (b) issuing an insurance policy that, under RVI's proffered post-claim interpretation of the applicable policy language, could not (i) transfer risk from Financial Pacific to RVI or (ii) provide coverage consistent with RVI's pre-claim representations to Financial Pacific.

57.     RVI's conduct violates its duties of good faith and fair dealing.

58.     As a direct and proximate result of RVI's bad faith, Financial Pacific has suffered damages in an amount to be proven at trial.

## VIII. FOURTH CAUSE OF ACTION:  VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT—RCW 19.86.020

59.     Financial Pacific repeats the allegations stated in paragraphs 1 through 58.

60.     In unreasonably failing and refusing to cover Financial Pacific's claim, RVI breached its duties of good faith and fair dealing.  This bad-faith conduct constitutes a violation of the Washington State Consumer Protection Act, RCW 19.86, et seq. ("CPA").

61.     RVI violated at least the following Washington Unfair Claims Settlement Practices Regulations, each of which is a *per se* violation of the CPA: (a) refusing to pay claims without conducting a reasonable investigation in violation of WAC § 284-30-330(4); and (b) failing to

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 11

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim in violation of WAC § 284-30-330(13).

62.     By virtue of these CPA violations, Financial Pacific is entitled to actual damages, treble damages, and an award of their attorneys' fees and costs incurred in prosecuting this action.

## PRAYER FOR RELIEF

Financial Pacific requests relief as follows:

a.     Monetary damages resulting from RVI's breach of contract, including exemplary damages pursuant to the CPA;

b.     A declaration that: (i) the determination of End of Term Value under the Policy is ambiguous and must be construed to accomplish the purpose of the insurance purchased; (ii) alternatively, RVI's calculation of End of Term Value and covered Loss would render coverage under the Policy illusory and is therefore unenforceable; and (iii) Financial Pacific is entitled to coverage for the amount by which the sum of the Insured Values of the Haliburton Units exceeds the fair market value of the units at the Lease Termination Date;

c.     An award of its attorney's fees, pursuant to the rule in *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 673 (1991) and as damages for RVI's bad faith and violation of the CPA; and

d.     Such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Financial Pacific hereby demands a trial by jury for all issues so triable that are raised in this Complaint.

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

DATED this 8th day of June, 2021.

**GORDON TILDEN THOMAS & CORDELL LLP**
Attorneys for Plaintiff

By  *s/Franklin D. Cordell*
Franklin D. Cordell, WSBA #26392

By  *s/Miles C. Bludorn*
Miles C. Bludorn, WSBA #54238
600 University Street, Suite 2915
Seattle, Washington 98101
206.467.6477
fcordell@gordontlden.com
mbludorn@gordontilden.com

Shattuck Ely, Ga. Bar No. 246944
FELLOWS LABRIOLA LLP
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, GA 30303
404.586.9200

COMPLAINT FOR DECLARATORY RELIEF AND
DAMAGES - 13

GORDON
TILDEN
THOMAS
CORDELL

600 University Street
Suite 2915
Seattle, WA  98101
206.467.6477

# EXHIBIT A



# R V I
## AMERICA

**R.V.I. AMERICA INSURANCE COMPANY**
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365
Financial Pacific Leasing, Inc.

# RESIDUAL VALUE INSURANCE

## MASTER DECLARATIONS FOR ELIGIBILITY PROGRAM

The party(ies) identified in Items 1 (and 2, if any) has (have) submitted to R.V.I. America Insurance Company (the "Company") an application for a residual value insurance policy (such application, the "Application" and such policy together with the declarations and endorsements attached thereto, the "Policy") in respect of the unit(s) of equipment identified in Item 4 for coverage up to the insured value thereof. In order to induce the Company to issue the Policy, each such party has certified, represented and warranted that the statements made in the Application and reproduced in part below are true and correct and each such party has agreed as provided in the Application.

**Item 1.**  **Insured:**  **Financial Pacific Leasing, Inc.**

**Address:**  3455 S. 344th Way
Federal Way, WA  98001

**Fax:**  800-447-7106

**Phone:**  253-568-6122

**Item 2.**  **Additional Named Insured:**

**Address:**

**Fax:**

**Phone:**

**Item 3.**  **Loss Payee (if different from Insured):**

**Address:**

**Fax:**

**Phone:**

**Item 4.**  **Equipment Insured (the "Unit(s)"):**

With respect to a Unit, the specific details of which are included either a) in the schedule attached to these Master Declarations (a "Schedule") or (b) in the Schedule attached to follow-

1365 financial pacific Eligibility Program Master Decs 03 12          Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

Policy Number: I01-01-30-1365

on declarations (such declarations, "Follow-On  Declarations") and the schedule thereto (also a "Schedule").

**Item 5.** **Lease (or other financing instrument):**

With respect to a Unit, the document identified in the Schedule as the applicable Lease, a copy of which shall be maintained by the Insured and be made available to the Company upon reasonable request, and the specific details of which shall be included in the Schedule under the applicable headings.

**Item 5a.** **Lease Commencement Date**:        As provided in the Schedule.

**Item 5b.** **Lease Termination Date**:        As provided in the Schedule.

**Item 6.** **Lessor**:        The Insured or as provided in the Schedule.

**Item 7.** **Lessee**:        As provided in the Schedule.

**Item 8.** **Insured Value**:        As provided in the Schedule, calculated in accordance with the Equipment Program Eligibility and Premium Endorsement.

**Item 9.** **Maximum Liability of Company**:

The sum of the Insured Values of all Units, reduced as may be provided in the "Exclusions" section of the Policy and further reduced by the amount of the applicable Deductible.

**Item 10.** **Deductible**:        None

**Item 11.** **Premium (non-refundable)**:

As provided in the Schedule.

**Item 12.** **Endorsements**:

    (A)   Equipment Program Eligibility and Premium

    (B)   Equipment Portfolio Return Conditions

    (C)   Approved Guides

**Item 13.** **Policy Period**:

From the Effective Date up to and including the Policy Termination Date.

    **(i)** **Effective Date:**        As of the earliest Lease Commencement Date as provided in a Schedule.

    **(ii)** **Policy Termination Date:**        The latest occurring Lease Termination Date as provided in a Schedule.

1365 financial pacific Eligibility Program Master Decs 03 12    Page 2    Copyright © 2015 by R.V.I. America Insurance Co.

ORIGINAL

# RVI
## AMERICA

Policy Number: I01-01-30-1365

In reliance upon the statements of the applicants in the Application for Eligibililty Program, the approval and execution of these Declarations constitute an undertaking by the Company to provide residual value insurance in the amounts provided herein, subject to the terms and conditions set forth in the Policy.

IN WITNESS WHEREOF, the Company has caused these Declarations to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By: _____
                    Daniel P. Egan

Title: _____ **Executive Vice President** _____



# R V I
## AMERICA

**R.V.I. AMERICA INSURANCE COMPANY**
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365
Insured: Financial Pacific Leasing, Inc.

## ENDORSEMENT A

## EQUIPMENT PROGRAM ELIGIBILITY AND PREMIUM

This Endorsement, effective as of June 29, 2015, forms a part of the Master Residual Value Insurance Policy issued by **R.V.I. AMERICA INSURANCE COMPANY** (the "Company") as set forth above. Capitalized terms used in this Endorsement and not otherwise defined in this Endorsement shall have the meanings assigned thereto in the Policy.

In consideration for the Premium charged, it is understood and agreed that, with respect to the coverage afforded by the Policy, the following amendment shall apply:

The Company hereby agrees that the following Units are eligible for coverage hereunder in such amounts, subject to such limitations and for such premium rates as are set forth below:

The Company will accept for coverage under the residual value insurance program (the "Program") such residuals as are required to bring "Minimum Lease Rentals", as defined in the Financial Accounting Standards Board's FASB Statement No. 13, paragraph 5.j.ii, to an amount equal to 90% of the fair value of the leased property, less any retained Investment Tax Credit, (the "Residual") subject to the following limits (the "Standard Limits"):

| Asset Group | Eligibility |
| --- | --- |
| Construction and Highway Transportation Equipment | 60% of booked residual. Premium rate shall be determined individually |
| All other Equipment | Shall be considered for underwriting and rated individually |

Nothing contained herein shall vary, alter, waive or extend any of the terms, provisions, representations, covenants, conditions, or agreements of the Policy other than as stated above.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be executed at Stamford, Connecticut.

R.V.I. AMERICA INSURANCE COMPANY
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By: _____
Daniel P. Egan

Title: _____Executive Vice President_____

PAGE 18

ORIGINAL

Copyright © 2015 by R.V.I. America Insurance Co.



# R V I
## AMERICA

R.V.I. AMERICA INSURANCE COMPANY
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365
Insured: Financial Pacific Leasing, Inc.

## ENDORSEMENT B

## EQUIPMENT PORTFOLIO RETURN CONDITIONS

THIS EQUIPMENT PORTFOLIO RETURN CONDITIONS ENDORSEMENT (this "Endorsement") forms a part of the residual value insurance policy referred to above, issued by R.V.I. America Insurance Company (the "Policy"). Capitalized terms used in this Endorsement and not otherwise defined in this Endorsement shall have the meanings assigned thereto in the Policy.

In consideration for the Premium charged, it is understood and agreed that, with respect to the coverage afforded by the Policy, the following amendment shall apply:

In performing the appraisal of a Unit pursuant to Article V of the Policy, the Qualified Appraiser shall determine the Appraised Value of the Unit, *except that* if such Unit or any individual aspect thereof fails to comply with any of the standards contained in this Endorsement, then the Appraised Value shall be determined *as if* that standard had been complied with. In applying the return conditions to a Unit, to the extent that a condition contained in the General Requirements of Section A is in conflict with any requirement for a specific type of Unit in Section B or any section thereafter, the requirements in Section B or any section thereafter shall be controlling:

A.   **GENERAL REQUIREMENTS**

1.   The Unit shall have been operated and maintained in strict accordance with the manufacturer's standard operating and maintenance programs and procedures, including any modifications, amendments or supplements to such programs in effect from time to time, to the level required to be eligible for warranty if available from manufacturer;

2.   The Unit shall have been operated and maintained in accordance with the terms of the Lease and must be ready for immediate use by another user without any need for refurbishment, repair or cost, returned in its like kind;

3.   At the time of return, each Unit shall:

  (a)   Have been maintained and be in compliance with all the applicable Federal, State and Local laws and regulations including those of the U.S. Department of Transportation (DOT), Occupational Safety and Health Administration (OSHA), and the U.S. Environmental Protection Agency (EPA), as applicable, and published changes scheduled to become effective within twelve months following the Lease Termination Date;

  (b)   Have all complete maintenance logs, equipment manuals, blue prints, process flow diagrams, equipment configuration diagrams and all other data returned in a satisfactory condition, detailed and in English;

   Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

**Return Conditions Endorsement**                                                    **Policy Number:** 01-01-30-1365

(c)  Have all original gauges and other mileage, time, pressure or other instrumentation, if applicable, in appropriate operational order and fully calibrated according to manufacturer recommendations;

(d)  Have all components and accessories, including, but not limited to, all engines, clutches, transmissions, differentials, axles, booms, cooling systems, hydraulic systems, and brakes, capable of satisfactorily performing the function for which they were designed within their respective manufacturer's published performance specifications and all components shall have no leaks;

(e)  Have tires and wheels of identical model, type and size, and no less grade or quality than that which was originally upon the Unit and all tires shall have no less than 60% of original tread depth remaining, and shall have no damage, cuts, flat spots, ply separations gouges, cracks or sidewall damage;

(f)  Not have been altered from its original designed use, and shall have had no change in drive horsepower, fuel or method of propulsion or gross operating capacities;

(g)  Have no broken, scratched, cracked or pitted glass, windows or other materials and no cracked, burned, singed, torn, dirty, ripped or missing upholstery, interiors, trim, seats, headliners or floor coverings;

(h)  Have been professionally cleaned and be in excellent appearance, in a clean condition, free of rust, corrosion, and of all hazardous substances and any other contaminants, and be free of all advertising or insignia placed thereon by Lessee;

(i)  Be in excellent repair and operating condition and have no missing, damaged or corroded parts or surfaces nor have been involved in fire, catastrophic failure, crash, other accident or incident causing any type of material structural damage whether or not repairable;

(j)  Have no exterior paint surface or structure damage in excess of $250 total appraised repair cost per Unit;

(k)  Have been upgraded and compatible to the most state-of-the-art electronic, mechanical and software configuration available at the time of the Lease Termination Date and tested for accuracy by the manufacturer. This includes not only the Unit but all other integral equipment necessary for the Unit to perform as designed or redesigned by the manufacturer. Lessee shall have relinquished all rights, claims and interest in and to all upgrades, data contained on or in any Unit and modifications to the Unit. All licenses affecting the value of the Unit shall be immediately transferable to the next user at no additional cost;

(l)  Have been de-installed, packaged, shrink-wrapped, as applicable, and crated or prepared in a manner consistent with the manufacturer's recommendation for transporting and packaging the Unit. A manufacturer's technician or a service provider certified by the manufacturer shall have provided a certificate stating that Unit is in good condition prior to shipment;

(m)  Pass all diagnostic tests appropriate for the Unit to verify equipment is performing as intended by the manufacturer;

(n)  Have all internal fluids such as lube oil and hydraulic oil filled to proper operating levels, filler caps secured and disconnected with hoses sealed to avoid spillage; and

(o)  Have all original equipment manufacturer's parts and spare parts and accessories provided.

