UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FINANCIAL PACIFIC LEASING INC., <br><br> Plaintiff, <br><br> v. <br><br> RVI AMERICA INSURANCE CO., <br><br> Defendant. | Case No. C21-0756-LK <br><br> REPORT AND RECOMMENDATION |

I.   INTRODUCTION

This is an insurance coverage action. Plaintiff Financial Pacific Leasing, Inc., is an asset-based lender that provides equipment leases and financing to commercial customers. Dkt. 14 ¶ 2. Plaintiff's asset portfolio includes 150 C112 Covered Hopper railcars ("Railcars"), which were leased to Haliburton Company until August 31, 2020. *Id.* at ¶¶ 2, 20. Defendant RVI America Insurance Company is an insurance company that provides residual value insurance policies to companies like Plaintiff. *See id.* at ¶ 3. Plaintiff purchased a Master Residual Value Insurance Policy ("Policy") from Defendant to protect itself from the risk that the value of the Railcars at the end of the Haliburton lease term ("End of Term Value") would be less than their insured value. *Id.* at ¶ 3. When the lease terminated and Plaintiff determined the Railcars' End

REPORT AND RECOMMENDATION - 1

of Term Value was less than the insured value, Plaintiff made a claim under the Policy. *Id.* at ¶¶ 37–38. Defendant then made its own determination of the Railcars' End of Term Value, but concluded their value was greater than the insured value, meaning there was no payment obligation under the Policy. *Id.* at ¶ 40. Plaintiff subsequently filed suit against Defendant, alleging, among other things, that Defendant improperly interpreted and/or applied the Policy's formula for determining End of Term Value. *Id.* at ¶ 41.

This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's lawsuit. *See* Dkt. 23. Having thoroughly considered the parties' briefing and finding oral argument unnecessary, the Court concludes Defendant's Motion, Dkt. 23, should be DENIED for the reasons explained herein.

## II.    BACKGROUND

### A.    The Policy

The Railcars had an original equipment cost of $81,500 each, and Plaintiff expected them to be worth approximately $61,000 at the end of the five-year lease to Haliburton. Dkt. 14 ¶ 2. To protect against the risk that the Railcars' End of Term Value would be less than their expected value, Plaintiff purchased the Policy from Defendant. *Id*. Under the Policy, Defendant agreed to pay Plaintiff for the amount that the Railcars' End of Term Value fell below their insured value of $51,815.08 per Railcar on the lease termination date. *Id.* at ¶ 20.

The first page of the Policy noted:

> THIS RESIDUAL VALUE INSURANCE POLICY IS NOT A FINANCIAL GUARANTEE OF THE CREDIT OR GUARANTEE OF THE PERFORMANCE OF ANY PERSON, BUT IS AN INDEMNITY AGAINST LOSS INCURRED BY THE INSURED DUE TO A FORTUITOUS DECLINE IN VALUE OF A CLASS OF ASSET TO WHICH THE INSURED EQUIPMENT BELONGS CAUSED BY CHANGES IN MARKET CONDITIONS WHEN SUCH EQUIPMENT IS USED AND MAINTAINED AS INTENDED.

Dkt. 14 at 44.

Article I of the Policy further provided (in part):

> Subject to all Declarations, exclusions and other terms and conditions hereof, the Company shall indemnify the Insured as of the Lease Termination Date against Loss, if any, which shall be payable on the Settlement Date, in respect of all Units[1] subject to a Lease.

*Id.*

The Policy defined "Loss" as:

> [W]ith respect to a Lease, the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease exceeds the sum of the End Of Term Values thereof on the Lease Termination Date, as determined in accordance with Article V., reduced by the Deductible.

*Id.* at 46, § 2.01(z).

The Policy provided that the End of Term Value for each Unit would be "defined and determined in accordance with Section 5.02" of the Policy. Dkt. 14 at 45, § 2.01(n). Section 5.02, in turn, provided that the End of Term Value would be determined by selecting the greater of three different sums, one of which was the "Appraised Value" of the Units, as defined in § 2.01(d) of the Policy. *Id.* at 50, § 5.02(a)–(c).