**B.**   **AUTOMOBILES.** If a Unit is of a type generally considered as an automobile, in addition to the requirements in A. above, at the time of return, each Unit shall:

# R V I
## AMERICA

Return Conditions Endorsement

Policy Number: 01-01-30-1365

1.    Be in a condition considered to be Clean as defined by Black Book or Good as defined by Kelley Blue Book.

C.    **COMMERCIAL AIRCRAFT.** If a Unit is of a type generally considered as a commercial aircraft, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Comply with the present and imminent legislation, rules and regulations required for airworthiness and for operation in commercial airline service by the Federal Aviation Administration (FAA) as well as any other applicable regulatory agency in effect or scheduled to be effective for the subject type of aircraft in commercial airline service within two years, including any collision avoidance systems (such as Traffic Collision Avoidance System (TCAS) or Airborne Collision Avoidance System (ACAS)). Each Unit shall also be acceptable for import to United States. Such Unit shall also comply with all applicable airworthiness directives and mandatory service bulletins, including final (terminating) compliance with any items under which temporary compliance by inspection is allowed by the authority, but require final compliance within two years or the equivalent number of hours or cycles, in accordance with the Lessee's typical annual operation;

2.    Have:

    (a)    completed immediately prior to Lease Termination Date the next sequential C-check (or equivalent annual inspection under the Lessee's approved maintenance program as defined in the Lease); and

    (b)    if the current maintenance program calls for any service which will require the aircraft to be out of service for more than 96 hours, the next airframe block overhaul shall have completed its last major inspection within the last twelve thousand (12,000) hours of operation (or the equivalent number of cycles) or fifty percent (50%) life remaining to such scheduled services, whichever is greater. If no service requires the aircraft to be out of service for more than 96 hours, then the aircraft shall have completed its last major inspection within the last 500 hours of operation or the last two (2) calendar months, whichever is the lesser, and during the three (3) year period immediately preceding the Lease Termination Date there shall have been no material change or alteration in the maintenance program with respect to the Unit;

3.    Have all current and complete maintenance records with respect to the Unit, including back-to-birth traceability maintained in the English language and delivered upon return with the Unit. Such complement of records shall include, but shall not be limited to, full detailed history for all components installed on the engines;

4.    Have all detailed and completed flight logs and all other records and manuals presented upon return and in English;

5.    Have had a full cold and hot section borescope inspection of the engines and the auxiliary power unit (APU) performed in accordance with the manufacturer's recommended maintenance procedures and any discrepancies shall have been corrected. Any discrepancies noted during the last borescope inspection of the engines and APU, which were outside of the manufacturer's limits, shall have been rectified, and the engines shall have not demonstrated a deterioration in condition which would normally result in a designation as an "on watch" item;

6.    Have, on each engine life-limited part (or such part installed on any replacement engine), at least 50% of the total allowable flight hours, cycles, or calendar time (whichever is most limiting) remaining under the manufacturer's recommended maintenance procedures before scheduled or anticipated replacement or removal, and the life-limited parts of each engine (or appropriate replacement engine) shall have in

ORIGINAL

# R V I
## AMERICA

**Return Conditions Endorsement**                                    Policy Number: 01-01-30-1365

aggregate at least 50% life remaining under the manufacturer's recommended maintenance procedures before any scheduled or anticipated replacement or removal;

7.  Have landing gear with no less than 50% life remaining to the next scheduled overhaul or expected removal under the manufacturer's recommended procedures. In addition, each landing gear's life-limited parts shall have in aggregate not less than 50% life remaining to the next scheduled overhaul or expected removal under the manufacturer's recommended maintenance procedures, and no landing gear component shall have less than 50% life remaining to such scheduled overhaul or expected removal;

8.  Have remaining the equivalent of at least 2,000 hours of operation, or fifty percent (50%) of the period between the applicable scheduled services, whichever is greater on all other hard-time and life-limited components;

9.  Including but not limited to the engines, APU, landing gear, flight surfaces and controls, and cabin interior, be in an airworthy and serviceable condition, fit for immediate operation in commercial airline service without further repair;

10. Have on Wings and Empennage, all leading edges free from damage which is outside manufacturer's Structural Repair Manual (SRM) limits, and wings free of fuel leaks;

11. Except as otherwise provided herein, be in the same cabin configuration as it was in at the inception date hereof;

12. Have all carpets and seat covers in good condition, clean and free of stains and meet all FAR 25 fire resistance regulations;

13. Have emergency equipment with a calendar life, no less than one year or 100% of its total approved life, whichever is less, remaining on all;

14. Be returned with all fittings, including without limitation, all loose equipment, spare parts and buyer-furnished equipment necessary for the Unit's commercial operation in the configuration it was in at inception hereof;

15. Have all fitted components returned serviceable at time of delivery;

16. Not have been damaged in a crash, hard landing, electrical fire or damage or other accident or incident causing material structural damage whether or not repaired or repairable;

17. Have no structural or mechanical damage or related corrosion on any exterior surfaces (including control surfaces), inside linings, lavatories, doors, hinges, latches and floors;

18. Have, when applicable, corrosion prevention and control programs and aging aircraft programs in full compliance;

19. Have a fresh coat of paint of a type approved by the manufacturer;

20. Have no exterior skin or paint damage in excess of $500 total appraised repair cost per Unit; and

21. Be currently and been in airline service without interruption except for purposes of maintenance.


D.  **COMMERCIAL VEHICLES.** If a Unit is of a type generally considered as a commercial vehicle, excluding trailers, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.  Be mechanically and structurally sound and roadworthy in all gears under full payload. The Unit shall be tested on a dynamometer and the engines shall perform within the manufacturer's published tolerances for

# R V I
## AMERICA

Return Conditions Endorsement                                    **Policy Number**: 01-01-30-1365

manifold and crankcase pressures. The clutches, transmissions, drive shaft, differentials and axles shall have no unusual sounds or lubricant leaks, which would indicate an unsound mechanical condition;

2.  With respect to any <u>Refrigeration units</u>, be mechanically sound and in good operating order and capable of satisfactorily passing any test for refrigeration or cooling loss as recommended by the Manufacturer. Each refrigeration unit shall have accumulated not more than 8,750 operating hours since the last overhaul or replacement;

3.  Have tires and wheels of identical model, type and size, and no less grade or quality than that which was originally upon the Unit (recap tires shall be permitted on rear wheels only and shall not be considered in computing average tread depth), and all tires and recap tires shall have an average of no less than 60% of original tread depth remaining, and shall have no cuts, flat spots, ply separations or sidewall damage;

4.  Have no split base on rims or disc wheels, upper couplet and king pin shall meet DOT approval;

5.  Have brake linings that meet Surface Transportation Board (STB) and DOT safety standards, if applicable;

6.  Have no unrepaired holes in sides or roof and all roof bows shall be in place and structurally sound. Patches shall be of a permanent type and sealed properly (no tape, tar, or drive rivet patches acceptable). Floor shall be flat without holes or patches;

7.  Have no unrepaired damage in regards to the nose (front) including any damaged corner caps. Nose rail welds shall be intact (no caulk, proper aluminum welds shall be accepted at radius corner) and nose rail shall be straight;

8.  Have all lights and accessories in working order;

9.  With respect to <u>Restrooms</u>: Have any non-functioning latches or broken or severely damaged panels or other components related to the restroom replaced with new original equipment manufacturer's parts;

10. With respect to <u>Gasoline-Powered Trucks</u>, not have been operated more than 65,000 miles per year per vehicle over its life. At the time of return, the average usage of each gasoline delivery truck shall not exceed 65,000 miles since the last in frame engine overhaul;

11. With respect to <u>Diesel-Powered Trucks</u>, not have been operated more than 75,000 miles per year per vehicle over the term of the Lease. At the time of return, the average usage of each diesel-powered delivery truck shall not exceed 75,000 miles since the last in frame engine overhaul; and

12. With respect to <u>Class VII or Class VIII tractors</u>, not have been operated more than 125,000 miles per year per vehicle over the term of the Lease. At the time of return, the average usage of each tractor shall not exceed 125,000 miles since the last in frame engine overhaul.

E.  **CONSTRUCTION EQUIPMENT.** If a Unit is of a type generally considered as construction equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.  Have brake linings that meet STB DOT safety standards, if applicable;

2.  Be mechanically and structurally sound in all gears under full payload. As applicable, tracked or wheeled Units in commercial service shall be tested on a dynamometer and the engines shall perform within the manufacturer's published tolerances for manifold and crankcase pressures. The clutches, transmissions, drive shafts, differentials and axles shall have no unusual sounds or lubricant leaks, which would indicate an unsound mechanical condition;

3.  Have engines with no less than 60% of the remaining time until the next scheduled major overhaul;

# R V I
## AMERICA

**Return Conditions Endorsement**                                    **Policy Number:** 01-01-30-1365

4.   Have 60% remaining wear on the diameter of rollers of the track, and the undercarriage shall have 60% remaining thickness of all components on tracked equipment;

5.   Have hydraulic system which should constantly develop 98% of designed operating pressure, and hydraulic fluid free of contaminants and which match or exceed original specifications;

6.   Have no cracked or bent frames, brake drums or any undercarriage damage;

7.   Have digging teeth, wear plates and ground contact components with 60% remaining over all dimensions;

8.   Have cables which perform at 98% of their design strength and which shall not bear any cracks, corrosion, abrasions or frayed strands; and

9.   Have been used the lesser of no more than single shift usage or 2,000 hours per annum.

F.   **CONTAINERS.** If a Unit is of a type generally considered as containers, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.   Have the size, regulatory markings and the 6- digit unit number marked on the Unit;

2.   Have floor surfaces smooth and _flat_ and shall support lift truck or loading carrier equal to the manufacturer's original specifications and meet any and all regulations and laws from U.S. Federal, State, Local, Provincial, marine or any other agency, in the case of international carriers, be in compliance with ISO and other international regulatory bodies;

3.   Have efficient and properly operating doors, hinges and latches, satisfying all legal and regulatory conditions;

4.   Have carried no toxic, poisonous, waste or corrosive materials nor any other material not accepted for transport by the U.S. Food and Drug Administration (FDA) and DOT, the Federal Transportation of Dangerous Goods Act, The Ontario Goods Protection Act, the Ontario Environmental Protection Act, the Ministry of Transport and/or any other recognized agency;

5.   Be in the condition required to be maintained pursuant to the Institute of International Containers Lessors, Ltd. version IV, V, or any version which has superseded such requirements;

6.   Not have been loaded in excess of its designed capacity;

7.   Have climate control system and atmospheric control system which perform at 98% of their designed specification;

8.   Be mechanically and structurally sound and road, rail or seaworthy under a full payload;

9.   Have container flooring replaced with new container flooring, if damaged, and the rear door seals shall have been recently replaced meeting the manufacturer's original specifications;

10.  With respect to repairs requiring painting of exterior and interior metal surfaces, be to the standard of protection required for an ocean environment. Metal preparation must include sandblast to a Swedish standard S.A.2.5. Coatings are to include original manufacturers prime and topcoat. If color is changed on container, all exterior surfaces are to be prepared by blasting to the above standard. The aforementioned metal protection shall include covering the gooseneck tunnel and outrigger cross-members. Metal perforation due to sandblasting shall be considered in excess of normal wear condition. Any repair necessary due to perforation is to be corrected prior to coating. Damaged interior surfaces, including any rust or paint blistering must be recoated. Interior vents to be free of all rust and shall not be considered normal wear and tear. Door seals to be removed and replaced during exterior surface preparation when Unit is recoated;

# R V I
## AMERICA

**Return Conditions Endorsement**                                    **Policy Number**: 01-01-30-1365

11. With respect to any refrigeration power units, be mechanically sound and in good operating order and capable of satisfactorily passing any test for refrigeration, temperature recovery or cooling loss as recommended by the manufacturer. Each refrigeration unit shall have accumulated no more than 8,750 operating hours since the last overhaul or replacement. Diesel and electric refrigeration compressor drive systems shall be lubricated and refrigeration gas tight, quiet running with all pressures and tolerances at 98% of the original factory standards. Engines shall not have been modified to burn substitute fuels;

12. As it relates to <u>Controls</u>:

    (a) Bear proof that electrical control boards were replaced or rebuilt within three years;

    (b) Have control board version upgraded to the latest version (state-of-the-art technology as per manufacturer's specifications);

    (c) Have all thermostats and temperature recorders, including supply air thermometer, safety thermostat and hot gas operation calibrated, and each shall function as per manufacturer's specification;

    (d) Have fuses and relays individually tested for functions, meeting all manufacturer requirements;

    (e) Have all electrical terminals, connections and plugs secure and clean;

    (f) Have been confirmed as having all digital readouts and program options, including indicator lights, alarms and diagnostic menus for tests, functioning as per manufacturer's specification; and

    (g) Be moisture-proof and shall have moisture-free seals for safe operation on all control boxes;

13. As it relates to <u>Motors</u>:

    (a) Have been electrically tested and found to meet manufacturer's specification;

    (b) Have all three-phase power legs (condenser fan motor, evaporator fan motor, in both high and low speeds, and the compressor) equal to each other and conform to manufacturer's specifications. Replacement having been made if either 1) the legs exceed the manufacturer's parameters, or 2) the measure exceeds (.5 amperes) as compared to each other;

    (c) Have the compressor system suction and discharge pressures tested not to exceed manufacturer's standards in the manufacturer's refrigeration guidelines in the model maintenance manual;

    (d) Not have high head pressure in the normal operation mode;

    (e) Have high and low pressure cut out switches which shall activate during the pre-trip check out;

    (f) Be free of bearing problems, vibration and misalignment;

    (g) Have lubricant levels confirmed as per manufacturer's requirements; and

    (h) Have replaced fan assembly for condenser and evaporators at eight years of life;

14. As it relates to <u>Coils</u>:

    (a) Have clean condenser and evaporator coils which have integrity; and

    (b) Have condenser coil finns that are resilient to the touch, not brittle or flaking;

15. As it relates to <u>Valves-plumbing</u>:

    (a) Have functioning service and expansion valves which have been replaced within the last three years;

    (b) Pass a leak test to ensure plumbing, fittings, and main refrigerant gas reservoir all have high pressure integrity;

PAGE 25

# R V I
## AMERICA

**Return Conditions Endorsement**                                    **Policy Number:** 01-01-30-1365

      (c)    Have no visible signs of corrosion; and

      (d)    Have clean evaporator hoses/drains and be clear to discharge;

16.    As it relates to <u>Gas</u>:

      (a)    Have clear sight glasses;

      (b)    Have readable line moisture indicators, clear lenses and read in the "green" aspect; and

      (c)    Have moisture indicators free of bubbles, indicating refrigerant gas level is full and without air in system;

17.    As it relates to the <u>system preparation and operation</u>:

      (a)    Be pre-tripped and new dryers shall have been installed; and

      (b)    Been tested and passed such test in a 70°F ambient environment and run to -12°F for 5 hours while testing temperature with Simpson meter at rear doors; temperature not varying in the chill mode from coil to doors. No sweating on exterior sidewalls of reefers.