After executing the Policy, the parties executed Endorsement D to the Policy. *See* Dkt. 14 ¶ 23. Endorsement D deleted § 5.02 of the Policy and replaced it with the following sentence: "5.02 The End of Term Value of the Unit shall be the Appraised Value (Reproduction Cost New)." *Id.* at 60. Endorsement D likewise deleted the definition of "Appraised Value" in § 2.01(d) and replaced it with the following definition:

> (d). **<u>Appraised Value (Reproduction Cost New)</u>**: with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an

---

[1] The Policy refers to the Railcars as "Units." Dkt. 14 at 15, 18.

REPORT AND RECOMMENDATION - 3

informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)      by the cost of substituting another asset of comparable utility;

(ii)      on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e. "reproduction cost new" basis);

(iii)      as of the applicable Lease Termination Date;

(iv)      by a Qualified Appraiser in accordance with Section 5.02 hereof;

(v)      on the basis that such Unit complies with all standards set forth in the Return Condition Endorsement;

(vi)      without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(vii)      without regard to quantity, location or country of registration of such Unit.

Dkt. 14 at 59 (emphasis in original).

Finally, Endorsement D provided that "[n]othing contained herein shall vary, alter, waive or extend any of the terms, provisions, representations, covenants, conditions, or agreements of the Policy other than as stated above." Dkt. 14 at 60.

Beyond these provisions, the Policy provided a mechanism for the parties to resolve any disputes between them as to the Railcars' End of Term Value. Per the Policy, after Plaintiff stated its opinion of the End of Term Value in a Preliminary Notice of Claim, Defendant would determine the End of Term Value in accordance with § 5.02 of the Policy. Dkt. 14 at 50, § 5.01.

REPORT AND RECOMMENDATION - 4

Defendant's determination would bind both parties, unless Defendant received from Plaintiff "within thirty (30) days after receipt of [Defendant's] determination of the End of Term Value, a written notice of objection accompanied by [Plaintiff's] determination of the End of Term Value and an appraisal of the Unit performed by a Qualified Inspector/Appraiser." *Id.*

If Defendant received an objection from Plaintiff and the parties were not able to agree on the Railcars' End of Term Value within thirty days, then the Policy required Plaintiff and Defendant to either "(i) request that [their] Qualified Inspector[s]/Appraiser[s] engaged for the purposes of the procedures set forth above continue to act for them, or (ii) engage new Qualified Inspectors/Appraisers . . . and the Qualified Inspector/Appraiser for [Plaintiff] and the Qualified Inspector/Appraiser for [Defendant] will select a third Qualified Inspector/Appraiser." Dkt. 14 at 51, § 5.03(b). If the two Qualified Inspectors/Appraisers were unable to agree on a third Qualified Inspector/Appraiser, then each would nominate three additional Qualified Inspectors/Appraisers, and the other would reject two of them. *Id.* at § 5.03(c). The third Qualified Inspector/Appraiser would then be chosen by "drawing lots." *Id.* However, if either party failed to choose a Qualified Inspector/Appraiser "within fifteen (15) Business Days after having received a written request from the other party to do so," the other party would choose both Qualified Inspectors/Appraisers, who would then choose the third Qualified Inspector/Appraiser. *Id.* at § 5.03(d). The third Qualified Inspector/Appraisal would then determine the Railcars' End of Term Value. *Id.* at § 5.03(e).

In order to make a claim under the Policy, Plaintiff needed to comply with several "conditions precedent" to coverage. *See* Dkt. 14 at 48, § 3.01(a)–(d). Of relevance, Defendant was required to "receive the Preliminary Notice of Claim and the Notice of Claim as to all Units

REPORT AND RECOMMENDATION - 5

subject to a Lease at the times and with the supporting documentation required by Sections 5.01 and 7.03 . . . ." *Id.* at 48, § 3.01(a).