G.    **DRILLING.** If a Unit is of a type generally considered as drilling equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Have all waste material and fluid removed from the Unit;

2.    Have diesel engines, generators and hydraulic systems that operate without excessive noise, exhaust and vibration, free of all material fluid leaks, and all fluids shall be free of any cross-contamination. Diesel engines and generating shall be mechanically sound and operate within the manufacture's specifications with regard to oil pressure, coolant temperature and other pressures. Generator, generator part and/or generator accessory shall have at least half (50%) hours remaining on each part, according to the then current manufacture's maintenance program overhaul interval;

3.    Be returned with all parts, components, accessories, pumps, motors and blocks as originally delivered, ordinary wear and tear excepted, and as necessary to operate the Unit for its intended purpose, including but not limited to trucks, trailers, ramp, a complete set of drilling equipment for the rated depth, derrick, mast and substructures, drawworks and diesel engines, power generation, electrical distribution equipment (i.e. SCR Systems, AC Systems, traction motors, electrical cables, switchgear panels), mud pumps, mixers, mud cleaning systems and tanks, complete drill string (pipe, collars, kelly and subs) and well control systems (i.e. blowout preventers, choke manifold, closing units and support), rig fabrication units including water, fuel, mud and support houses, controls and gauges, and all original auxiliary equipment such as hoists, lighting, control houses, forklifts, hoses, and all other support systems;

4.    Have no structural or mechanical damage, except ordinary wear and tear. Frames, structural members, accessories and attachments shall be structurally sound without breaks or cracks. Any structural repairs shall have been made in observance of customary and professional standards and all other applicable requirements, and in a workmanlike manner so as not to detract from the equipment's functionally or integrity;

5.    Be able to perform its required tasks effectively without repair, including (but not limited to) electronic, electrical and mechanical controls, pumps, motors, belts, hoses, pins, bushings, measuring devices, screws, barrels, ways, rams, and clamps;

6.    Have not less than 50% useful life remaining before the next replacement, overhaul, recalibration, refurbishment or rebuilt on all parts of the Unit with predictable or scheduled replacements or overhaul lives;

# R V I
## AMERICA

Return Conditions Endorsement                                      Policy Number: 01-01-30-1365

    7.     Have all locking keys for buildings, ignition and other external components together and secured to a major external component of the equipment; and

    8.     Have disassembly performed according to the manufacturer's recommendations and with any transportation devices, such as metal skids, lifting slings, and brackets, which were with the equipment when it was originally delivered, or replacement device that are equally suitable for the purposes contemplated herein. All components will have been match marked and color coded.

H.    **FORESTRY AND AGRICULTURE.**  If a Unit is of a type generally considered as forestry, logging, sawmill and agriculture equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

    1.     Have engines with no less than 60% of the remaining time until the next scheduled major overhaul as determine by the original equipment manufacturer;

    2.     Have an engine that shall produce (+/-) 5% of original horsepower as when delivered from the manufacturer;

    3.     Have 60% of new remaining wear on the diameter of the rollers of the track, and the undercarriage shall have 60% of new remaining thickness of all components on tracked equipment;

    4.     Have digging teeth, blades, saws, wear plates and ground contact components with 60% of new remaining over all dimensions;

    5.     Have hydraulic system which constantly develop 98% of designed operating pressure, and hydraulic fluid;

    6.     Have counter weights that have not been altered or modified and lifting mass profile shall not have been changed;

    7.     Have cables which perform at 98% of new of their design strength and which shall not bear any cracks, corrosion, abrasions or frayed strands;

    8.     Show no signs of abuse, unreasonable wear and tear, rust, corrosions, accumulation of lubricants or other materials or have any leaks;

    9.     Not have been operated beyond lifting capacity in pounds, nor over its height or over a 3% grade;

    10.    Not have been used in steel mill service, automotive assembly, foundry or landfill;

    11.    Lift its designated capacity as specified by the manufacturer;

    12.    Travel at designed speeds as specified by the manufacturer; and

    13.    Have been used the lesser of a single shift or no more than 2,000 hours per annum.

I.    **FORKLIFT.**  If a Unit is of a type generally considered as a forklift, in addition to the requirements in A. above, at the time of return, each Unit shall:

    1.     Have engines with no less than 60% of the remaining time until the next scheduled major overhaul;

    2.     Have a hydraulic system capable of constantly developing 98% of designed operating pressure and hydraulic fluid free of contaminants and which matches or exceeds original specifications;

    3.     Have counter weights that have not been altered or modified and lifting mass profile shall not have been changed;

    4.     Have a battery and charger of the correct size and capacity for the Unit and a spare battery if such was delivered with the Unit.  All batteries must be free from leaks of any kind and produce 95% of their original specification voltage and amperage.  All chargers must be in good operating condition;

1365 material pacific endorse B ret conds     Page 9     Copyright © 2015 by R.V.I. America Insurance Co.



# R V I
## AMERICA

**Return Conditions Endorsement**                                                    **Policy Number:** 01-01-30-1365

5.   Not have been operated beyond lifting capacity in pounds, nor over its height or over a 3% grade;

6.   Not have been used in steel mill service, automotive assembly, foundry or landfill;

7.   Consistently lift its designated capacity as specified by the manufacturer;

8.   Travel at designed speeds as specified by the manufacturer; and

9.   Have been used the lesser of no more than single shift usage or 2,000 hours per annum and must be free of contaminants and match original specifications.

J.   **GENERAL AVIATION.**   If a Unit is of a type generally considered as a corporate/business aircraft including helicopters, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.   Comply with the rules and regulations required for airworthiness by the FAA as well as any other applicable regulatory agency in effect or scheduled to be effective for the subject type of aircraft in service within two years, and shall possess Reduced Vertical Separation Minimum (RVSM) certification for the North Atlantic Track. Each Unit shall also be acceptable for import to United States. Such Unit shall also comply with all mandatory airworthiness directives, which allow temporary compliance by inspection but require final compliance within two years or the equivalent number of cycles;

2.   Have current and complete maintenance records with respect to the Unit, including back-to-birth traceability maintained in the English language and delivered upon return with the Unit. Such complement of records shall include, but shall not be limited to, full detailed history for all components installed on the engines;

3.   Have had a full cold and hot section borescope inspection of the Engines and APU performed in accordance with the manufacturer's recommended maintenance procedures and any discrepancies shall have been corrected. Any discrepancies noted during the last borescope inspection of the engines and APU, which were outside of the manufacturer's limits shall have been rectified, and the engines shall have not demonstrated a deterioration in condition which would normally result in a designation as an "on watch" item;

4.   Have, on each installed engine, at least 50% of the calendar time, hours or cycles, whichever may be applicable and is most restrictive, between scheduled hot section inspections, heavy shop visits and/or engine overhauls (as applicable) available before the next such inspection, visit and/or overhaul. In the event that the engines are maintained in accordance with a condition monitoring program wherein there are not scheduled hot section inspections, heavy shop visits or overhauls, each life limited engine component shall have at least 2,500 hours, or the equivalent number of cycles determined in accordance with the number of hours per cycle typically experienced by the subject aircraft type in corporate use, remaining before life expiration;

5.   Have landing gear with no less than 50% life remaining to the next scheduled overhaul or expected removal under the manufacturer's recommended procedures. In addition, each landing gear's life-limited parts shall have in aggregate not less than 50% life remaining to the next scheduled overhaul or expected removal under the manufacturer's recommended maintenance procedures, and no landing gear component shall have less than 50% life remaining to such scheduled overhaul or expected removal;

6.   With respect to the airframe, have at least 50% of the interval between any required major services remaining before the next such required service. Such available interval shall be measured by the most restrictive of any measurement whether it by calendar time, flight hours or flight cycles;

1365 makeia pacific endorse B ret conds                    Page 10              Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

**Return Conditions Endorsement**                    **Policy Number:** 01-01-30-1365

7.  Including but not limited to the engines, APU, landing gear, flight surfaces and controls, and cabin interior, be in an airworthy and serviceable condition without need for repair, fit for immediate operation in corporate use;

8.  Have at least 75% of life remaining on each component part of assembly including; rotors, hinges, blades, propellers and all hard time limited components with a defined life limit before the next required overhaul or replacement, determined in accordance with the most restrictive of any alternate life;

9.  Except as otherwise provided herein, be in the same cabin configuration as it was in at the inception date hereof;

10. Be returned with all equipment and fittings, including without limitation, all loose equipment and buyer-furnished equipment necessary for the Unit's executive and cargo operation in the configuration it was in at inception hereof;

11. Not have been damaged in a crash, hard landing, electrical fire or damage or other accident or incident causing material structural damage whether or not repaired or repairable;

12. Be clean and in good condition, reasonable wear and tear incurred in the operation of the Unit in the manner existing as of the application for coverage hereunder excepted, and shall be free from any substantial or material corrosion, followed by a fresh coat of paint of a type approved by the manufacturer. If the Unit was used over salt water, it shall have undergone corrosion preventative maintenance during the lease term;

13. Have no exterior skin or paint damage in excess of $500 total appraised repair cost per Unit;

14. Be currently and has been in service without interruption except for purposes of maintenance; which shall not have exceeded one week; and

15. Shall not be operated more than 1,200 hours per annum for aircraft in offshore configuration and 600 hours per annum for aircraft in corporate and EMS configuration.

K.  **GENERATORS AND UTILITIES/COMPRESSORS.** If a Unit is of a type generally considered as power generation equipment or compressor equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.  Have undergone a Preventative Maintenance [PM] and Operating and Maintenance [O&M] procedure regimen for the entire Unit per the manufacturer(s) specifications due within twelve months of the Lease Termination Date and must provide supportive detailed documentation to that effect that all required preventative maintenance, operating and maintenance procedures, and overhaul procedures for the entire Unit in accordance with the manufacturer's interval maintenance and overhaul schedules and specifications to be performed based upon the actual operating hours of the Unit have been performed;

2.  For Combustion Turbine Generators/Compressors:

    (a)  Have completed within sixty days, if the Unit has 50,000 fired hours, a major overhaul by the manufacturer at its depot, performing a complete inspection of the turbine hot section and combustor, nozzles, blades and rotating parts, performing bore-scope inspections, replacing all major components and bringing unit to zero-hour condition; and

    (b)  Have completed within sixty days, if the Unit has 25,000 fired hours of operation, a level of overhaul that shall focus on the turbine hot section and combustor where components such as the blades and rotating parts are thoroughly inspected, including bore-scopes, maintained and replaced as required;

3.  For Diesel or Natural Gas Engine Generator Sets or Compressor Sets:

# R V I
## AMERICA

**Return Conditions Endorsement**                                    **Policy Number:** 01-01-30-1365

    (a)    Have completed within sixty days, if the Unit has 25,000 operating hours, a major overhaul by the manufacturer at its depot, performing a complete inspection of the engine and generator or compressor (as applicable) including cylinder heads, fuel injectors, coolant pump, lubricating oil cooler, cylinder liners, pistons and piston rings, crankshaft, camshaft, lubricating oil pump(s) fuel pump(s), connecting rods, bottom end  and main bearings, rocker and camshaft bearings and all bearing surfaces, bottom end bolts, and governor, and turbochargers, replacing all major components of the engine and generator or compressor and bringing the unit to zero-hour condition;

4.    Have all control and monitoring equipment incorporated within the Unit to provide measurement and alarm functions;

5.    Have, if applicable, allowed for dual or multiple alternative fuel capability per manufacturer's specifications; and

6.    Have used top grade fuel as specified for the Unit and designed by the manufacturer.

L.    **GOLF CARS.** If a Unit is a golf car, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Have been operated and maintained in accordance with the manufacturer's standard operating and maintenance procedures, including but not limited to:

    (a)    Maintenance of proper pressure in tires;

    (b)    Bringing all batteries to a full charge daily, adding battery water when needed (distilled only);

    (c)    Setting and operating charger in accordance with charger instructions; and

    (d)    Have all original gauges and other mileage, time, GPS, movement or rotation monitoring devices, none of which have been reset, disconnected, damaged or otherwise interfered with except by the manufacturer or its designated service representative;

2.    Have no:

    (a)    Engines that burn an abnormal amount of oil for a vehicle of comparable age or mileage, or that have uneven compression ratios across cylinders;

    (b)    Fluid leaks in the engine, transmission(s), differential(s), steering mechanism, brake system, or cooling system;

    (c)    Stripped or cross-threaded nuts, bolts or spark plugs;

    (d)    Faulty hoses, or faulty exhaust systems;

    (e)    Faulty electrical systems, motors or wiring;

    (f)    Missing tire(s) or wheel(s) including spare if originally included;

    (g)    Worn or faulty shock absorbers or other suspension or steering parts, systems or mechanisms;

    (h)    Bent, twisted, dented, dinged or gouged bumper(s);

    (i)    Dented, scratched, rusted, broken or missing chrome or trim;

    (j)    Paint scratches, chips, mismatches or special colors, or paint which is less than factory grade;

    (k)    Accessories, insignia, decals, lettering, or special identification, or other auxiliary equipment or markings on the body, fenders, bumpers, dash or elsewhere, including holes left by the removal thereof; and

ORIGINAL

# RVI
## AMERICA

**Return Conditions Endorsement**

Policy Number: 01-01-30-1365

    (1)    Mechanical or other physical alterations to the Unit after delivery to the Lessee or acceptance by the Company in the Declarations;

3.    Not have been used for facility or course maintenance purposes (or other utility use) unless identified as such in the Declarations (or schedule, as applicable); and

4.    If powered by batteries, have its batteries in good condition, able to hold full charge and must enable Unit to be operated as intended by original equipment manufacturer specifications.