B.     The Parties' Dispute

While leased to Haliburton, the Railcars' fair market value fell to approximately $28,000 per Railcar—$23,815.08 less than their insured value of $51,815.08 each—due to a change in market demand for the materials they primarily transported. Dkt. 14. ¶¶ 19, 24–36. As a result, Plaintiff made a claim under the Policy, identifying an End of Term Value of $28,000 per Railcar in its Notice of Claim and $3,524,631.84 in total covered loss.[2] *Id.* at ¶¶ 38–39. Defendant then determined the Railcars' End of Term Value, but because it concluded each was worth between $67,500 and $69,500, it found no covered loss. *Id.* at ¶ 40. Plaintiff alleges Defendant, in making this determination, misapplied the Appraised Value (Reproduction Cost New) definition for calculating the End of Term Value by failing to "take into account the actual market value of the [Railcars] based on the depressed market conditions," and instead applying a straight-line depreciation of 3.1% per year. *Id.* at ¶¶ 41–42. According to Plaintiff, using this approach, there never could have been a covered loss under the Policy. *Id.* at ¶¶ 43–45.

On June 8, 2021, Plaintiff filed this action seeking (1) damages for Defendant's alleged breach of the Policy; (2) a declaration as to the proper calculation of the Railcars' End of Term Value, or, alternatively, a declaration that Defendant's determination of End of Term Value and covered Loss render coverage under the Policy illusory; and (3) damages for Defendant's alleged breach of its duties of good faith and fair dealing, as well as alleged violations of Washington's Consumer Protection Act, RCW 19.86.020 ("WCPA") and the Washington Insurance Fair Conduct Act, RCW 48.30.015 ("IFCA"). Dkt. 14 ¶¶ 48–66.

---

[2] This claim amount reflects the fact that two of the 150 Railcars were declared a total loss before the lease termination date and were not included in Plaintiff's claim total. Dkt. 14 ¶ 39.

REPORT AND RECOMMENDATION - 6

On August 23, 2021, Defendant moved to dismiss Plaintiff's lawsuit, alleging (1) the Appraised Value (Reproduction Cost New) definition used in calculating End of Term Value and covered Loss is clear and unambiguous, and no reasonable interpretation of that definition entitles Plaintiff to relief; (2) Plaintiff's claim for illusory coverage fails because circumstances exist where loss would be covered under the Policy; (3) Plaintiff, by not following the Policy's mandatory appraisal procedures, has failed to state a claim; and (4) Plaintiff's WCPA and IFCA claims fail because they are predicated on its other improper claims. *See* Dkt. 23.

### III.   DISCUSSION

Under FRCP 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Dismissal is proper "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015) (citation omitted). This means that to survive a motion to dismiss, the complaint need only "allege enough facts to state a claim to relief that is plausible on its face." *Id.* (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In ruling on a motion to dismiss, the Court "must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Taylor*, 780 F.3d at 935 (citation omitted).

#### A.    Choice of Law

The parties dispute whether Washington or Connecticut law governs this action. While the Policy contains a Connecticut choice of law clause, *see* Dkt. 14 ¶ 6; *id.* at 54, § 7.12, a Washington statute provides that "no insurance contract delivered or issued for delivery in this