M.    **HIGH TECHNOLOGY AND OFFICE EQUIPMENT.** If a Unit is of a type generally considered as high technology or office equipment, including copiers, telephone, computers and furniture and fixtures, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Have been kept in excellent condition, both in operating condition and in appearance, and the condition of each Unit on return shall be such that (i) such Unit, including all electronic, electrical, hydraulic, mechanical and pneumatic systems, shall be operational and in the same condition as when new, normal wear and tear excepted; (ii) such Unit shall be capable of passing performance tests according to the supplier's specifications; and (iii) all peripherals and additional systems on or attached to such Unit shall be intact, operational, and in condition similar to that required to such Unit;

2.    Be accompanied by a certification of the manufacturer or maintenance provider acceptable to the Company that such Unit has been tested and is operational in accordance with the supplier's specifications. Each Unit shall have been modified, repaired or replaced (with an item of equal or greater value) as specified by the manufacturer's inspection and testing report supplied to the Company and the supplier shall have issued its certificate of the work completed and the working status of each Unit;

3.    Have all accessories including but not limited to plugs, keys, trays, dividers, file hangers, wires, cables, cabinets, stackers, sorters and stands returned. Toner cartridges and document sorters shall be removed and packed separately and safely prior to shipment;

4.    Be entirely clean, without scratches, cracks, dirt or in need of refinishing;

5.    Not exhibit "burn-in" on any monitors and video screens;

6.    Have no more than $250 of damage, repairable or not, on any system or $5 on any telephone; and

7.    Not have been used excessively as appropriate to the use of the Unit.

N.    **LOCOMOTIVES.** If a Unit is of a type generally considered as a locomotive, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Have had periodic inspection and maintenance performed, with supporting documentation, in accordance with:

    (a)    DOT;

    (b)    American Association of Railroads (AAR);

    (c)    Federal Railroad Administration (FRA);

    (d)    EPA;

    (e)    Any other regulatory agencies directly concerned with the regulation of rolling stock; and

    (f)    Original equipment manufacturer.

2.    Be in compliance with all the applicable Federal, State and Local laws and regulations and in compliance with the regulations/specifications, including annual changes current to and including year of delivery of the

ORIGINAL

# R V I
## AMERICA

Return Conditions Endorsement                                      Policy Number: 01-01-30-1365

DOT, the AAR, any other Federal agencies with relevant authority, including the EPA and Atomic Energy Commission (AEC) and with all published changes scheduled to become effective within twenty-four months following the Lease Termination Date;

3.    Be in compliance with all EPA and United States pollutant emissions laws applicable to units of the same or similar make, model, specification and age in effect on the Lease Termination Date or scheduled to become effective within 24 months following the Lease Termination Date;

4.    Have been operated and maintained in accordance with original load capacity as specified by the manufacturer's published standard operating and maintenance procedures, and

    (a)    Have passed a periodic brake safety test; and

    (b)    Have passed a dead brake load test as prescribed by the original manufacturer and must have a spectrographic test performed. Horsepower rating must be within .5% of original manufacturer specifications.

5.    Not be subjected to or undergone any fuel substitution except and unless approved by the original manufacturer/rebuilder;

6.    Have wheels of identical model, type and size, and no less grade or quality than that which was originally upon such Unit. Wheels shall retain a thickness equal to 60% of new. Brake shoes shall have 60% remaining thickness and insured must perform a Clean Oil Test and Stencil (C.O.T.S.) within six months prior to delivery; and

7.    Have no structural or mechanical damage or any other type of damage on any exterior surfaces, inside linings, seals, doors, hinges, latches, outlet gates, circular hatch covers, couplings and floors; and all other parts and components shall be in excellent and serviceable condition and operating order.

O.    **MACHINE TOOLS.** If a Unit is of a type generally considered as a machine tool, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Be cleaned of all chips and scrap. Coolant will be removed and disposed of in accordance of local EPA guidelines;

2.    Be disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, with any transportation devices, such as metal skids, lifting slings and brackets which were with the machine when it originally arrived, included. All proper blue printing, mapping, tagging and labeling for each individual part including cables, electrical apparatus and wires shall be included. All process fluids and/or any hazardous materials shall have been removed from the equipment;

3.    Be mechanically and structurally sound and must operate at design speeds and load without modification or alteration to any control or any applicable software;

4.    Have all gears and bearing assemblies, electronic, electrical and mechanical controls, pumps, motors, belts, hoses, pins, bushings, measuring devices, screws, barrels, ways, rams, clamps, hydraulic systems, saws, cutting, drilling, and all major components and accessories and all instrumentation capable of satisfactorily performing the function for which they were designed within manufacturer's published performance specifications and pass all diagnostic tests necessary to demonstrate such requirements;

5.    Have had all predictable or scheduled replacements or overhauls lives with not less than 50% useful life remaining before the next such replacement, overhaul, recalibration or rebuild;

6.    Have no broken, cracked or altered or modified safety or electrical devices;

7.    Have all locking keys together and secured to a major external component of the machine;

ORIGINAL

# R V I
## AMERICA

**Return Conditions Endorsement**

**Policy Number**: 01-01-30-1365

8. Be capable of being immediately assembled and operated by a third party purchaser without further inspection, repair, replacement, alteration or improvement; and

9. Not have exceeded an average of 1,200 hours per annum on cutting or spindle utilization.

P. **MANUFACTURING EQUIPMENT.** If a Unit is of a type generally considered as manufacturing equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1. Have been kept in excellent condition both operating and in appearance, and the condition of each Unit on return shall be such that (i) such Unit, including all electronic, electrical, hydraulic, mechanical and pneumatic systems, shall be operational and in the same condition as when new, normal wear and tear excepted; (ii) such Unit shall be capable of passing performance tests according to the manufacturer's specifications; and (iii) all peripherals and additional systems on or attached to such Unit shall be intact, operational, and in condition similar to that required with respect to such Unit;

2. Be accompanied by a certification of the manufacturer or maintenance provider acceptable to the Lessor that such Unit has been tested and is operational in accordance with the manufacturer's specifications. Each Unit shall have been modified, repaired or replaced as specified by the manufacturer's inspection and testing report supplied to the Company and the manufacturer shall have issued its certificate of the work completed and the working status of each Unit;

3. Have all accessories and spare parts including but not limited to plugs, keys, belts, cables, and wires returned. Each Unit shall be shrink-wrapped and secure as applicable;

4. Not exhibit "burn-in" on any monitors and video screens;

5. Have recently been serviced and not require any major service or overhaul within twenty-four months of the date returned; and

6. Not have been used more than a double shift as appropriate to the use of the Unit.

Q. **MEDICAL EQUIPMENT.** If a Unit is of a type generally considered as medical equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1. Have been kept in excellent condition both operating and in appearance, and the condition of each Unit on return shall be such that (i) such Unit, including all electronic, electrical, hydraulic, mechanical and pneumatic systems, shall be operational and in the same condition as when new, normal wear and tear excepted; (ii) such Unit shall be capable of passing performance tests according to the manufacturer's specifications; and (iii) all peripherals and additional systems on or attached to such Unit shall be intact, operational, and in condition similar to that required with respect to such Unit;

2. Be accompanied by a certification of the manufacturer or maintenance provider acceptable to the Lessor that such Unit has been tested and is operational in accordance with the manufacturer's specifications. Each Unit shall have been modified, repaired or replaced as specified by the manufacturer's inspection and testing report supplied to the Company and the manufacturer shall have issued its certificate of the work completed and the working status of each Unit have had de-installation, dismantling and packing performed or supervised by the manufacturer's representative and in compliance with the manufacturer's recommendations, and has been re-certified for continued maintenance;

3. Have all accessories including but not limited to plugs, keys, trays, dividers, file hangers, wires, cables, stackers, and stands returned. Where applicable, the Unit shall be shrink-wrapped and secure. All software and licenses affecting the value of the Unit shall be transferred to the Company;

4. Not exhibit "burn-in" on any monitors and video screens;



Page 15        Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

Return Conditions Endorsement                                   Policy Number: 01-01-30-1365

5.    If Unit is computed tomography (CT), have at least 60% of remaining time until the next necessary replacement on all x-ray tubes with documented date of last replacement; and

6.    Not have been used excessively or beyond single shift terms, as appropriate to the use of the equipment.

R.    **MINING EQUIPMENT.** If a Unit is of a type generally considered as mining equipment, including shovels, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Have brake linings that meet STB DOT safety standards, if applicable;

2.    Be mechanically and structurally sound in all gears under full payload. As applicable, tracked or wheeled Units shall be tested on a dynamometer and the engines shall perform within the manufacturer's published tolerances for manifold and crankcase pressures. The clutches, transmissions, drive shafts, differentials and axles shall have no unusual sounds or lubricant leaks, which would indicate an unsound mechanical condition;

3.    Have engines with no less than 60% of the remaining time until the next scheduled major overhaul;

4.    Have electro-torque control system which must pass programmable logic sequential functions test and exhibit fault determination for the control system and the related drive motors and drive train;

5.    Have transformer capacity, which shall be demonstrated by the advanced diagnostic system included with programmable logic controllers;

6.    Have 60% remaining wear on the diameter of the rollers of the track, and the undercarriage shall have 60% remaining thickness of all components on tracked equipment;

7.    Have hydraulic system which should constantly develop 98% of designed operating pressure, and hydraulic fluid must be free of contaminants and match original specifications;

8.    Have no cracked or bent frames, brake drums or any undercarriage damage;

9.    Have digging teeth, wear plates truck bed surface and ground contact components with 60% remaining over all dimensions;

10.    Have cables which perform at 98% of their design strength and which shall not bear any cracks, corrosion, abrasions or frayed strands;

11.    Have an average operating availability in the case of a shovel, which shall be measured by a time frame of one year before appraisal inspection. This availability shall be based on a maximum of 75% and a minimum of 73% calculated by reducing the maximum availability (75%) by one half percent for each 5,000 hours of incremental operation;

12.    For all aggregate processing equipment, have been used the lesser of no more than single shift usage or 2,000 hours per annum; and

13.    For all major commodity mining equipment, have been used the lesser of no more than double shift usage or 4,000 hours per annum.

S.    **OVERHEAD, TOWER AND GANTRY CRANE EQUIPMENT.** If a Unit is of a type generally considered as crane equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.    Meet all OSHA regulations, such as, but not limited to, Standards 29 CFR Overhead and Gantry Cranes – 1920.179;

2.    Be disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, with any transportation devices, such as metal skids, lifting slings and brackets which were with the Unit when it originally arrived, included. All proper blue printing, mapping,

# R V I
## AMERICA

Return Conditions Endorsement                                        Policy Number: 01-01-30-1365

tagging and labeling of each individual part including cables, electrical apparatus and wires shall be included.  All process fluids, all internal fluids and/or any hazardous materials shall have been drained and removed from the equipment;

3.  Have been recently rerated, realigned, recambered and recalibrated to conform with the original manufacturer's specifications; such rated load tests shall not be more than 125 percent of the rated load unless otherwise recommended by the manufacturer; all rated load markings shall be plainly marked on each side of the crane;

4.  Have passed all load testing of overhead traveling cranes, hoists and monorails and all other applicable parts of such Unit;

5.  Have passed all magnetic particle testing;

6.  Have had all predictable or scheduled replacements or overhauls with not less than 50% useful life remaining before the next such replacement, overhaul, recalibration or rebuild;

7.  Have undergone and applied reinforcements and re-evaluation of runway girders, masts and their supporting structures;

8.  Be mechanically and structurally sound and must operate at design speeds and load without modification or alteration to any control or any applicable software;

9.  Have engines with no less than 60% of the remaining time until the next scheduled major overhaul;

10.  Have 60% remaining wear on the diameter of the rollers of the track, and the undercarriage shall have 60% remaining thickness of all components on tracked equipment;

11.  Have hydraulic system which constantly develops 98% of designed operating pressure, and hydraulic fluid must be free of contaminants and match original specifications;

12.  Have all gears and bearing assemblies, electronic, electrical and mechanical controls, pumps, motors, belts, hoses, pins, bushings, measuring devices, screws, barrels, ways, rams, clamps, hydraulic systems, saws, cutting, drilling, and all major components and accessories and all instrumentation capable of satisfactorily performing the function for which they were designed within manufacturer's published performance specifications and passed all diagnostic tests necessary to demonstrate such requirements;

13.  Have no broken, cracked or altered or modified safety or electrical devices;

14.  Have cables which perform at 98% of their design strength and which shall not bear any cracks, corrosion, abrasions or frayed strands;

15.  Have wind indicators and automatic rail clamps in good working order, audible, and perform as specified by the manufacturer;

16.  Have all drop tables, turntables, transfer tables, hoists and jacks fully operational and in excellent condition;

17.  Have any beads or weld flash on the rail heads be ground off;

18.  Have no markings or labels which are not necessary for the operation, maintenance or repair of the Unit; and

19.  Be capable of being immediately assembled and operated by a third party purchaser without further inspection, repair, replacement, alteration or improvement.