1  state and covering subjects located, resident, or to be performed in this state, shall contain any
2  condition, stipulation, or agreement . . . requiring it to be construed according to the laws of any
3  other state or country . . . ." RCW 48.18.200(1)(a). Defendant argues the choice of law clause
4  controls, Dkt. 23 at 16 n.3, whereas Plaintiff argues the Washington statute necessitates the
5  application of Washington law, Dkt. 31 at 6–8. Defendant also contends, however, that for the
6  purposes of this Motion, it makes no difference whether Washington or Connecticut law applies
7  because under either (1) the language of the Policy is clear and unambiguous and precludes
8  calculating End of Term Value in the manner advocated by Plaintiff, Dkt. 23 at 20–23, and (2)
9  because the Policy is clear and unambiguous, the Court cannot consider extrinsic evidence when
10 construing it, nor can it look to extrinsic evidence to find ambiguity, Dkt. 34 at 8–9. Defendant
11 therefore presents the Court with both Washington and Connecticut law in its Motion.
12        Defendant misapprehends an important component of Washington contract law.
13 Contrary to Defendant's contentions, under Washington law, the Court, applying the "context
14 rule," can consider extrinsic evidence in construing a contract, regardless of whether the contract
15 is deemed ambiguous, to aid in ascertaining the parties' intent. *Berg v. Hudesman*, 115 Wn.2d
16 657, 667–69, 801 P.2d 222 (1990). In other words, even if a contract is unambiguous, extrinsic
17 evidence—including the subject matter or objective of the contract, all circumstances
18 surrounding the making of the contract, the subsequent acts and conduct of the parties, and the
19 reasonableness of the parties' respective interpretations—can be considered to illuminate the
20 meaning of the words used in the contract. *Id.*; *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154
21 Wn.2d 493, 502, 115 P.3d 262 (2005). But extrinsic evidence cannot be considered to "'show an
22 intention independent of the instrument' or to 'vary, contradict or modify the written word.'"
23

1  *Hearst Commc'ns, Inc.*, 154 Wn.2d at 503 (quoting *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695–96, 974 P.2d 836 (1999)).

Because Defendant does not acknowledge Washington's use of the "context rule," Defendant has neither addressed whether Connecticut law applies the same, nor explained how the "context rule" impacts its interpretation of the Policy. Regardless, the Court need not resolve these questions or the issue of choice of law at this time. The Court concludes that on its face, the Policy's language—specifically that of Endorsement D—is ambiguous. Defendant's Motion should be denied.

B.  Breach of Contract

Defendant moves to dismiss Plaintiff's breach of contract claim, arguing the plain language used in the Appraised Value (Reproduction Cost New) definition for calculating End of Term Value unambiguously precludes finding any breach by Defendant. *See* Dkt. 23 at 20–23.

1.  Legal Framework

Resolution of a breach of contract claim on a motion to dismiss is proper if the terms of the contract are unambiguous. *See Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 209–12 (9th Cir. 1957); *Case v. State Farm Mut. Auto Ins. Co.*, 294 F.2d 676, 678 (5th Cir. 1961); *see also Kingston v. Int'l Bus. Machines Corp.*, 454 F. Supp. 3d 1054, 1062 (W.D. Wash. 2020) (dismissing breach of contract claim because "[t]he clear and unambiguous language of the agreement . . . precludes . . . the finding of a breach of contract . . . ."); *Rubio v. U.S. Bank N.A.*, No. C 13-05752 LB, 2014 WL 1318631, at *10 (N.D. Cal. Apr. 1, 2014) ("Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous.") (citations omitted). Whether a contract is ambiguous is a question of law for the

Court to decide. *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 135, 317 P.3d 1074 (2014) (citation omitted).[3]

In determining whether a contract's terms are ambiguous, courts "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst*, 154 Wn.2d at 504 (citation omitted). In the insurance context, courts consider the policy as a whole, interpreting particular language in the context of other policy provisions and giving the policy "a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 669–70, 15 P.3d 115 (2000) (citation omitted). An interpretation which gives effect to all of the words in a contract is favored over one which renders some of the language meaningless or ineffective. *Wagner v. Wagner*, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980) (citation omitted). While "interpretation of an insurance clause must be reasonable and take into account the purpose of the insurance at issue," *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 123 Wn.2d 678, 689–90, 871 P.2d 146 (1994) (citations omitted), "the expectations of the insured cannot override the plain language of the contract," *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 172, 110 P.3d 733 (2005) (citation omitted).