T.  **PRINTING.**  If a Unit is of a type generally considered as printing equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

# R V I
## AMERICA

**Return Conditions Endorsement**                                   **Policy Number**: 01-01-30-1365

1.  Be disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the Unit, and include certification, proper crating, proper blueprinting, mapping, tagging and labeling for each part including cables, electrical apparatus and wires. All process fluids and/or any hazardous materials shall have been removed from the Unit;

2.  Be complete with all major components and all wear points, including but not limited to electronic, electrical and mechanical controls, pumps, motors, belts, hoses, pins, bushings, measuring devices, rollers and blankets, clamps and supports within the manufacturer's design performance specifications and tolerances;

3.  Have all maintenance records, including dates and times of service for lubrication and parts removal and replacement. All rollers shall have been taken out and resurfaced annually, blankets changed monthly, each printing Unit should be broken down and the oil changed annually;

4.  Have removed all ink spillage and Lessee installed markings which are not necessary for the operation, maintenance or repair of the Unit; and

5.  Be capable of performing as originally intended by the manufacturer in a safe manner with same quality of print runs as designed by manufacturer; and

6.  Have all parts and components with no less than 75% of the remaining time until the next scheduled major overhaul.

U.  **RAILCARS.** If a Unit is of a type generally considered as a railcar, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.  Have had periodic maintenance and inspections performed, with supporting documentation, in accordance with the requirements of the:

    (a)     DOT and FRA;

    (b)     AAR;

    (c)     Any other regulatory agencies directly concerned with the regulation of rolling stock; and

    (d)     Original equipment manufacturer.

2.  Be in compliance with all the applicable Federal, State and Local laws and regulations and in compliance with all the requirements and specifications of the DOT, the AAR, and any other government agencies with relevant authority, including the Environmental Protection Administration and the Atomic Energy Commission including annual changes effective on the Lease Termination Date, and published changes scheduled to become effective within 24 months following the Lease Termination Date;

3.  If railcar is an autorack, be re-certified in compliance with mechanical standards set forth by the AAR, within 90 days of return and if the railcar is a tank car, any mandated testing must be completed within 90 days of return;

4.  Have no erosion of load bearing members and must be plated and repaired to AAR standards;

5.  Have all mandated tank, valve and HM201 tests brought up to date;

6.  Meet all mechanical and operational standards, including hydraulics and vacuums;

7.  Have brake shoes with 60% remaining thickness and any mandated and standard brake test must have been performed within one month prior to the Lease Termination Date. All braking components must be of the latest braking configuration;

# R V I
## AMERICA

Return Conditions Endorsement                                    Policy Number: 01-01-30-1365

8.   Not have exceeded manufacturer's requirements and gross weight limit and be structurally sound, all load-bearing members must be free of cracks, welded connections, must be sound and free of separations, all grab irons, rails and safety items must be in excellent condition;

9.   Have better than half-life remaining on couplers, coupler pocket, draft sills and draft gears;

10.  Have half-life remaining for hopper frame, doors, discharge gate, hinges, hydraulics, suspension, truck springs, pocket hardware and all movable parts;

11.  Have wheels of identical model, type and size, and no less grade or quality than that which was originally upon the Unit. All wheels must retain a thickness equal to 60% of new;

12.  Have half-life remaining for truck sets, side frames and bolsters;

13.  Have at least 80% of original thickness remaining on all plate side sheets, plate end sheets, plate slope sheets and hopper chutes;

14.  Have a state-of-the-art interior lining that meets a "zero-defects" standard for transport requiring no repairs, replacement or changes;

15.  Be free and clean of all, special paint markings and, have a protective paint coating of the original manufacturer's specification and be certified to have not carried any toxic and/or corrosive materials during its life and have undergone professional steam cleaning prior to return; and

16.  Have no structural, mechanical or any other noted damage on any exterior surfaces, inside linings, seals, doors, hinges, latches, outlet gates and circular hatch covers, couplings and floors; and all other parts and components shall be in excellent and serviceable condition and operating order for a like product; no significant signs of wear shall be apparent upon inspection on the lining, paint or any other part.

V.   **SEMICONDUCTOR EQUIPMENT.** If a Unit is of a type generally considered as semiconductor equipment, in addition to the requirements in A. above, at the time of return, each Unit shall:

1.   Be disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, with any transportation devices, such as metal skids, lifting slings and brackets which were with the Unit when it originally arrived, included. All proper blue printing, mapping, tagging and labeling for each individual part including cables, electrical apparatus and wires shall be included. All process fluids, all internal fluids and/or any hazardous materials shall have been drained and removed from the equipment;

2.   Have all predictable or scheduled replacements or overhauls lives with not less than 50% useful life remaining before the next such replacement, overhaul, recalibration or rebuild;

3.   Be capable of being immediately assembled and operated by a third party purchaser without further inspection, repair, replacement, alteration or improvement;

4.   Be mechanically and structurally sound and must operate at design speeds and load without modification or alteration to any control or any applicable software;

5.   Have all gears and bearing assemblies, electronic, electrical and mechanical controls, pumps, motors, belts, hoses, pins, bushings, measuring devices, screws, barrels, ways, rams, clamps, hydraulic systems, saws, cutting, drilling, and all major components and accessories and all instrumentation capable of satisfactorily performing the function for which they were designed within manufacturer's published performance specifications and pass all diagnostic tests necessary to demonstrate such requirements;

6.   Have all locking keys together and secured to a major external component of the machine;

7.   Have no broken, cracked or altered or modified safety or electrical devices;

# R V I
## AMERICA

**Return Conditions Endorsement**                              **Policy Number**: 01-01-30-1365

8.  Have no markings or labels which are not necessary for the operation, maintenance or repair of the Unit; and

9.  Not have been used in excess of 2,000 hours per annum or single shift usage.

W.  **TRAILERS.**  If a Unit is of a type generally considered as trailers, in addition to the requirements in A. and D., above, at the time of return, each Unit shall:

1.  Carry no toxic, poisonous, waste or corrosive materials nor any other material not accepted for transport by the FDA and DOT;

2.  Have upper coupler and king pin which meet DOT approval;

3.  Have suspension sliders in serviceable condition and operable as designed by manufacturer and springs or air ride suspension must pass DOT inspection;

4.  Have brakes and drums which are complete and working with ¼" lining (no cracks), no scouring, and pass DOT inspection;

5.  Not have been loaded in excess of its designed capacity;

6.  Have engines which have not been modified to burn substitute fuels unless approved by all parties concerned;

7.  Have climate control system and atmospheric control system certified by a factory technician to perform at 98% of their designed specification;

8.  Have landing gear which is complete and operational in two speeds;

9.  Have rims or disk wheels with no split base rims;

10. Have tires and wheels of identical model, type and size, and no less grade or quality than that which was originally upon the Unit (recap tires shall be permitted on rear wheels only and shall not be considered in computing average tread depth), and all tires and recap tires shall have an average of no less than 60% of original tread depth remaining, and shall have no cuts, flat spots, ply separations or sidewall damage;

11. Have no broken/ missing cross-members and good structural attachment to bottom rail;

12. Have flat floors which have no holes or any floor patches;

13. Have no unrepaired holes in sides, roof and all roof bows, which shall be in place and structurally sound. Patches shall be of a permanent-type and sealed properly (no tape, tar or drive rivet patches acceptable);

14. Have nose rail wells intact (no caulk, proper aluminum welds shall be accepted at radius corner) and nose rail reasonably straight;

15. Have no unrepaired damage to nose (front) with any damaged corner caps repaired;

16. Have lights and accessories in working order; and

17. With respect to any refrigeration power units, be mechanically sound and in good operating order and capable of satisfactorily passing any test for refrigeration, temperature recovery or cooling loss as recommended by the manufacturer and performed by an authorized factory representative. Each refrigeration unit shall have accumulated no more than 8,750 operating hours since the last overhaul or replacement. Diesel and electric refrigeration compressor drive systems shall be lubricated and refrigeration gas tight, quiet running with all pressures and tolerances 98% of the original factory standards.



1365 Mitsui Rail Pacific endorse B ret conds                Page 20        Copyright © 2015 by R.V.I. America Insurance Co.

PAGE 38

# R V I
## AMERICA

**Return Conditions Endorsement**                    **Policy Number:** 01-01-30-1365

X.      **VENDING MACHINES.**   If a Unit is of a type generally considered as vending machines, in addition to the requirements in A. above, at the time of return, each Unit shall:

  1.      Have a certificate from the manufacturer or a qualified maintenance organization acceptable to the manufacturer stating that the Unit(s) have been inspected, de-installed properly, tested and are in the condition as required hereby, which shall be provided to the Lessor;

  2.      Be at or above the configuration originally leased, and shall include the most current microcode, software releases and engineering changes, and all changes that are available from the manufacturer at the time of the return;

  3.      Have replaced any unit panel bearing Lessee advertising materials with a new panel recommended by manufacturer; and

  4.      Not have more than $100 of repair or cleaning costs, with no dents, scratches, pitted or broken materials, missing parts, or dirt.

Y.      **VESSELS.** If a Unit is of a type generally considered as a vessel, in addition to the requirements in A. above, at the time of return, each Unit and all of her equipment shall:

  1.      Be in compliance with all the applicable laws, regulations and other legal requirements including, but not limited to those of the U.S. Coast Guard and the American Bureau of Shipping (ABS) and/or other approved classification societies of such Unit's flag and the flag designated by the Company, the United States and have proper documentation to this effect;

  2.      Have been operated and maintained in class and/or in accordance with standard operating and maintenance procedures;

  3.      Have been operated, maintained, and returned in strict compliance with the terms of the charter;

  4.      Have all components, including but not limited to, all engines, anchors, propellers, shafts, cranes, booms, winches, hoists, boilers, machinery, appurtenances, any and all spare parts originally delivered with vessel, hatches, any and all required spare parts, hydraulic systems, generators, desalinators, radars, navigation systems, communication systems and accessories, capable of satisfactorily performing the function for which they were designed within their respective manufacturer's published performance specifications;

  5.      Have a hydraulic system which constantly develops 98% of designed operating pressure, and hydraulic fluid must be free of contaminants and match or exceed original specifications;

  6.      Be in good repair and operating condition, safely afloat, securely moored, free of cargo, tight, staunch, seaworthy, fully outfitted as when received, and have no missing or damaged parts, and have no structural or mechanical damage on any exterior surfaces, inside linings, seals, hatches, doors, hinges, anchors, latches and decks; and all other parts and components shall be in good condition and operating order;

  7.      Not have cracked, damaged, corroded or bent frames, ribs, manhole covers, fuel lines, deck fittings, or keel;

  8.      Not have any paint, hull or superstructure damage;

  9.      Be in good appearance, in a clean condition, free of rust and corrosion, and free of all advertising or insignia placed thereon by the charter party; and

  10.     Have passed a special survey by the applicable classification society selected by the company within twelve (12) months prior to the Lease Termination Date, and not have experienced any material change in condition since the date of such special survey.



# R V I
## AMERICA

**Return Conditions Endorsement**                                           **Policy Number**: 01-01-30-1365

Z.      **WINE BARRELS**.  If a Unit is of a type generally considered as a wine barrel, in addition to the requirements in Section A. above, at the time of return, each Unit shall:

    1.     Have all repairs done to the barrels in a professional manner;

    2.     Have undergone a comprehensive inspection 90 days prior to end of lease with any noted defects repaired or the barrels replaced.  The barrels per this inspection shall be available for immediate use in a winery for at least three years beyond the lease expiration without further repair, refurbishment or other maintenance prior to being put into service;

    3.     Have all barrels in good appearance with adequate protective coatings, free of bacteria, in good working order, cleaned, sterilized and rinsed with ozone.  The Units must have contained wine at least 90 days prior to lease end and all markings must be removed from the Units; and

    4.     Have been properly stored indoors in the appropriate humidity controlled environment, in accordance with standard industry practice and/or manufacturer recommendation.

Nothing contained herein shall vary, alter, waive or extend any of the terms, provisions, representations, covenants, conditions, or agreements of the Policy other than as stated above.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By: _____
Daniel P. Egan

Title: _____ Executive Vice President _____



# R V I
## AMERICA

**R.V.I. AMERICA INSURANCE COMPANY**
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365
Insured: Financial Pacific Leasing, Inc.

# ENDORSEMENT C

## APPROVED GUIDES

THIS APPROVED GUIDES ENDORSEMENT (this "Endorsement") forms a part of the residual value insurance policy referred to above, issued by R.V.I. America Insurance Company (the "Policy"). Capitalized terms used in this Endorsement and not otherwise defined in this Endorsement shall have the meanings assigned thereto in the Policy.