If only one reasonable meaning can be ascribed to a contract, then it is unambiguous. *See Martinez v. Miller Industries, Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999) (citation omitted). But if a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations, then the provision is ambiguous. *See, e.g., Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014); *Jensen v. Lake Jane Estates*,

---

[3] While the Court has not decided which law governs this lawsuit, it applies Washington law herein; the "context rule" is not relevant to its findings.

REPORT AND RECOMMENDATION - 10

165 Wn. App. 100, 105, 267 P.3d 435 (2011) (citation omitted); *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 275, 883 P.2d 1387 (1994) (citation omitted). That being said, a contract provision is not ambiguous simply because the parties to the contract suggest opposing meanings. *Shafer*, 76 Wn. App. at 275 (citations omitted).

If a contract's language is clear and unambiguous, the court must enforce it as written and cannot modify it or create ambiguity where none exists. *Transcon. Ins. Co. v. Washington Pub. Utilities Districts' Util. Sys.*, 111 Wn.2d 452, 456, 760 P.2d 337 (1988) (citations omitted). A court will not read ambiguity into a contract if it can reasonably be avoided. *McGary v. Westlake Investors*, 99 Wn.2d 280, 285, 661 P.2d 971 (1983) (citation omitted).

        2.     *Ambiguity of the Policy*

Defendant contends the Policy is unambiguous. It argues that by (1) deleting § 2.01(d)'s Appraised Value definition and replacing it with the Appraised Value (Reproduction Cost New) definition; and (2) deleting § 5.02 of the Policy (which permitted the End of Term Value to be determined using the Appraised Value definition), and replacing it with a clause requiring the End of Term Value to be determined using the Appraised Value (Reproduction Cost New) definition, Endorsement D unambiguously required the Appraised Value (Reproduction Cost New) definition to control the Railcars' appraisal. Dkt. 23 at 20–21. Defendant further contends Plaintiff's interpretation and application of the Appraised Value (Reproduction Cost New) definition, which urges consideration of the Railcars' actual market value, is "contrary to and inconsistent with the plain and unambiguous language of [Endorsement D]." *Id.* at 21–22.

The Court agrees Endorsement D is valid and binding, and that it both deleted and replaced previous Policy provisions. Plaintiff does not dispute as much. But the language of Endorsement D, and the manner in which the Appraised Value (Reproduction Cost New)

definition is intended to determine the Railcars' End of Term Value, is not as clear or unambiguous as Defendant contends.

The Appraised Value (Reproduction Cost New) definition states that the "fair retail price" for a Unit should be determined by looking to an "arm's-length retail sales transaction . . . between an informed and willing seller under no compulsion to sell and an informed and willing purchaser . . . under no compulsion to purchase, who is purchasing the Unit for its own usage . . . with the intent of utilizing the Unit in accordance with the Unit's intended usage . . . ." Dkt. 14 at 59. It further provides that the "fair retail price" should be determined (in relevant part) on the basis of the expense necessary to "construct an exact duplicate of a subject property . . . ." *Id.*

Plaintiff argues that combining these two disparate concepts creates ambiguity as to how End of Term Value is to be determined—"is it to be determined by an arm's-length transaction involving an informed and willing buyer under no compulsion (who would not pay more than the fair market value) or the cost to construct a new, replacement unit, or some combination of the two?" Dkt. 31 at 10. Defendant, on the other hand, argues Endorsement D precludes consideration of the Railcars' "fair market value" or "actual market value" because these words do not appear in the Endorsement. Dkt. 23 at 22–23. The Court is persuaded by Plaintiff's position.