In consideration for the Premium charged, it is understood and agreed that, with respect to the coverage afforded by the Policy, the following amendment shall apply:

Pursuant to the Policy, Article II. Section 2.01(e), the following Approved Guides shall apply to the Unit(s):

|  | Unit Type | Publication and Publisher | Specified Value Level |
|---|---|---|---|
| 1. | Construction Equipment | *Green Guide for Construction Equipment*, EquipmentWatch, a PRIMEDIA Business Directories & Book Group, San Jose, CA, © PRIMEDIA Business Magazines and Media Inc. | Average Resale Price |
| 2. | High Technology and Office Equipment | *Orion Blue Book*, Orion Research Corporation, Scottsdale, AZ, © Orion Research Corporation | Retail Price |
| 3. | General Aviation (Standard Condition) | *Aircraft Bluebook—PRICE DIGEST*®, PRIMEDIA Business Directories & Books, Overland Park, KS, © PRIMEDIA Business Magazines & Media Inc. | Retail Used Aircraft Value (currently set forth in the column labeled "AVG. $ RETAIL") adjusted in accordance with such publication by adding (i) applicable features for the "Add for" row beneath the Unit description, (ii) any other applicable addition from the Supplemental Pricing |

Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

Policy Number: 01-01-30-1365

| Unit Type | Publication and Publisher | Specified Value Level |
|---|---|---|
| | | Information section and (iii) no damage history. |
| 4. General Aviation (Prime Condition) | *Aircraft Bluebook—PRICE DIGEST*®, PRIMEDIA Business Directories & Books, Overland Park, KS, © PRIMEDIA Business Magazines & Media Inc. | Retail Used Aircraft Value (currently set forth in the column labeled "AVG. $ RETAIL") adjusted in accordance with such publication to reflect a Prime Condition Aircraft by adding (i) applicable features for the "Add for" row beneath the Unit description, (ii) a zero-time adjustment, (iii) prime condition aircraft "PCA™ Calculation" with factory refurbishment, (iv) any other applicable addition from the Supplemental Pricing Information section and (v) no damage history. |
| 5. Commercial Aircraft | *AVITAS*® *BlueBook of Jet Aircraft Values,* AVITAS, Inc., Chantilly, VA and London, England | Base Value |
| 6. Automobiles | *Black Book Used Car Market Guide Monthly* | Retail Clean |
| 7. Commercial Vehicles (Trucks) | *ATD / N.A.D.A. Official Commercial Truck Guide,* National Automobiles Dealers Used Car Guide Company, McLean, VA, © N.A.D.A. Official Used Car Guide Company | Retail |
| 8. Commercial Vehicles (Buses) | *The Official Bus Blue Book,* Bus Solutions, McMinnville, OR, © Bus Solutions | High Retail |
| 9. Railcars and Locomotives | *Investor's Guide To Railroad Freight Cars and Locomotives,* Rail Solutions, Inc. | Estimated Replacement Cost |

# R V I
**AMERICA**

Policy Number:  01-01-30-1365

Nothing contained herein shall vary, alter, waive or extend any of the terms, provisions, representations, covenants, conditions, or agreements of the Policy other than as stated above.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By:   _____
Daniel P. Egan

Title:   _____Executive Vice President_____

ORIGINAL



# R V I
## AMERICA

**R.V.I. AMERICA INSURANCE COMPANY**
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365
Financial Pacific Leasing, Inc.

# RESIDUAL VALUE INSURANCE

## MASTER POLICY FOR ELIGIBILITY PROGRAM

**THIS RESIDUAL VALUE INSURANCE POLICY IS NOT A FINANCIAL GUARANTEE OF THE CREDIT OR GUARANTEE OF THE PERFORMANCE OF ANY PERSON, BUT IS AN INDEMNITY AGAINST LOSS INCURRED BY THE INSURED DUE TO A FORTUITOUS DECLINE IN VALUE OF A CLASS OF ASSET TO WHICH THE INSURED EQUIPMENT BELONGS CAUSED BY CHANGES IN MARKET CONDITIONS WHEN SUCH EQUIPMENT IS USED AND MAINTAINED AS INTENDED.**

In consideration of the payment of Premium (see Article II for definition of capitalized terms) and in reliance upon the statements in the Application, R.V.I. America Insurance Company (the "Company") agrees with the Insured as follows:

### ARTICLE I.  INSURING AGREEMENT

Subject to all Declarations, exclusions and other terms and conditions hereof, the Company shall indemnify the Insured as of the Lease Termination Date against Loss, if any, which shall be payable on the Settlement Date, in respect of all Units subject to a Lease.  Under no circumstances shall the sum of the Company's liabilities in connection with the Policy that are attributable to a Lease (as to which a Notice of Claim has been submitted) exceed the Maximum Liability of Company.

### ARTICLE II.  DEFINITIONS

2.01    **Definitions**.  For the purposes of the Policy, the following terms shall have the meanings assigned to them:

(a)     Additional Named Insured:  with respect to a Unit, the Person identified in Item 2 of the Declarations.

(b)     Adjusted Insured Value:  with respect to a Unit, the amount calculated in accordance with, and as defined in, Article VI.

(c)     Application:  the application for eligibility program executed by the Insured and subsequently attached to the Policy, pursuant to and in reliance upon which the Policy was issued.

(d)     Appraised Value:  with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

     Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

Policy Number: 01-01-30-1365

    (i)   as of the Lease Termination Date;

    (ii)  by a Qualified Inspector/Appraiser in accordance with Section 5.02(a) or Section 6.01(b)(ii), as applicable;

    (iii) with respect to Section 5.02(a), on the basis that such Unit complies with all standards set forth in the Equipment Portfolio Return Conditions Endorsement but with respect to Section 6.01(b)(ii), on the basis of such Unit being in its existing condition;

    (iv) without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

    (v)  highest and best use without regard to quantity, location or country of registration of such Unit.

(e)    Approved Guide: with respect to a Unit: (i) the publication listed in the Approved Guides Endorsement; (ii) if such publication ceased publication prior to the Lease Termination Date for such Unit but a successor publication commenced publication prior to the Lease Termination Date for such Unit, such successor publication; (iii) if no successor publication commenced publication prior to the Lease Termination Date for such Unit, a publication agreed upon by the Insured and the Company; or (iv) if the Insured and the Company are unable to agree upon a publication, there shall be no Approved Guide in respect of the Unit.

(f)    Approved Guide Published Value: with respect to a Unit, the value at the Specified Value Level set forth in the Approved Guide, for an item of equipment by the same manufacturer and of the same model and vintage as such Unit; provided, however, that if the appropriate asset type has no publication listed in the Approved Guides Endorsement, there shall be no Approved Guide (and, accordingly, no Approved Guide Published Value) in respect of the Unit.

(g)    Approved Guides Endorsement: the Endorsement, if any, captioned "Approved Guides Endorsement" identified in Item 12 of the Declarations.

(h)    Business Day: any day except Saturday, Sunday and a day on which banks are required or authorized to close in the state of the Company's domicile.

(i)    Claim: a written demand by the Insured for payment of a Loss made in accordance with the Policy.

(j)    Company: R.V.I. America Insurance Company.

(k)    Declarations: with respect to a Unit, the Master Declarations or the relevant Follow-on Declarations.

(l)    Deductible: with respect to a Unit or a Lease, the amount identified in Item 10 of the Declarations.

(m)    Effective Date: the date identified in Item 13(i) of the Declarations.

(n)    End Of Term Value: with respect to a Unit, as defined and determined in accordance with Section 5.02.

(o)    Endorsements: with respect to a Unit, the endorsements, if any, identified in Item 12 of the Declarations and attached to, and forming a part of, the Policy, and such endorsements as may be added by the Company during the Policy Period.

ORIGINAL

# R V I
## AMERICA

Policy Number: 01-01-30-1365

(p)    Equipment Portfolio Return Conditions Endorsement:  the Endorsement, if any, captioned "Equipment Portfolio Return Conditions Endorsement" identified in Item 12 of the Declarations.

(q)    Equipment Program Eligibility and Premium Endorsement:  the Endorsement, if any, captioned "Equipment Program Eligibility and Premium Endorsement" identified in Item 12 of the Declarations.

(r)    Follow-on Declarations:  declarations constituting an undertaking by the Company to provide coverage of the relevant Units under the Policy.

(s)    Insured:  with respect to a Unit, the Person identified in Item 1 of the Declarations.

(t)    Insured Value:  with respect to all Units, the amount identified for such Units in Item 8 of the Declarations.

(u)    Lease:  with respect to a Unit, the applicable equipment lease or financing agreement identified in Item 5 of the Declarations, which does not materially deviate from the form of lease or agreement used by the Insured and as maintained in the Document Binder, as such form of lease or agreement may be amended or supplemented with the prior written approval of the Company.

(v)    Lease Commencement Date:  with respect to a Unit, the date identified in Item 5a of the Declarations.

(w)    Lease Termination Date:  with respect to a Unit, the date identified in Item 5b of the Declarations, or if such date is not identified therein, the date on which the Lease terminates.

(x)    Lessee:  with respect to a Unit, the applicable Person identified in the Schedule referenced in Item 7 of the Declarations.

(y)    Lessor:  with respect to a Unit, the applicable Person identified in Item 6 of the Declarations.

(z)    Loss:  with respect to a Lease, the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease exceeds the sum of the End Of Term Values thereof on the Lease Termination Date, as determined in accordance with Article V., reduced by the Deductible.

(aa)   Loss Payee:  with respect to a Unit, the Person, if any, identified in Item 3 of the Declarations.

(bb)   Master Declarations:  the declarations constituting an undertaking by the Company to provide, in reliance upon the statements contained in the Application, residual value insurance in the amounts provided in such declarations.

(cc)   Maximum Liability of Company:  in connection with a Lease as to which a Notice of Claim has been submitted, the amount identified in Item 9 of the Declarations.

(dd)   Notice of Claim:  a written final notice of a Claim executed by the Insured and given to the Company which: (i) states the Policy number; (ii) states the amount of the Claim; (iii) identifies the Lease as to which the Claim is made and all the Units subject to the Lease; (iv) states the End Of Term Value of such Units as finally determined in accordance with Article V.; and (v) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 have been satisfied.

(ee)   Other Insurance:  any coverage provided other than by the Policy, or which would be provided but for the existence of the Policy, in respect of the residual value of the Units, including assurances of value by means of "puts," guarantees or other contracts of a similar nature, whether direct or indirect, and whenever and by

# R V I
## AMERICA

Policy Number: 01-01-30-1365

whomsoever effected. "Other Insurance" shall not be deemed to include any insurance, guarantees or other contracts as to the payment and/or performance of the Company's obligations under the Policy.

(ff)   Person:   a natural person or any other entity, including corporations, limited liability companies, partnerships, trusts and other organizations.

(gg)   Policy:   with respect to a Unit, this Policy, the Application, the Declarations and the Schedule thereto and the Endorsements.

(hh)   Policy Period:   the period identified in Item 13 of the Declarations.

(ii)   Policy Termination Date:   the date identified in Item 13(ii) of the Declarations.

(jj)   Preliminary Notice of Claim:   a written preliminary notice of a Claim executed by the Insured and given to the Company which: (i) states the Policy number; (ii) states the estimated amount of the anticipated Claim; (iii) identifies the Lease as to which the Claim may be made and all the Units subject to such Lease; (iv) states the Insured's opinion of the End Of Term Value of each such Unit accompanied by an appraisal of each such Unit performed by a Qualified Inspector/Appraiser; and (iv) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 will be satisfied.

(kk)   Premium:   with respect to a Unit, the amount specified in Item 11 of the Declarations.

(ll)   Qualified Inspector/Appraiser:   a person selected to inspect, appraise and/or value the Units pursuant to Article V who is recognized as an expert in the field *and* has at least ten (10) years of experience in appraising property of a type and nature similar to the Units, *or*, has at least five (5) years of experience in appraising property of a type and nature similar to the Units and is ASA (American Society of Appraisers) certified with a designation in *Machinery and Equipment Valuation*, and has no personal or financial interest which would prevent the making of an impartial judgment.

(mm)   Sale Proceeds:   with respect to a Unit, the sum of:

(i)   the sale price agreed to by the Insured and the purchaser of the Unit in the event the Insured has sold the Unit, (A) without reduction of such sale price by the value of any trade-in, allowances or set-offs and (B) without deduction from such sale price of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to the sale of such Unit (including, without limitation, with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit);

(ii)   any amounts payable by the Lessee pursuant to the Lease with respect to any deficiencies in the condition of the Unit; and

(iii)   the amounts of any commissions separately paid or payable in connection with the sale of the Unit.

(nn)   Schedule:   with respect to a Unit, the schedule submitted to the Company by the Insured (upon which bases the Company issues the Declarations) in accordance with Section 7.07.

(oo)   Settlement Date:   with respect to a Lease as to which a Notice of Claim has been submitted, the date that is twenty (20) Business Days after the last day on which the Insured would have been permitted to submit such Notice of Claim in accordance with Section 7.03, irrespective of whether such Notice of Claim in respect of such Lease was actually submitted earlier.

PAGE 47

# RVI
## AMERICA

Policy Number: 01-01-30-1365

(pp)  Specified Value Level:

   (i)  if the Approved Guide in question is a publication listed in the Approved Guides Endorsement, the "Specified Value Level" with respect to such Approved Guide is the value level set forth opposite the name of such publication in the Approved Guides Endorsement;

   (ii)  if the Approved Guide in question is an alternate publication not listed in the Approved Guides Endorsement but selected pursuant to the definition of "Approved Guide," the "Specified Value Level" with respect to such Approved Guide is the nearest equivalent value level, as set forth in such alternate publication, to the "Specified Value Level" set forth opposite the name of the original publication in the Approved Guides Endorsement.