In an arm's-length transaction between an informed and willing buyer under no compulsion to purchase and an informed and willing seller under no compulsion to sell, the parties act in their own interest to attain the most beneficial deal. *See Money Mailer, LLC v. Brewer*, 194 Wn.2d 111, 120, 449 P.3d 258 (2019). Further, analogous language is commonly used to define "fair market value." *See id*. Thus, by invoking such language, Endorsement D implies that an informed and willing buyer would not pay more for the Railcars than their fair

1  market value. Yet the Appraised Value (Reproduction Cost New) definition also contemplates
2  the Railcars' fair retail price being determined by the cost to construct a new "subject property,"
3  Dkt. 14 at 59, a sum that is entirely disconnected from the Railcars' fair market value. Because
4  it is unclear how the Policy intends these two concepts to function together, the Appraised Value
5  (Reproduction Cost New) definition is ambiguous.

6    Defendant entirely fails to acknowledge Endorsement D's reference to an arm's-length
7  transaction between an informed and willing buyer and seller, seemingly contending that only
8  the cost to construct a new Railcar should be considered. But ignoring this language would
9  render it meaningless and ineffective, which should be avoided. *See Wagner*, 95 Wn.2d at 101
10 (citation omitted).

11   The Policy's stated purpose—to serve as an "indemnity against loss incurred by the
12 insured due to a fortuitous decline in value of a class of asset to which the insured equipment
13 belongs caused by changes in market conditions . . . ," Dkt. 14 at 44—also creates ambiguity as
14 to whether, and to what extent, the market should be considered in determining the Railcars' End
15 of Term Value. Defendant argues this statement "must be considered in view of the definition of
16 Loss[,]" which is determined in part by using the Appraised Value (Reproduction Cost New)
17 definition, which Defendant contends unambiguously excludes consideration of market value.
18 Dkt. 34 at 8. Defendant further argues that Plaintiff's expectation that the Policy would cover a
19 "fortuitous decline in value of the railcars" caused by market changes cannot be a basis for
20 interpreting the Policy because such an interpretation is contrary to the Policy's clear and
21 unambiguous terms. Dkt. 23 at 21–22.

22   These arguments fail to address the impact of the Appraised Value (Reproduction Cost
23 New) definition's reference to an arm's-length transaction between an informed and willing

REPORT AND RECOMMENDATION - 13

buyer and seller, nor do they negate the implication of the Policy's stated purpose itself. "An interpretation of an insurance clause must . . . take into account the purpose of the insurance at issue." *Lynott*, 123 Wn.2d at 689–90 (citations omitted). Indeed, how can the Policy intend to indemnify against a fortuitous decline in the Railcars' value caused by changes in market conditions if it fails to consider market conditions at all?

Defendant argues Plaintiff, by failing to demonstrate that the Policy's terms are subject to more than one reasonable interpretation, has failed to show that the Policy is ambiguous. Dkt. 34 at 7. But in order for the Policy to be ambiguous, it need only be uncertain. *See, e.g.*, *Viking Bank*, 183 Wn. App. at 713; *Jensen*, 165 Wn. App. at 105 (citation omitted); *Shafer*, 76 Wn. App. at 275 (citation omitted). The Court need not—and does not—decide at this juncture whether the market is an appropriate consideration in applying the Appraised Value (Reproduction Cost New) definition.[4] It finds only that the manner in which the Appraised Value (Reproduction Cost New) definition is intended to operate is uncertain, and therefore ambiguous.

In light of this ambiguity, and construing the Amended Complaint's allegations in the light most favorable to Plaintiff, Plaintiff states a plausible claim for breach of contract. Dismissal is improper.

/ / /

---

[4] The Court notes, however, that Defendant's own appraiser appears to have considered the market's impact on the Railcars' End of Term Value. *See* Dkt. 32 at 9 (explaining that when appraising the Railcars using the Appraised Value (Reproduction Cost New) definition, he "start[ed] with the current reproduction cost new of the [Railcars], then deduct[ed] for the loss of value caused by the physical deterioration, functional obsolescence, and *economic obsolescence*. The logic behind the cost approach is the principle of substitution: a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility.") (emphasis added). While the Court does not consider this evidence in reaching its conclusions herein, Defendant's argument—that "nowhere did the appraiser consider the 'actual value' or 'fair market value,' because these words and concepts were not included in Endorsement D[,]" Dkt. 34 at 9—fails to rebut the clear implication of the appraiser's described approach.