(qq)  Units: all units of equipment subject to a Lease and identified in the Schedule referenced in Item 4 of the Declarations.

## ARTICLE III.  CONDITIONS PRECEDENT

3.01  The Company's liability under the Policy as to all Units subject to a Lease is subject at all times to the following conditions precedent:

   (a)  the Company must receive the Preliminary Notice of Claim and the Notice of Claim as to all Units subject to a Lease at the times and with the supporting documentation required by Sections 5.01 and 7.03;

   (b)  Premium in respect of such Unit shall have been paid in full;

   (c)  the Insured has made no statement, submission of documents, claim or other communication to the Company in connection with the Policy which was not true and complete when made, nor has the Insured concealed from the Company any material fact or circumstance in connection therewith, or omitted a fact necessary to prevent any of the foregoing from being misleading; and

   (d)  neither the Insured nor any of its affiliates have taken any action that could reasonably be foreseen to have a material adverse impact upon the resale market value of the Unit.

3.02  Satisfaction of the foregoing conditions will be without prejudice to any defense that the Company may have under applicable law to payment hereunder, including defenses based on the Insured's breach of other terms or conditions of the Policy.

## ARTICLE IV.  EXCLUSIONS

4.01  No coverage shall be provided under the Policy and the Company shall be relieved of all liability under the Policy as to a Unit under any of the following circumstances:

   (a)  Such Unit or any other Unit subject to the same Lease is sold or transferred by the Insured (or its owner if other than the Insured) on or before the applicable Lease Termination Date without the prior written consent of the Company;

   (b)  The Insured makes or shall have made a statement, submission of documents, claim or other communication to the Company in connection with the Policy, which, taken separately or together with others, was not true

# R V I
## AMERICA

Policy Number: 01-01-30-1365

and complete when made, concealed from the Company any material fact or circumstance in connection herewith, or omitted a fact necessary to prevent any of the foregoing from being misleading;

(c)     Any Lease provision relating to the return, maintenance, operation, use, storage or physical condition of such Unit or any other provision of the applicable Lease referred to in the Policy is amended, modified or terminated without the Company's prior written consent;

(d)     With respect a Unit, during the term of the applicable Lease, such Unit is operated or maintained by any Person other than the Lessee, the manufacturer, or any other Person approved in writing by the Company (such approval not to be unreasonably withheld in the case of maintenance by a Person who possesses a recognized maintenance capability and reputation as good as or better than that of the Lessee as of the Effective Date);

(e)     Theft, dishonesty or infidelity, including wrongful conversion, misappropriation, embezzlement or hiding of a Unit or any material part thereof, that prevents the Insured from complying with any term or condition of the Policy;

(f)     The Insured, the applicable Lessee, or the manufacturer of such Unit or its engine, is bankrupt or insolvent or there is an uncured material default by the applicable Lessee under the applicable Lease *unless*,

    (i)     with respect to a Lessee default, bankruptcy or insolvency, the Insured:

        (A)     regains possession of such Unit and uses its best efforts to remarket such Unit to a suitable lessee that has financial and maintenance capability as good as or better than the financial and maintenance capability that the applicable Lessee under the applicable Lease had on the Lease Commencement Date,

        (B)     during any off-lease period, causes such Unit to be maintained and stored in accordance with manufacturer specifications or industry best practices, and

        (C)     during any off-lease period, provides the Company with rights of access, inspection, demonstration and remarketing, such rights to be exercised only on reasonable notice and at reasonable times and at the Company's cost and expense; and

    (ii)     with respect to the bankruptcy or insolvency of the manufacturer of such Unit or its engine or a replacement parts provider or service provider having the quality and timeliness equal to the quality and timeliness that were available on the Lease Commencement Date continue to be readily available at reasonable cost;

(g)     Such Unit has, on or prior to the Lease Termination Date, suffered irreparable loss or damage, or loss or damage sufficient to cause or permit termination of the Lease (irrespective of whether or not the Lease was in fact terminated due to such loss or damage), or such loss or damage as would have been sufficient to cause or permit termination of the Lease had it still been in effect;

(h)     Loss as a result of nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such Loss be direct or indirect, proximate or remote;

(i)     Loss caused by or resulting from:



# R V I
### AMERICA

Policy Number: 01-01-30-1365

(i)     hostile or warlike action in time of peace or war, including action in hindering, combating or defending against actual, impending or expected attack by any government or sovereign power (*de jure* or *de facto*), or by any authority maintaining or using military forces;

(ii)    any discharge, explosion or use of any weapon or war employing atomic fission, fusion or radioactive force in time of peace or war;

(iii)   insurrection, rebellion, revolution, civil war, civil commotion assuming the proportions of or amounting to an uprising, usurpation of power, mutiny, or any action taken by any governmental authority in hindering, combating or defending against any such occurrence;

(iv)   the use or threatened use of any violence or force (including acts of sabotage) by any Person for religious, racial, ethnic, ideological, political, financial or other ends, whether or not such Person is acting in concert with or on behalf of any organization or government (*de jure* or *de facto*), including but not limited to any use or threatened use of any violence, force or physical harm by any means that intimidates or instills fear in the public; or

(v)    international economic sanctions, including but not limited to energy embargo or boycott; or

(j)    A Claim in respect of such Unit shall have been made and subsequently withdrawn.

## ARTICLE V.  DETERMINATION OF END OF TERM VALUE
## AND OF COMPLIANCE WITH CERTAIN POLICY CONDITIONS

5.01   If the Insured wishes to give to the Company a Preliminary Notice of Claim as to all Units subject to a Lease, the Insured must do so not later than one hundred eighty (180) days (nor earlier than three hundred sixty (360) days) prior to the applicable Lease Termination Date.  The Insured must state in a Preliminary Notice of Claim its opinion of the End Of Term Value of each Unit subject to the Lease and the basis thereof..  Following all relevant documentation pertaining to the Units in question being made available to the Company, the Company will, in accordance with Section 5.02, determine the End Of Term Value of each such Unit.  These determinations will bind the Company and the Insured if the terms and conditions of the Policy are satisfied, unless the Company has received from the Insured within thirty (30) days after receipt of the Company's determination of the End Of Term Value, a written notice of objection accompanied by the Insured's determination of the End Of Term Value and an appraisal of the Unit performed by a Qualified Inspector/Appraiser.

5.02   The End Of Term Value of each Unit shall be calculated by determining the greater of Section (a), (b) or (c) below:

(a)    The Appraised Value of the Unit determined under the direction of the Company but at the Insured's expense, by a Qualified Inspector/Appraiser selected and approved by the Company;

(b)    The Sale Proceeds with respect to the Unit in the event the Insured has sold the Unit; provided, however, that the Insured shall have obtained the Company's prior written consent to such sale;

(c)    The Approved Guide Published Value with respect to the Unit in the event that there is a publication that qualifies as an Approved Guide with respect to the Unit.



1365 Guardian Pacific Eligibility Program Policy 06 12     Page 7     Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
### AMERICA

Policy Number: 01-01-30-1365

5.03   If the Company receives from the Insured a written notice of objection pursuant to Section 5.01, then:

(a)    The respective representatives of the Insured and the Company will meet and attempt to arrive at a mutually acceptable determination after each gives reasonable consideration to the criteria and reasoning of the other.

(b)    Where the Insured is objecting to a determination of the End Of Term Value made in accordance with Section 5.02(a), if, within thirty (30) days after receipt by the Company of written notice from the Insured of its objection as referred to in Section 5.01, the Insured and the Company are not able to agree upon the End Of Term Value of one or more of the Units, then the Insured and the Company shall each either (i) request that its Qualified Inspector/Appraiser engaged for the purposes of the procedures set forth above continue to act for them, or (ii) engage new Qualified Inspectors/Appraisers (in either case, at the Insured's expense) and the Qualified Inspector/Appraiser for the Insured and the Qualified Inspector/Appraiser for the Company will select a third Qualified Inspector/Appraiser.

(c)    If the two Qualified Inspectors/Appraisers cannot agree upon a third Qualified Inspector/Appraiser, each Qualified Inspector/Appraiser will nominate three Qualified Inspectors/Appraisers and the other will reject two of them. The third Qualified Inspector/Appraiser will then be chosen by drawing lots.

(d)    If either party fails to choose a Qualified Inspector/Appraiser within fifteen (15) Business Days after having received a written request from the other party to do so, the other party will choose both Qualified Inspectors/Appraisers, and they will choose the third Qualified Inspector/Appraiser.

(e)    The third Qualified Inspector/Appraiser will make an independent determination pursuant to the procedure stated above, which determination will be conclusively binding on the parties; provided, however, that the appraisal of the third Qualified Inspector/Appraiser will be deemed to be no less than the lower of the prior two appraisals nor greater than the higher. The Insured and the Company will bear equally the cost of the third Qualified Inspector/Appraiser.

## ARTICLE VI. ELECTION TO PAY ADJUSTED INSURED VALUE

6.01   If the Company receives a Preliminary Notice of Claim, the Company may elect, at its sole option, in lieu of paying a Loss in accordance with the provisions of Article I, to pay to the Insured an amount (the "Adjusted Insured Value") equal to:

(a)    the Insured Value of such Units subject to a Lease, less

(b)    the amount, if any, by which (i) the End Of Term Value of such Units determined pursuant to Section 5.02 exceeds (ii) the Appraised Value of such Units in its existing condition as determined under the direction of the Company but at the Insured's expense, by a Qualified Inspector/Appraiser selected and approved by the Company.

Such election shall be made by written notice to the Insured, given at any time *after* the receipt by the Company of a Preliminary Notice of Claim and *before* the Settlement Date. If the Company elects to pay the Adjusted Insured Value, the obligation of the Company to pay a Loss with respect to such Units under Article I will terminate.

6.02   If the Company makes such election and so requests, the Insured shall at its own expense:

(a)    deliver such Units to the Company or its designee at the location which the Company may reasonably designate;

PAGE 51

# R V I
## AMERICA

Policy Number: 01-01-30-1365

(b)    convey to the Company or its designee all right, title and interest in and to such Units, free and clear of all liens, security interests and other encumbrances;

(c)    in connection with the conveyance, provide to the Company or its designee the documentation and warranties set forth in Section 6.06; and

(d)    provide to the Company or its designee all logs, manuals, data and records delivered or available to the Lessor pursuant to the Lease.

6.03  Payment shall be made in accordance with Section 7.05 on the Settlement Date.  No such payment will be made if the Insured is unwilling or unable to deliver and convey the applicable Units on the Settlement Date if so requested by the Company.

6.04  Nothing in the Policy will change or modify (i) the Policy Termination Date or (ii) the right of the Company to elect to pay the Adjusted Insured Value in exchange for the Units delivery and conveyance as specified herein.

6.05  **Storage**.  If the Company elects to pay the Adjusted Insured Value of a Unit and to require its delivery and conveyance, the Insured will at its own expense provide for storage of such Unit within the 48 contiguous states of the United States in the manner and place which would provide the best protection reasonably available for equipment of its type for a period of up to ninety (90) days from the date of delivery to the Company at the location which the Company designates. During such storage period, the Insured will maintain property and casualty insurance for such Unit.

6.06  **Warranty**.  In the event the Company elects to purchase a Unit pursuant to Section 6.01, the Insured shall provide a bill of sale as to the Unit in such form as shall be acceptable to the Company.  The Insured shall warrant that it is transferring to the Company good title to the Unit free and clear of all liens and encumbrances whatsoever, and such other documents or evidence of title as the Company shall require.

## ARTICLE VII.  MISCELLANEOUS

7.01  **Assignment**.  The Policy is a personal contract and neither the Policy nor the Insured's rights hereunder may be assigned without the prior written consent of the Company.  No assignment by the Insured shall be effective until the assignee delivers an application acceptable to the Company and the exiting Insured delivers to the Company a release of its rights under the Policy.

7.02  **Notices**.  All notices, requests, demands, consents, approvals and other communications and transmittals required or permitted hereunder must be in writing and sent, postage prepaid by overnight courier or by confirmed facsimile transmission (such facsimile transmission to be accompanied by the delivery of a hard copy via overnight courier) to the intended recipient at the address or facsimile number set forth in the Declarations, or to such other addresses or facsimile numbers as the Insured or the Company may designate in writing from time to time by notice.

7.03  **Notice of Claim**.  If the Insured wishes to give to the Company a written Notice of Claim as to all Units subject to a Lease, the Insured must do so not later than three (3) Business Days after the later of (a) the Lease Termination Date and (b) the date that the final determination of End Of Term Value has been made for all such Units in accordance with Article V.

7.04  **Withdrawal of Claim.**  The Insured may withdraw a Preliminary Notice of Claim at any time.  Once a Claim is withdrawn, the obligations of the Company under the Policy as to such Units are terminated, and the Company will have no liability in respect thereof.

7.05  **Payments by the Company**.

# R V I
## AMERICA

Policy Number: 01-01-30-1365

(a)     Subject to all Declarations, exclusions and other terms and conditions of the Policy, payment by the Company under the Policy will be made in the currency in which the Insured Value is denominated in the Declarations (or if none, in United States Dollars) to the Insured (or Loss Payee) at the address specified in the Declarations.