REPORT AND RECOMMENDATION - 14

C.  Illusory Coverage

Defendant argues Plaintiff's claim for illusory coverage should be dismissed because in order for coverage to be deemed illusory, the "Policy's language must eliminate coverage altogether," but there are circumstances in which using the Appraised Value (Reproduction Cost New) definition to calculate End of Term Value would result in coverage under the Policy. Dkt. 23 at 25. Plaintiff argues Defendant's illusory coverage arguments are premature and that Defendant improperly relies on extrinsic evidence in seeking to demonstrate coverage could exist. Dkt. 31 at 13–14.

Courts "will not give effect to interpretations that would render contract obligations illusory." *SAK & Assocs., Inc. v. Ferguson Const., Inc.*, 189 Wn. App. 405, 412, 357 P.3d 671 (2015) (citations omitted). Whether coverage is illusory is resolved by looking to the language of the contract. *See id.* at 411. Coverage is not illusory if it exists under some circumstances. *See Neil Jones Food Co. v. Traveler's Cas. Ins. Co. of Am.*, No. C15-5459-RJB, 2016 WL 150382, at *4 (W.D. Wash. Jan. 13, 2016).

The Court has concluded that the Appraised Value (Reproduction Cost New) definition—which sets out how End of Term Value is to be determined—is ambiguous. Thus, the Court cannot yet determine how or when coverage might exist under the Policy, nor can it determine whether coverage under the Policy is illusory.

The Amended Complaint alleges that Defendant agreed to pay Plaintiff for the amount that the Railcars' End of Term Value fell below their insured value of $51,815.08 per Railcar as of the August 31, 2020, lease termination date. Dkt. 14 ¶ 20. It further alleges that the Railcars' End of Term Value is no greater than $28,000, *id.* at ¶¶ 24–38, but that Defendant improperly calculated their End of Term Value at $67,500 to $69,500 by applying a straight-line

depreciation of 3.1% per year to the original equipment cost of $81,500 per Railcar—ignoring the loss of value caused by changes in market conditions, *id.* at ¶¶ 17, 40–42. Finally, it alleges that this approach renders coverage under the Policy illusory because, while the Railcars' insured value at the end of the lease term is 60% of their original equipment cost, applying a straight-line deprecation of 3.1% per year to the original equipment cost results in the Railcars' End of Term Value being approximately 84.5% of the original equipment cost, meaning there could never have been a covered loss using this approach.[5] *Id.* at ¶¶ 43–45.

Construed in the light most favorable to Plaintiff and taken as true, these allegations plausibly plead a claim for illusory coverage. Defendant's Motion should be denied.

### D.      Mandatory Appraisal Procedure

Defendant argues Plaintiff's lawsuit should be dismissed because Plaintiff failed to follow the Policy's mandatory appraisal procedures, Dkt. 23 at 26–27, which Defendant contends were a condition precedent to Plaintiff's ability to bring this action, *id.* at 27 (citing *15 Couch on Ins.* § 210:46 (recognizing that when appraisal is a condition precedent to an action on a policy, the parties must comply with the appraisal requirement before bringing an action in court); *Insured at Fault*, 15 Couch on Ins. § 211:76 ("Where appraisal is a condition precedent to an action on the policy, and the failure to secure an award upon an attempted appraisal or arbitration is due to the fault of the insured or his or her appraiser, the absence of an award is a bar to an action on the policy by the insured.")). Defendant acknowledges Plaintiff started the appraisal process, but states Plaintiff "refused to participate after a certain point unless [Defendant] would agree to [Plaintiff's] (incorrect) interpretation of Endorsement D or forego

---

[5] Though not material to the findings herein, the Court notes that Defendant's appraisal lends support to the plausibility of Plaintiff's position that Defendant's appraisal considered depreciation in determining the Railcars' End of Term Value. *See* Dkt. 32 at 8, 14.