(b)     Payment by the Company of the amount of a Claim in respect of Units will be made only against receipt from the Insured of a duly executed general release of claims, relieving the Company from all liability arising out of or in connection with the Policy in respect of such Units, and acceptance of such payment by the Insured will be final and conclusive as between the Company and the Insured as to the amount owed the Insured on account of such Claim.

7.06   **Premium.** With respect to a Unit, Premium is fully earned on the date of submission by the Insured of the Schedule. With respect to all Units, the Policy will be void as if it had never been issued unless the Premium is received by the Company on or before the date that shall be thirty (30) days after the date of submission by the Insured of the Schedule. Premium is non-refundable.

7.07   **Schedules.** To submit Units for insurance under this Policy, the Insured shall describe such Units on Schedule(s) in the form attached to the Application and shall submit each such Schedule to the Company no later than thirty (30) days after the month in which the term of the applicable Lease(s) commence(s). Each Unit described on a Schedule shall be subject to acceptance by the Company in accordance with the Equipment Portfolio Return Conditions Endorsement.

7.08   **Amendments, Changes, Waivers or Modifications.**

(a)     Notice to, or knowledge possessed by, any agent or other representative of the Company (or any investigation made or that could have been made by the Company) will not effect a waiver of, or change to, any requirement of the Policy or prevent the Company from asserting any right hereunder.

(b)     The Policy may not be amended, changed or modified, or any provisions hereof waived or discharged, except by an endorsement to the Policy executed by the Company.

7.09   **Waiver.** The failure by any party to insist upon full performance of any provision of the Policy will not be deemed a waiver of such provision. No waiver at any time, or with respect to any right, condition or requirement contained in the Policy, will be deemed a waiver at any other time or with respect to any other right, condition or requirement.

7.10   **Other Insurance.** Coverage under the Policy with respect to any Units is excess to Other Insurance.

7.11   **Subrogation and Recoveries.**

(a)     The Insured will take all commercially reasonable measures available to preserve its rights of recovery against third parties in respect of the value of the Units and, after giving a Preliminary Notice of Claim, will do nothing to impair such rights without the prior written consent of the Company.

(b)     Upon payment by the Company in respect of Units pursuant to Article I, the Company will be subrogated to the Insured's rights of recovery against third parties as to such Units, up to the full extent of such payment, and upon the Company's request, the Insured will execute and deliver such instruments and papers as may be necessary to secure such rights for the Company.

(c)     Any recoveries obtained by the Insured from third parties in respect of the diminution in the value of Units at any time before payment by the Company hereunder will reduce the Company's liability in respect of such Units dollar for dollar to the extent of any claim payable on account of such Units.

**R V I**
**AMERICA**

Policy Number: 01-01-30-1365

7.12   **Governing Law.**  The Policy shall be governed by and construed in accordance with the laws of the state of the Company's domicile.

7.13   **Assistance and Cooperation of the Insured**.  The Insured will provide all reasonable cooperation to the Company with respect to matters arising out of or in connection with the Policy and, upon the Company's request, will attend hearings and trials, assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and otherwise assist in the conduct of any proceeding relating to the Policy.

7.14   **Inspection, Appraisal and Audit.**  At any time during the term of the Policy, any extension(s) thereof and within three (3) years after the applicable Settlement Date, the Insured will make or, to the extent permitted by the applicable Lease(s), cause the applicable Lessee to make, Units, all books and records pertaining thereto and such other information regarding the Units as the Company and its agents and authorized representatives may reasonably require available for inspection and/or appraisal by the Company and its agents and authorized representatives for the purposes of the Policy. The Company and its agents and authorized representatives will be permitted, but not obligated, to make inspections at any time during this period. The costs and expenses incurred by the Company in connection with such inspections and appraisals will be paid by the Insured. Neither the Company's right to make inspections and/or appraisals nor the making thereof nor any report thereon will constitute an undertaking, on behalf of or for the benefit of the Lessee and/or the Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

7.15   **Indemnification.**  The Insured shall defend, indemnify, pay and hold the Company harmless from any and all actions, causes of actions, suits, claims, demands, damages and judgments, including attorneys' fees, court costs and other expenses of litigation, which the Company may hereafter suffer, incur, pay or lay out by reason of any loss, damage or injury that any Person incurs or suffers or claims to have incurred or suffered, as a result of or relating to (1) the Insured's ownership, possession, storage or use of any Units, (2) the possession, operation, maintenance, storage or use of any Units by or on behalf of the Lessee or any other Person during the term of the applicable Lease, or (3) the Policy (except such liabilities as the Company may have to pay Losses with respect to Claims as expressly provided hereunder).

7.16   **Cancellation.**  If Premium with respect to a Unit as provided in the Schedule has been paid in full when due, the Policy shall not be cancelable by the Company with respect to such Units in the Schedule except for fraud or misrepresentation of material facts. Otherwise, the Insured or the Company may terminate, with thirty (30) days notice pursuant to Section 7.02, the right to accept the enrollment of Units for coverage under the Policy.

IN WITNESS WHEREOF, the Company has caused the Policy to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By:  _____
                     Daniel P. Egan

Title:  _____Executive Vice President_____

# EXHIBIT B

# R V I
## AMERICA

R.V.I. AMERICA INSURANCE COMPANY
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365-02
Insured: Financial Pacific Leasing, Inc.

# RESIDUAL VALUE INSURANCE

## FOLLOW-ON DECLARATIONS

R.V.I. America Insurance Company (the "Company") has issued to the party(ies) identified in Items 1 (and 2, if any), a "Master Residual Value Insurance Policy" (which, together with other documents as specified therein, constitutes the "Policy"), and such party(ies) has (have) requested coverage under the Policy in respect of the Unit(s) of equipment identified in Item 4, up to the Insured Value thereof, such liability in no event to exceed the Maximum Liability of Company set forth below.

**Item 1.**   **Insured:**   Financial Pacific Leasing, Inc.

Address:   3455 S. 344th Way
Federal Way, WA  98001
Fax:   800-447-7106
Phone:   253-568-6122

**Item 2.**   **Additional Named Insured:**

Address:

Fax:
Phone:

**Item 3.**   **Loss Payee (if
different from the Insured):**

Address:

Fax:
Phone:

**Item 4.**   **Equipment Insured (the "Unit(s)"):**

With respect to a Unit, the specific details of which are included in the schedule attached to this Follow-On Declarations (a "Schedule").

**Item 5.**   **Lease (or other financing instrument):**

With respect to a Unit, the specific details of which are included in the Schedule.

**Item 5a.**   **Lease Commencement Date:**   As provided in the Schedule.

2 1365 financial pacific Eligibility Program Folllow-On Decs 03 12          Copyright © 2015 by R.V.I. America Insurance Co.

# R V I
## AMERICA

Policy Number: 01-01-30-1365-02

**Item 5b.** **Lease Termination Date**:      As provided in the Schedule.

**Item 6.**    **Lessor**:     The Insured or as provided in the Schedule.

**Item 7.**    **Lessee**:     As provided in the Schedule.

**Item 8.**    **Insured Value**:     As provided in the Schedule.

**Item 9.**    **Maximum Liability of Company**:

The sum of the Insured Values of all Units, reduced as may be provided in the "Exclusions" section of the Policy and further reduced by the amount of the applicable Deductible.

**Item 10.**   **Deductible**:      None

**Item 11.**   **Premium (non-refundable)**:     As provided in the Schedule.

**Item 12.**   **Endorsements**:     Endorsement D Establishment of Reproduction Cost New Appraisal Methodology for Two Hundred Fifty (250) Units Only

**Item 13.**   **Policy Period**:

From the Effective Date up to and including the Policy Termination Date:

**(i)**    **Effective Date:** As of the earliest Lease Commencement Date as provided in the Schedule.

**(ii)**    **Policy Termination Date:** The last occurring Lease Termination Date as provided in the Schedule.

In reliance upon the statements of the Insured, the approval and execution of these Follow-On Declarations constitute an undertaking by the Company to provide residual value insurance in the amounts provided herein, subject to the terms and conditions set forth in the Policy

IN WITNESS WHEREOF, the Company has caused these Follow-On Declarations to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, CT 06901-2048

By: _____
               Daniel P. Egan

Title: _____ Executive Vice President _____

Copyright © 2015 by R.V.I. America Insurance Co.

ORIGINAL

PAGE 57

# R.V.I.
## AMERICA

---

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, Stamford, CT 06901

**Telephone: (203) 975-2100**
**Facsimile: (203) 975-2199**

---

**To:**    Financial Pacific Leasing, Inc.
3455 S. 344th Way
Federal Way, WA 98001

**Date:** September 23, 2015

**Invoice No:**    30-1365-02

**Re:**    Residual Value Insurance Policy # 01-01-30-1365

## INSURANCE PREMIUM INVOICE

---

**Premium Due:**    $ 274,283.88

**Premium is due in full within fifteen (15) days of the date of this invoice.**

**Please remit total amount due via FED WIRE to:**

| | |
|---|---|
| For Credit to: | R.V.I. America Insurance Company<br>Wells Fargo Bank<br>300 Main Street, Stamford, CT 06901<br>ABA Routing #: 121000248<br>Account Type: Money Market<br>Account #:2030000971673<br>Swift Code# WFBIUS6S<br>**Reference: 1365-02** |

ORIGINAL

# R V I

## AMERICA

**R.V.I. AMERICA INSURANCE COMPANY**
STAMFORD, CONNECTICUT
A CAPITAL STOCK COMPANY

Policy Number: 01-01-30-1365-02
Insured:  Financial Pacific Leasing, Inc.

## ENDORSEMENT D

### ESTABLISHMENT OF REPRODUCTION COST NEW APPRAISAL METHODOLOGY FOR TWO HUNDRED FIFTY (250) UNITS ONLY

This Endorsement, effective as of September 1, 2015, forms a part of the Residual Value Insurance Policy issued by **R.V.I. AMERICA INSURANCE COMPANY** of Stamford, Connecticut as set forth above.

In consideration for the Premium charged, it is understood and agreed that, with respect to the coverage afforded by this Policy for the 250 Units identified as covered hoppers in Schedule 2 attached to the Follow-On Declarations, 150 of which are currently leased to Haliburton and 100 of which are currently leased to US Silica, the following amendment(s) shall apply:

1. Section 2.01 (d) of the Policy ("Definitions") is hereby deleted in its entirety and replaced with the following:

"**(d).** <u>**Appraised Value (Reproduction Cost New)**</u>:  with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)        by the cost of substituting another asset of comparable utility;

(ii)      on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e. "reproduction cost new" basis);

(iii)     as of the applicable Lease Termination Date;

(iv)     by a Qualified Appraiser in accordance with Section 5.02 hereof;

(v)      on the basis that such Unit complies with all standards set forth in the Return Condition Endorsement;

(vi)     without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(vii)    without regard to quantity, location or country of registration of such Unit."

Copyright © 2015 by RVI America Insurance Co.

**R V I**

**AMERICA**

Policy Number 01-01-30-1365-02

2.  Section 5.02 of the Policy ("Determination of End of Term Value and of Compliance with Certain Policy Conditions") is hereby deleted and replaced by the following sentence:

"5.02  The End of Term Value of the Unit shall be the Appraised Value (Reproduction Cost New)."

Nothing contained herein shall vary, alter, waive or extend any of the terms, provisions, representations, covenants, conditions, or agreements of the Policy other than as stated above.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be executed at Stamford, Connecticut.

**R.V.I. AMERICA INSURANCE COMPANY**
177 Broad Street, 9th Floor
Stamford, Connecticut 06901-2048

By _____
                    Daniel P. Egan

Title _____
                    Executive Vice President

ORIGINAL



**RVI AMERICA**

FINANCIAL PACIFIC LEASING, INC.
Residual Value Insurance Policy #01-01-30-1365
Schedule 2  -  Aug-2015

| Lease Number | Lessee | Qty | Year of Mfr | Description | Serial Number | Lease Begin | Lease End | OEC USD | Booked Residual USD | Termination Value USD | Insured Value USD | Initial Premium USD | Deferred (or Additional) Premium USD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | TOTAL TERMINATION YEAR 2020 | | | | 12,225,000.00 | 9,150,000.00 | 7,772,262.00 | 7,772,262.00 | 194,306.55 | 0.00 |
| | | | | TOTAL TERMINATION YEAR 2025 | | | | 7,950,000.00 | 4,300,000.00 | 3,199,093.00 | 3,199,093.00 | 79,977.33 | 0.00 |
| | | | | TOTAL SCHEDULE 2 | | | | 20,175,000.00 | 13,450,000.00 | 10,971,355.00 | 10,971,355.00 | 274,283.88 | 0.00 |
| 013-1129651-001 | Halliburton | | | 150 2015 Greenbriar 3,250 Cu. Ft. Covered Hopp | | 09/01/15 | 08/31/20 | 12,225,000.00 | 9,150,000.00 | 7,772,262.00 | 7,772,262.00 | 194,306.55 | 0.00 |
| | | | | TOTAL TERMINATION YEAR 2020 | | | | 12,225,000.00 | 9,150,000.00 | 7,772,262.00 | 7,772,262.00 | 194,306.55 | 0.00 |
| 013-1129667-001 | US Silica | | | 100 2015 Greenbriar 3,250 Cu. Ft. Covered Hopp | | 09/01/15 | 08/31/25 | 7,950,000.00 | 4,300,000.00 | 3,199,093.00 | 3,199,093.00 | 79,977.33 | 0.00 |
| | | | | TOTAL TERMINATION YEAR 2025 | | | | 7,950,000.00 | 4,300,000.00 | 3,199,093.00 | 3,199,093.00 | 79,977.33 | 0.00 |

PAGE 61

Page 1 of 1