REPORT AND RECOMMENDATION - 16

application of Endorsement D entirely." Dkt. 34 at 13.  As a result, Defendant contends no "'conclusively binding' determination of the End of Term Value of the railcars was ever made by a third Qualified Inspector/Appraiser pursuant to Section 5.03(e)." *Id.*

Article III of the Policy details certain conditions precedent to Defendant's liability, and (of relevance) requires Defendant to receive a Preliminary Notice of Claim and Notice of Claim with the supporting documentation required by §§ 5.01 and 7.03 within certain timeframes.[6] Dkt. 14 at 48.  While neither § 5.01 nor § 7.03 reference Article V's appraisal procedures, the Policy defines "Notice of Claim" to require a statement of the Railcars' End of Term Value "as finally determined in accordance with Article V . . . ." *Id.* at 46, § 2.01(dd).  Under Article V, Defendant can definitively determine the End of Term Value.  *Id.* at 50, § 5.01.  If Plaintiff objects to Defendant's determination, however, then § 5.03 of Article V outlines the appraisal process the parties should follow to conclusively determine the Railcars' End of Term Value.  *Id.* at 51, § 5.03.  This indicates that in order to comply with Article III's requirement that Defendant receive a Notice of Claim, Plaintiff's Notice of Claim needed to include either the End of Term Value as definitely determined by Defendant, or the End of Term Value conclusively determined in accordance with the appraisal process outlined in § 5.03, which it apparently did not.

Even so, the Amended Complaint provides that Plaintiff "submitted a Preliminary Notice of Claim and Notice of Claim to [Defendant] in accordance with § 5.01 of the Policy." Dkt. 14 ¶ 37.  This sufficiently pleads compliance with the relevant condition precedent, and is all that is required at the pleading stage.

Moreover, the appraisal procedures outlined in § 5.03 indicate that Defendant could have proceeded with the appraisal process absent Plaintiff's participation to conclusively determine

---

[6] The other conditions precedent listed in Article III are not relevant to Defendant's Motion.

REPORT AND RECOMMENDATION - 17

the End of Term Value. *See* Dkt. 14 at 51, § 5.03(d) (providing that "[i]f either party fails to choose a Qualified Inspector/Appraiser within fifteen (15) Business Days after having received a written request from the other party to do so, the other party will choose both Qualified Inspectors/Appraisers, and they will choose the third Qualified Inspector/Appraiser[,]" who will conclusively determine the End of Term Value). The limited authority cited by Defendant in support of its arguments indicates that only when the failure to secure an appraisal is the fault of the insured should the absence of an appraisal bar the insured from bringing an action on the policy. *See 15 Couch on Ins.* § 211:76. Here, the failure to secure a conclusively binding appraisal determining the Railcars' End of Term Value was seemingly also the fault of Defendant. Thus, the lack of such an appraisal should not bar Plaintiff's action.

E.   WCPA and IFCA Claims

Defendant moves to dismiss Plaintiff's extracontractual WCPA and IFCA claims, arguing courts "in the Western District of Washington dismiss extracontractual claims like those here when the insurer's interpretation of the policy is legally correct." Dkt. 23 at 27. Per Defendant, both claims are premised on Plaintiff's "breach of contract allegations, and the plain language of the Policy demonstrates that there could not have been a breach." Dkt. 34 at 12.

Because the Court concludes the Policy is ambiguous and the Court cannot yet determine whether there could have been a breach, Defendant's Motion as to Plaintiff's WCPA and IFCA claims should be denied.

IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, Dkt. 23, should be DENIED.

///

///

## V.    OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 15, 2022**.

Dated this 31st day of March, 2022.

*S. Kate Vaughan*

S. KATE VAUGHAN
United States Magistrate Judge