UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FINANCIAL PACIFIC LEASING INC., | CASE NO. 2:21-CV-00756-LK |
| Plaintiff, | ORDER ADOPTING REPORT AND RECOMMENDATION WITH MODIFICATIONS |
| v. | |
| RVI AMERICA INSURANCE CO., | |
| Defendant. | |

This matter comes before the Court on Defendant RVI America Insurance Company's Motion to Dismiss, Dkt. No. 23, the Report and Recommendation (the "R&R") of United States Magistrate Judge S. Kate Vaughan, Dkt. No. 43, RVI America's objections thereto, Dkt. No. 47, and the parties' supplemental briefs, Dkt. Nos. 57–59. Also before the Court are RVI America's Motion for an Order Staying All Discovery or, in the Alternative, for a Protective Order, Dkt. No. 36, Judge Vaughan's order denying that motion, Dkt. No. 51, and RVI America's partial objections to that order, Dkt. No. 52. After reviewing the full record and hearing the parties' oral arguments, the Court modifies Judge Vaughan's R&R as follows and grants in part and denies in part RVI America's motion to dismiss. RVI America's discovery motion is denied.

# I.   INTRODUCTION AND BACKGROUND

Financial Pacific is an asset-based lender that leases equipment to commercial customers. Dkt. No. 14 at 2. At the center of this dispute are 150 Greenbriar C112 Covered Hopper railcars that Financial Pacific leased to Halliburton Company (a party not otherwise featured in this case) in 2015 for a five-year term. *Id.* at 2, 5, 7. Financial Pacific purchased these railcars for $81,500 apiece and expected a residual value of $61,000 per railcar at the end of the lease term. *Id.* at 2. According to Financial Pacific, it purchased a Master Residual Value Insurance Policy (the "Policy") from RVI America to "protect itself from the risk that the actual value of the railcars at the end of the lease term would be significantly lower than the expected residual value[.]" *Id.*

## A.   Relevant Policy Provisions

The first page of the Policy states, in capitalized bold font, that it is "an indemnity against loss incurred by the insured due to a fortuitous decline in value of a class of asset to which the insured equipment belongs caused by changes in market conditions when such equipment is used and maintained as intended." *Id.* at 44. A few other Policy provisions require mention. Under Article I, RVI America agreed to indemnify Financial Pacific "as of the Lease Termination Date against Loss, if any, which shall be payable on the Settlement Date, in respect of all Units subject to a Lease." *Id.* The Policy further defines "Loss" as "the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease exceeds the sum of the End Of Term Values thereof on the Lease Termination Date, as determined in accordance with Article V., reduced by the Deductible." *Id.* at 46. The "Insured Value" of each railcar was $51,815.08, or approximately 60% of the original equipment cost. *Id.* at 3, 5.

As for End of Term Value, the Policy states that it must be "defined and determined in accordance with Section 5.02." *Id.* at 45. This is the crux of the parties' dispute. Section 5.02 of the Policy originally required the End of Term Value to be calculated by determining the greater

of three sums. *Id.* at 50. Two of those sums are not relevant to the dispute at hand. For current

purposes, it suffices to note that one of the three values was "[t]he Appraised Value of the Unit

determined under the direction of [RVI America] but at the Insured's expense, by a Qualified

Inspector/Appraiser selected and approved by [RVI America.]" *Id.* And Section 2.01(d) of the

Policy originally defined "Appraised Value" as follows:

> <u>Appraised Value</u>: with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

> > (i)     as of the Lease Termination Date;

> > (ii)    by a Qualified Inspector/Appraiser in accordance with Section 5.02(a) or Section 6.01(b)(ii), as applicable;

> > (iii)   with respect to Section 5.02(a), on the basis that such Unit complies with all standards set forth in the Equipment Portfolio Return Conditions Endorsement but with respect to Section 6.01(b)(ii), on the basis of such Unit being in its existing condition;

> > (iv)    without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

> > (v)     highest and best use without regard to quantity, location or country of registration of such Unit.

*Id.* at 44–45.

The parties, however, executed Endorsement D to the Policy, *id.* at 6, which deleted Section

5.02 in its entirety and replaced it with the following sentence: "5.02 The End of Term Value of

the Unit shall be the Appraised Value (Reproduction Cost New)." *Id.* at 60. It also deleted Section

2.01(d) of the Policy (the original "Appraised Value" definition) and replaced it with the following

definition of "Appraised Value (Reproduction Cost New)":

> Appraised Value (Reproduction Cost New): with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:
>
> > (i)     by the cost of substituting another asset of comparable utility;
> >
> > (ii)    on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e., "reproduction cost new" basis);
> >
> > (iii)   as of the applicable Lease Termination Date;
> >
> > (iv)    by a Qualified Appraiser in accordance with Section 5.02 hereof;
> >
> > (v)     on the basis that such Unit complies with all standards set forth in the Return Condition Endorsement;
> >
> > (vi)    without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and
> >
> > (vii)   without regard to quantity, location or country of registration of such Unit.

*Id.* at 59–60.

The Court's cataloguing of Policy provisions does not end there. As Judge Vaughan observed in her R&R, the parties' dispute implicates two other provisions. *See* Dkt. No. 43 at 4–6. First, Article III of the Policy sets forth four conditions precedent to filing a claim. *See* Dkt. No. 14 at 48. The only condition germane to this dispute, however, is the requirement that RVI America "must receive the Preliminary Notice of Claim and the Notice of Claim as to all Units subject to a

Lease at the times and with the supporting documentation required by Sections 5.01 and 7.03[.]" *Id.*[1] And second, Article V of the Policy establishes a mandatory mechanism for resolving disputes over the End of Term Value. *Id.* at 50. That provision requires the insured to "state in a Preliminary Notice of Claim its opinion of the End Of Term Value of each Unit subject to the Lease and the basis thereof." *Id.* Once RVI America has "all relevant documentation pertaining to the Units in question," it must, "in accordance with Section 5.02, determine the End Of Term Value of each such Unit." *Id.* The Policy makes clear that RVI America's calculation of the End of Term Value binds the parties unless RVI America receives, within 30 days, "a written notice of objection accompanied by the Insured's determination of the End Of Term Value and an appraisal of the Unit performed by a Qualified Inspector/Appraiser." *Id.*

If the insured submits a written notice of objection, Article V specifies additional processes for resolving the dispute. *Id.* at 51. The parties thereafter have 30 days to "meet and attempt to arrive at a mutually acceptable determination" and, in the event such attempt fails, they must each choose a Qualified Inspector/Appraiser. *Id.* Their Qualified Inspectors/Appraisers must then select a third Qualified Inspector/Appraiser. *Id.* "If either party fails to choose a Qualified Inspector/Appraiser within fifteen (15) Business Days after having received a written request from

---

[1] The Policy defines "Notice of Claim" and "Preliminary Notice of Claim" as follows:

> Notice of Claim: a written final notice of a Claim executed by the Insured and given to [RVI America] which: (i) states the Policy number; (ii) states the amount of the Claim; (iii) identifies the Lease as to which the Claim is made and all the Units subject to the Lease; (iv) states the End Of Term Value of such Units as finally determined in accordance with Article V.; and (v) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 have been satisfied.

> Preliminary Notice of Claim: a written preliminary notice of a Claim executed by the Insured and given to [RVI America] which: (i) states the Policy number; (ii) states the estimated amount of the anticipated Claim; (iii) identifies the Lease as to which the Claim may be made and all the Units subject to such Lease; (iv) states the Insured's opinion of the End Of Term Value of each such Unit accompanied by an appraisal of each such Unit performed by a Qualified Inspector/Appraiser; and (iv) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 will be satisfied.

Dkt. No. 14 at 46–47.

1  the other party to do so, the other party will choose both Qualified Inspectors/Appraisers, and they

2  will choose the third Qualified Inspector/Appraiser." *Id.* However the third Qualified

3  Inspector/Appraiser is ultimately selected, he or she must "make an independent determination"

4  of the End of Term Value pursuant to the Policy's criteria. *Id.* That determination is "conclusively

5  binding on the parties," although the third Qualified Inspector/Appraiser's determination cannot

6  be "less than the lower of the prior two appraisals nor greater than the higher." *Id.*

7  **B.    The Dispute**

8         According to Financial Pacific, the fair market value of a Greenbriar C112 Covered Hopper

9  railcar "plummeted to $28,000 or less" by the end of the five-year lease to Halliburton. *Id.* at 3.[2]

10  This means that each railcar was worth at least $23,815.08 less than its $51,815.08 Insured Value.

11  *See* Dkt. No. 43 at 6. Financial Pacific accordingly submitted a Preliminary Notice of Claim and

12  Notice of Claim to RVI America identifying an End of Term Value of $28,000 per Unit and a total

13  Loss of $3,572,262. Dkt. No. 14 at 8–9.[3] RVI America countered with its own calculation of the

14  End of Term Value, which it placed between $67,500 and $69,500 per Unit. *Id.* at 9. It thus

15  determined that there was no covered Loss under the Policy. *Id.*; *see id.* at 46 (defining "Loss" as

16  "the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease

17  exceeds the sum of the End Of Term Values thereof on the Lease Termination Date"). Financial

18  Pacific timely objected to RVI America's End of Term Value determination. *Id.* at 10. The parties,

19

20  [2] Financial Pacific attributes this decline in value to the 2016 drop in oil prices. Dkt. No. 14 at 8. As it explains in its amended complaint, C112 Covered Hoppers "are specialized railcars used mainly for the transportation of 'frac sand'

21  (sand used in hydraulic fracturing to facilitate the production of oil and natural gas), cement, and non-metallic minerals and earths." *Id.* at 7. Financial Pacific avers that in 2018, the market for frac sand was "further impacted . . . by the

22  use of in-basin (locally sourced) brown sand . . . in hydraulic fracturing" because in-basin sand "can be delivered to the wellhead for one-third or less of the cost of white silica sand[.]" *Id.* at 8. The market for C112 Covered Hoppers

23  is now "essentially nonexistent," and "[m]any of the large less[ors] of C112 Covered Hoppers"—for example, Financial Pacific—"are facing, or have declared, bankruptcy." *Id.*

24  [3] Financial Pacific subsequently reduced its claim to $3,524,631.84 because two of the 150 Units leased to Halliburton "were declared a total loss prior to the termination of the . . . lease[.]" Dkt. No. 14 at 9.

ORDER ADOPTING REPORT AND RECOMMENDATION WITH MODIFICATIONS - 6

1  however, did not adhere to the remainder of Article V's End of Term Value dispute procedure.

2  Financial Pacific instead filed suit in this Court for breach of contract, declaratory relief, insurance

3  bad faith, and violations of Washington's Consumer Protection Act ("CPA"), Wash. Rev. Code

4  § 19.86.020, and Insurance Fair Conduct Act ("IFCA"), *id.* § 48.30.015. Dkt. No. 1 at 10–12; Dkt.

5  No. 14 at 10–12.[4] These claims turn on interpretation of the Appraised Value (Reproduction Cost

6  New) definition used to calculate the End of Term Value.

7  **C.   RVI America's Motion to Dismiss and Motion to Stay Discovery**

8         RVI America moved to dismiss Financial Pacific's claims. Dkt. No. 23. It argued that the

9  Appraised Value (Reproduction Cost New) definition is clear and unambiguous, and, under a

10  straightforward application of that definition, Financial Pacific did not suffer a Loss and therefore

11  has no claim under the Policy. *Id.* at 20–23. RVI America also maintained that any claim for

12  illusory coverage must fail because "there are examples of when using the Appraised Value

13  (Reproduction Cost New) methodology to calculate the End of Term Value would result in a claim

14  payment obligation." *Id.* at 25. Next, RVI America urged wholesale dismissal of Financial

15  Pacific's action on the ground that the parties failed to complete Article V's mandatory End of

16  Term Value dispute process—a condition precedent to asserting a claim under the Policy. *Id.* at

17  26–27. Financial Pacific allegedly "started the claim submission procedures required by the Policy,

18  but refused to participate in the appraisal [dispute process] unless RVI would agree to FinPac's

19  (incorrect) interpretation of Endorsement D or forego application of Endorsement D entirely." *Id.*

20  at 27. Last, RVI America contended that Financial Pacific's CPA and IFCA claims must fail

21  because they are premised on an allegedly unreasonable denial of coverage, and RVI America's

22  interpretation of the Policy was legally correct. *Id.*

23

24  _____

[4] Financial Pacific's amended complaint added a claim under IFCA. *See* Dkt. No. 14 at 12.

ORDER ADOPTING REPORT AND RECOMMENDATION WITH MODIFICATIONS - 7

1    Roughly three months after RVI America filed its motion to dismiss, Financial Pacific

2    served its First Set of Interrogatories and First Requests for Production of Documents. *See* Dkt.

3    No. 37-1–37-2. RVI America opposed the request and moved the Court to stay discovery pending

4    resolution of the motion to dismiss or, alternatively, to enter a protective order with respect to

5    Financial Pacific's requests. Dkt. No. 36 at 6–9. It argued that a stay was appropriate because

6    Financial Pacific's claims involve pure questions of law—interpretation of the Policy language—

7    that must be resolved without consideration of extrinsic evidence. *Id.* at 7. And in the event the

8    Court found a stay of discovery unnecessary, RVI America pressed for a protective order that

9    would at least shield it from Financial Pacific's first interrogatories and document requests. *Id.* at

10   8. RVI America premised this alternative ask on its position that Financial Pacific's discovery

11   requests sought irrelevant information "because FinPac's claims for breach of contract and

12   'illusory' coverage are pure questions of law that are to be decided by the Court based on the clear

13   and unambiguous Policy language." *Id.* ("The requested document discovery and interrogatories

14   seek documents and information that are impermissible to show ambiguity or that coverage is

15   'illusory.'").

16   **D.    Judge Vaughan's Report and Recommendation**

17   Judge Vaughan recommended denying RVI America's motion to dismiss. Dkt. No. 43 at

18   2. As for Financial Pacific's breach of contract claim, she concluded that its amended complaint

19   states a plausible claim for relief because "on its face, the Policy's language—specifically that of

20   Endorsement D—is ambiguous." *Id.* at 9. Judge Vaughan agreed that the definition of Appraised

21   Value (Reproduction Cost New) combines "two disparate concepts." Dkt. No. 43 at 12. On the

22   one hand, the prefatory language of 2.01(d) suggests that Appraised Value must be ascertained by

23   looking to the fair market value of the railcar: "the fair retail price . . . that would result from an

24   arm's length retail sales transaction . . . between an informed and willing seller under no

1   compulsion to sell and an informed and willing purchaser . . . under no compulsion to purchase."

2   Dkt. No. 14 at 59; *see* Dkt. No. 43 at 12. This "arm's length" language, in Judge Vaughan's view,

3   evinces the parties' intent to incorporate fair market value into the definition. *See* Dkt. No. 43 at

4   12–13 ("[A]nalogous language is commonly used to define 'fair market value.' Thus, by invoking

5   such language, Endorsement D implies that an informed and willing buyer would not pay more for

6   the Railcars than their fair market value." (citation omitted)).

7       On the other hand, seven subsections specify how "fair retail price" must be determined.

8   *See* Dkt. No. 14 at 59. Judge Vaughan took specific issue with criterion (ii), which considers "the

9   expense necessary to construct an exact duplicate of a subject property," *id.*, and found that it is

10  "inherently disconnected from the Railcars' fair market value," Dkt. No. 43 at 13 ("Because it is

11  unclear how the Policy intends these two concepts to function together, the Appraised Value

12  (Reproduction Cost New) definition is ambiguous."). Nor does the ambiguity end there. Judge

13  Vaughan also determined that the Policy's stated purpose "creates ambiguity as to whether, and to

14  what extent, the market should be considered in determining the Railcars' End of Term Value."

15  *Id.* The Policy—again, as Judge Vaughan read it—necessarily calls for consideration of fair market

16  value because it purports to protect Financial Pacific against loss resulting from "a fortuitous

17  decline in value of a class of asset . . . caused by changes in market conditions." Dkt. No. 14 at 44.

18  Her rhetorical question best summarizes the perceived issue: "[h]ow can the Policy intend to

19  indemnify against a fortuitous decline in the Railcars' value caused by changes in market

20  conditions if it fails to consider market conditions at all?" Dkt. No. 43 at 14.

21      Most of Judge Vaughan's R&R turns on her ambiguity determination. With respect to

22  Financial Pacific's illusory coverage claim, Judge Vaughan could not assess "how or when

23  coverage might exist under the Policy" because the Appraised Value (Reproduction Cost New)

24  definition is ambiguous. *Id.* at 15. The R&R also concluded that Financial Pacific otherwise stated

a plausible claim for relief, assuming that its allegations about RVI America's calculation are true—i.e., the Insured Value of each railcar is 60% of the original equipment cost but the End of Term Value is approximately 84.5% of the original equipment cost, "meaning there could never have been a covered loss using this approach." *Id.* at 16; *see* Dkt. No. 14 at 46 (defining "Loss" as "the amount, if any, by which the sum of the Insured Value of all Units . . . exceeds the sum of the End Of Term Values thereof[.]"). Judge Vaughan likewise concluded that Financial Pacific's CPA and IFCA claims should survive. Although RVI America urged dismissal of these claims based on its purportedly correct interpretation of the Policy, here again Judge Vaughan's ambiguity finding foreclosed such a result. *See* Dkt. No. 43 at 18.

Judge Vaughan was also unpersuaded by RVI America's arguments about the Policy's allegedly mandatory End of Term Value dispute procedure. Two considerations underpin her rejection of this defense. First, Financial Pacific alleged in its amended complaint that it submitted a Preliminary Notice of Claim and Notice of Claim to RVI America in accordance with Policy requirements. *Id.* at 17; *see* Dkt. No. 14 at 10 (alleging that Financial Pacific "has satisfied all conditions precedent."). Judge Vaughan found that this "is all that is required at the pleading stage." Dkt. No. 43 at 17. And second, "only when the failure to secure an appraisal is the fault of the insured should the absence of an appraisal bar the insured from bringing an action on the policy." *Id.* at 18. Here, Judge Vaughan concluded that RVI America "could have proceeded with the appraisal process absent [Financial Pacific]'s participation to conclusively determine the End of Term Value." *Id.* at 17–18. Thus, RVI America was at least partially at fault for the parties' failure to secure a conclusively binding End of Term Value determination, and Financial Pacific's action should not be barred. *Id.* at 18. RVI America filed timely objections. Dkt. No. 47.

1  **E.       Judge Vaughan's Order on the Discovery Motion**

2          Judge Vaughan subsequently denied RVI America's motion to stay discovery. Dkt. No. 51

3  at 4. In doing so, she rejected RVI America's argument that a stay was proper simply because it

4  had filed a motion to dismiss: "[i]ndeed, the undersigned recommends denying [RVI America]'s

5  Motion to Dismiss, believing both that [Financial Pacific] has successfully stated a claim for relief

6  and that, because the Policy is ambiguous, extrinsic evidence is relevant to ascertaining its

7  meaning." *Id.* at 3. RVI America's alternative bid for a protective order fared no better. Judge

8  Vaughan reasoned that because the Policy is ambiguous, the extrinsic evidence sought by Financial

9  Pacific is relevant and a "blanket protective order" precluding access to that evidence is

10 inappropriate. *Id.* at 5. And as Judge Vaughan further observed, RVI America "made no showing

11 suggesting [Financial Pacific]'s discovery requests annoy, embarrass, oppress, or impose an undue

12 burden or expense on it." *Id.* at 5–6. RVI America again filed timely objections. Dkt. No. 52.

13                                    **II.       DISCUSSION**

14         The Court first addresses RVI America's objections to Judge Vaughan's R&R. Because

15 the Policy language at issue is ambiguous, the Court denies RVI America's request to stay

16 discovery or, alternatively, for a protective order.

17 **A.       Objections To Report And Recommendation**

18         The Court makes "a de novo determination of those portions of the [R&R] to which

19 objection is made," and "may accept, reject, or modify, in whole or in part, the recommendations

20 made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) (the Court

21 "must determine de novo any part of the magistrate judge's disposition that has been properly

22 objected to."). As the statute and rule suggest, the Court reviews findings and recommendations

23 "*if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th

24 Cir. 2003) (en banc); *accord Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005).

1          1.     Legal Standard

2          Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory

3  or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular*

4  *Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true

5  all factual allegations in the complaint and construes them in the light most favorable to the

6  nonmoving party. *Gonzalez v. Google LLC*, 2 F.4th 871, 885 (9th Cir. 2021). "To survive a motion

7  to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

8  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

9  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) (a plaintiff must make a

10  "short and plain statement of the claim showing that [he] is entitled to relief"). A claim is facially

11  plausible "when the pleaded factual content allows the court to draw the reasonable inference that

12  the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

13          2.     Choice-Of-Law Provision

14          As an initial matter, the parties dispute whether Washington or Connecticut law applies to

15  the interpretation of the Policy. *See* Dkt. No. 43 at 7. The Policy contains a choice-of-law provision

16  stating that it "shall be governed by and construed in accordance with the laws of the state of [RVI

17  America's] domicile," which is Connecticut. Dkt. No. 14 at 3, 54. Under Washington law,

18  however, "no insurance contract delivered or issued for delivery in this state and covering subjects

19  located, resident, or to be performed in this state, shall contain any condition, stipulation, or

20  agreement . . . requiring it to be construed according to the laws of any other state or country[.]"

21  Wash. Rev. Code § 48.18.200(1). Any provision that violates this directive "shall be void[.]" *Id.* §

22  48.18.200(2); *see, e.g.*, *Providence Health & Servs. v. Certain Underwriters at Lloyd's London*,

23  358 F. Supp. 3d 1195, 1199 (W.D. Wash. 2019) (insurance policy's New York choice-of-law

24  provision was void under Section 48.18.200).

RVI America argues that "[f]or purposes of the instant motion only, it makes no difference if the law of Connecticut or the law of Washington applies because the outcome is the same under either state's law." Dkt. No. 23 at 16 n.3. It cites to both Washington and Connecticut law in its briefing. *See generally* Dkt. No. 23. For its part, Financial Pacific emphatically asserts that Section 48.18.200 voids the Policy's choice-of-law provision and, as a result, Washington law applies:

> Financial Pacific is a Washington corporation with its principal place of business in Federal Way[,] and the insurance polic[y] was issued for delivery, and delivered[,] to Financial Pacific[] in Washington. Further, the RVI policy 'covers subjects located, resident, or to be performed in' Washington, as this specialized insurance covers the value of Financial Pacific's financial interest in property, rather than casualty loss (i.e., damage) to any physical property. The 'subject' that the RVI policy covers, then, for purposes of [Section] 48.10.200(1)(a) is Financial Pacific's ownership interest in the subject leased property, rather than the inherently transient railcars themselves. That subject—the value of Financial Pacific's ownership interest—is located in Washington and the insurance obligation thus is to be performed in Washington.

Dkt. No. 31 at 7 (citations omitted). Despite RVI America's ambivalence about Connecticut versus Washington law for purposes of this motion, it counters that Section 48.18.200(1)(a) does not apply here because the railcars "were not located or resident in Washington." Dkt. No. 34 at 4 n.1. Judge Vaughan sidestepped the choice-of-law issue because, in her view, the outcome was the same under either Washington or Connecticut law: "the Court need not resolve . . . the issue of choice of law at this time. The Court concludes that on its face, the Policy's language—specifically that of Endorsement D—is ambiguous." Dkt. No. 43 at 9. She then relied on Washington law to find the Appraised Value (Reproduction Cost New) definition ambiguous. *See id.* at 9–14. RVI America objects to Judge Vaughan's Report and Recommendation "[t]o the extent that [it] found that Washington law governs[.]" Dkt. No. 47 at 14.

Where, as here, the Court is sitting in diversity, it applies Washington's choice-of-law rules. *See Coneff v. AT & T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012). "Under Washington law, when parties dispute choice of law, there must be an actual conflict between the laws or interests

of Washington and the laws or interests of another state before the Court will engage in a conflict-of-laws analysis." *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1126 (W.D. Wash. Feb. 12, 2010) (citing *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007)); *accord Seizer v. Sessions*, 940 P.2d 261, 264 (Wash. 1997) (a real conflict exists only "[w]hen the result of the issues is different under the law of the two states"). Washington law applies absent an actual conflict. *Carideo*, 706 F. Supp. 2d at 1126.

The Court's ruling on each of RVI's motions would be the same regardless of whether Washington or Connecticut law applies. *Compare, e.g.*, *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) (discussing criteria for interpreting insurance contracts, including ambiguity and when it exists), *with Karas v. Liberty Ins. Corp.*, 228 A.3d 1012, 1020 (Conn. 2019) (same). The Court therefore applies Washington law.

3. <u>Breach Of Contract</u>

Financial Pacific alleges that RVI America breached the Policy "by failing to pay for the loss incurred . . . for the decline in value of the Hal[l]iburton Units caused by changes in market conditions." Dkt. No. 14 at 10. However, the parties hotly dispute how the rail cars' end of term value should be appraised under the Policy.

The brunt of RVI America's objections center on Judge Vaughan's finding that the Policy language at issue—Endorsement D's Appraised Value (Reproduction Cost New) definition—is ambiguous because reproduction cost new is "entirely disconnected from the Railcars' fair market value." Dkt. No. 43 at 13; *see* Dkt. No. 47 at 8–13. According to RVI America, "Endorsement D sets forth a specific process for determining 'fair retail price' without any regard to fair market value." *Id.* at 8. Although Endorsement D "mentions 'arm's-length retail sales transaction,'" these words "are descriptive and illustrative for contract interpretation purposes" rather than "prescriptive and mandatory." *Id.* (quoting Dkt. No. 1 at 59).

Financial Pacific counters with the opposite position. It argues that Endorsement D is ambiguous because it "contains two entirely disparate and irreconcilable concepts of valuation." Dkt. No. 48 at 2. The prefatory language of Endorsement D, as Financial Pacific reads it, refers to an "arm's length transaction" and thus mandates consideration of fair market value, while the latter portion of Endorsement D indicates that "fair retail price" must be determined, in relevant part, "on the basis of the expense necessary to construct an exact duplicate of" the insured railcar. *Id.* at 3 (internal quotation marks omitted) (quoting Dkt. No. 1 at 59) (highlighting allegedly conflicting language in green and red). In its supplemental briefing, Financial Pacific also contends that Section 2.01(d)(i) and (ii) (the first two criteria for ascertaining fair retail price) conflict and thus "highlight[] the uncertainty in meaning identified by Magistrate Judge Vaughan in her Report and Recommendation." Dkt. No. 58 at 3. According to Financial Pacific, subsection (d)(i)'s comparable utility requirement "is entirely separate from—and unconnected with—the cost to construct an exact duplicate" under subsection (d)(ii). *Id.* ("Whether the insured property is obsolete or is otherwise fit for some purpose . . . has no relationship to the expense necessary to construct it.").

The Court disagrees with Financial Pacific's argument that the prefatory language in Endorsement D defines how to determine fair retail price. However, it agrees that subsections 2.01(d)(i) and (d)(ii) render Endorsement D ambiguous.

   a.   *Contract Interpretation In Washington*

"The criteria for interpreting insurance contracts in Washington are well settled." *Quadrant Corp.*, 110 P.3d at 737. The "primary goal" is to ascertain and give effect to the parties' intent at the time of the Policy's execution, not "the interpretations the parties are advocating at the time of the litigation." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 399–400 (Wash. 2013). The Court therefore "focus[es] on the objective manifestation of the agreement, rather than

1   the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115

2   P.3d 262, 267 (Wash. 2005). This principle is "quite simple": the parties' "[u]nilateral or subjective

3   purposes and intentions about the meanings of what is written do not constitute evidence of [their]

4   intentions." *Lynott v. Nat'l Union Fire Ins. Co.*, 871 P.2d 146, 149 (Wash. 1994). Thus, although

5   "[a]n interpretation of an insurance clause must be reasonable and take into account the purpose

6   of the insurance at issue," *Lynott*, 871 P.2d at 152, the "expectations of the insured cannot override

7   the plain language of the contract," *Quadrant Corp.*, 110 P.3d at 737. The Court will "not interpret

8   what was intended to be written but what was written." *Hearst*, 115 P.3d at 267.

9        In doing so, the Court "construe[s the] insurance polic[y] as a whole and give[s] the

10   language a fair, reasonable, and sensible construction as would be given to the contract by the

11   average person purchasing insurance." *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK)*

12   *PLC*, 516 P.3d 796, 800 (Wash. 2022) (cleaned up). Undefined terms are given "their popular and

13   ordinary meaning in accord with the understanding of the average purchaser of insurance[.]" *Kut*

14   *Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016). But when the Policy expressly defines

15   terms, the Court is bound by those definitions. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 327

16   (Wash. 2002). Again, the Court must enforce clear and unambiguous language as written and will

17   not "modify the contract or create ambiguity where none exists." *Transcon. Ins. Co. v. Wash. Pub.*

18   *Utilities Dists.' Util. Sys.*, 760 P.2d 337, 340 (Wash. 1988). Nor will the Court inject ambiguity

19   into the Policy so that it may be construed in favor of the insured. *See ABCD Marine*, 313 P.3d at

20   400.

21        The Washington Supreme Court has emphasized that policy language is ambiguous "if, on

22   its face, it is fairly susceptible to two different but reasonable interpretations." *Seattle Tunnel*

23   *Partners*, 516 P.3d at 800. Contract provisions can also be ambiguous if their terms are uncertain.

24   *Brower Co. v. Baker & Ford Co.*, 431 P.2d 595, 597 (Wash. 1967); *Dan's Trucking, Inc. v. Kerr*

*Contractors, Inc.*, 332 P.3d 1154, 1158 (Wash. Ct. App. 2014). However, language is not ambiguous just because one party suggests an opposing meaning. *Davis v. State, Dep't of Transp.*, 159 P.3d 427, 431 (Wash. Ct. App. 2007). Indeed, the Court "will not read ambiguity into a contract where it can reasonably be avoided." *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014) (cleaned up).

One final point deserves mention. As noted, the Court construes the Policy as a whole, meaning it "give[s] force and effect to each clause." *Transcon. Ins. Co.*, 760 P.2d at 340; *Certification from U.S. Dist. Ct. ex rel. W. Dist. of Wash. (Kroeber) v. GEICO Ins. Co.*, 366 P.3d 1237, 1239 (Wash. 2016) ("This court views an insurance contract in its entirety, does not interpret a phrase in isolation, and gives effect to each provision."). As particularly relevant here, this includes consideration of "endorsements that explicitly change the terms of the policy." *Kut Suen Lui*, 375 P.3d at 602; s*ee Transcon. Ins. Co.*, 760 P.2d at 343 (an endorsement forms part of the policy "even if the result is a new and different contract"); Wash. Rev. Code § 48.18.520 (insurance contracts "shall be construed" as modified by any endorsement).

       b.     *Endorsement D's Valuation Approach Is Not In The Prefatory Language*

The Court begins with the prefatory language of Endorsement D. The parties agreed that, with respect to each railcar, the Appraised Value (Reproduction Cost New) is

> the *fair retail price* . . . that would result from an arm's-length retail sales transaction . . . between an informed and willing seller under no compulsion to sell and an informed and willing purchaser . . . under no compulsion to purchase, who is purchasing the [railcar] for its own usage (not for resale) with the intent of utilizing the [railcar] in accordance with the [railcar's] intended usage, *such fair retail price being determined:*
>
> (i)      by the cost of substituting another asset of comparable utility;
>
> (ii)     on the basis of the expense necessary to construct an exact duplicate of [the railcar]," given "current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e., 'reproduction cost new' basis)";

1        (iii)    as of the applicable Lease Termination Date . . . .

2   Dkt. No. 14 at 59 (emphasis added). The criteria for determining "fair retail price" includes seven

3   subsections, but only the three above are relevant for purposes of the parties' dispute.

4        In urging that Endorsement D's valuation approach is defined by the language preceding

5   "such fair retail price being determined," Financial Pacific reads into the Policy something that is

6   not there. The Policy states that the Appraised Value (Reproduction Cost New) of each railcar is

7   the "fair retail price," and it specifically defines that term in the subsections (i.e., by the cost of

8   substituting another asset of comparable utility "on the basis of the expense necessary to construct

9   an exact duplicate of [the] subject property, considering current prices for identical components,

10  criteria, design, arrangement, and quality meeting current regulatory requirements," as of the

11  applicable Lease Termination Date). Nowhere does "fair market value" appear. Financial Pacific

12  nonetheless contends that reference to "arm's length retail sales transaction" and "informed and

13  willing" sellers and buyers operates as talismanic language incorporating "fair market value" into

14  the definition and superseding any subsequent language purporting to define the valuation

15  approach. *See id.* at 4–5 ("[T]he phrases 'arms-length transaction' [sic] and 'informed and willing'

16  buyer and sellers are the fundamental building blocks of the typical definition of fair market

17  value."). This language does not have the effect or meaning that Financial Pacific suggests.

18       Two strong cues support that the parties intended "fair retail price" to be determined by the

19  listed criteria, not the prefatory language. First, the parties' use of the phrase "such fair retail price

20  being determined" followed by a colon makes it clear that the fair retail price must be determined

21  by the criteria following the colon. *Id.* at 59. A sentence that follows a colon is one that "illustrates,

22  extends, or amplifies the preceding thought." American Psychological Association, *What are the*

23  *correct ways to use a colon?*, https://apastyle.apa.org/learn/faqs/colon-use (last visited Jan. 15,

24  2016); *see also United States v. Ernest E Marks Co.*, 29 C.C.P.A. 77, 80 (1941) ("[I]f the ordinary

rules of grammatical construction be followed, the language before the colon . . . must be regarded as descriptive only[.]"). Here, "such fair retail price being determined," coupled with a colon and the ensuing numbered list, suggests that the list describes how to determine the fair retail price. *See Bachstein v. Discord, Inc.*, 424 F. Supp. 3d 1154, 1159 (M.D. Fla. 2019) ("[T]he sentence ends in a colon, which is followed by a bulleted list of terms, suggesting that the additional terms and conditions being referred to are contained in the bulleted list that follows."). Indeed, the parties' other uses of colons in the Policy have the same function. *See, e.g.*, Dkt. No. 14 at 36–37 ("At the time of return, each Unit shall:" followed by a numbered list describing requirements at the time of a unit's return). Second, in executing Endorsement D, the parties kept the prefatory language from the prior version of Section 2.01(d), but changed the criteria explaining how "such fair retail price" would "be[] determined." *Compare* Dkt. No. 14 at 44–45 *with id.* at 59–60; *see also* Dkt. No. 56 at 31–32. Thus, the parties could not have intended or understood the prefatory language to have independent, talismanic significance.

In sum, the text following the colon—not the prefatory language—defines the specific valuation approach for the "fair retail price." But the clarity ends there.

### c.    *Sections 2.01(d)(i) And (ii) Render Endorsement D Ambiguous*

As discussed above, the parties agreed that fair retail price of the rail cars would be determined "by the cost of substituting another asset of comparable utility . . . on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements[.]" Dkt. No. 14 at 59. The parties do not dispute that "a subject property" refers to the rail cars. *See* Dkt. No. 57 at 5; Dkt. No. 58 at 2–3. However, the operative language creates a potential conflict because the cost of substituting another asset of comparable utility for a rail car is not necessarily the same as the expense of constructing an exact duplicate of a rail car.

Endorsement D therefore calls for two potentially irreconcilable valuation methods. And to salvage Endorsement D, the Court would have to render Section 2.01(d)(i) or (d)(ii) meaningless. That it cannot do.

An analogy is helpful. If the insured property were a 2017 Ford F-150, the policy would require an appraiser to determine its fair retail price by (1) the cost of substituting another truck of comparable utility (say, a Ram 1500), (2) "on the basis of" the cost of constructing the F-150 new using current prices for its components, etc., and meeting the quality standards required by current regulations. It is entirely possible that those two values are different. And if the Ram 1500's price was $25,000 and the cost to build the F-150 new was $35,000, the language of the agreement does not provide a legally viable avenue for resolution. Either the appraiser is to determine the cost of substitution (which in reality is $25,000) "on the basis of" something different (i.e., the $35,000 new build cost), in which case the language of Section 2.01(d)(i) is rendered meaningless, or the appraiser is left with two different numbers and no language in Endorsement D indicating how to reconcile them.

"An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective, and a court should not disregard language that the parties have used." *Snohomish Cnty. Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 271 P.3d 850, 856 (Wash. 2012). The plain language of Endorsement D does not provide a clear way to give effect to both Section 2.01(d)(i) and (ii). *See Slottow v. Am. Cas. Co. of Reading, Pa.*, 10 F.3d 1355, 1361 (9th Cir. 1993) (language preceding a colon applies equally to the clauses that follow). And although the thrust of Endorsement D—as indicated by its title—seems to be that the appraisal value of the rail cars is "reproduction cost new,"[5] such construction renders ineffective

---

[5] *See* Dkt. No. 14 at 59 (endorsements title is "Endorsement D Establishment of Reproduction Cost New Appraisal

Section 2.01(d)(i). Indeed, cases and articles discussing the different valuation methods suggest that substitution (i.e., replacement) cost and reproduction cost are often two different values.[6] The excerpt of the "Valuing Machinery and Equipment" text that RVI America attaches to its supplemental brief also differentiates between the two: "The appraiser starts with the current replacement cost new (or in some circumstances the reproduction cost new) of the property being appraised[.]" Dkt. No. 57 at 12.

The Court thus reaches the same conclusion as the R&R, albeit via a different path: the Policy is ambiguous.

d. *Financial Pacific's Breach Of Contract Claim Must Be Dismissed*

RVI America contends that, because the Appraised Value (Reproduction Cost New) definition is unambiguous, "FinPac failed to state a breach of contract claim." Dkt. No. 47 at 13. The Court disagrees because it finds the definition ambiguous for the reasons just discussed. However, it is unclear whether—and to what degree—Financial Pacific's breach of contract claim is based on its failed arguments regarding the prefatory text of Endorsement D.

Financial Pacific predicates its breach of contract claim on RVI America's "fail[ure] to pay for . . . the decline in value of the Hal[l]iburton Units caused by changes in market conditions."

---

Methodology for Two Hundred Fifty (250) Units Only," and subsection (d) heading is "Appraised Value (Reproduction Cost New)" (capitalization altered)); *see also id.* at 60 (stating that old section 5.02 is "deleted and replaced" with "5.02 The End of Term Value of the Unit shall be the Appraised Value (Reproduction Cost New)").

[6] *See, e.g.*, Robert F. Reilly, *Personal Property Appraisal Report Guidelines*, 23 Am. Bankr. Inst. J. 46, 67 (July/August 2004) ("It is essential that the appraiser understand the difference between replacement cost new and reproduction cost new. Replacement cost is the current cost of a similar new property having the nearest equivalent utility as the property being appraised, whereas reproduction cost is the current cost of reproducing a new replica of the property being appraised using the same, or closely similar, materials." (quoting *Valuing Machinery and Equipment*, American Society of Appraisers, 2000, p. 46)); James A. Amdur, *Property Taxation of Regulated Industries*, 40 Tax Law. 339, 359–60 (1987) ("In theory, functional obsolescence [i.e., loss in value resulting from improvements in technology and inadequacy of the property for present needs] is the difference between reproduction cost new and replacement cost new. It reflects the fact that a company ordinarily would not reproduce the property, but rather would replace it with a substitute reflecting the current state of the art." (footnote omitted)); *Farmers Union Cent. Exch. v. FERC*, 584 F.2d 408, 412 n.3 (D.C. Cir. 1978) (differentiating between "the reproduction cost (present cost of reproducing the same physical assets)" and "the replacement cost (present cost of building a like enterprise taking advantage of modern technology)").

ORDER ADOPTING REPORT AND RECOMMENDATION WITH MODIFICATIONS - 21

Dkt. No. 14 at 10. "Changes in market conditions" can be reflected in either reproduction cost new or replacement cost new, because those valuation approaches consider current prices for either a comparable substitute for, or a new reconstruction of, the subject property. However, there is some indicia that Financial Pacific's allegations are based on its theory that the prefatory language of Endorsement D defines the valuation method. *See, e.g.*, *id.* at 8–9 (alleging that RVI America should have valued the cars at their fair market value of $28,000 or less); Dkt. No. 31 at 5, 14 (same); Dkt. No. 48 at 2–6 (same). To the extent Financial Pacific's breach of contract claim is premised on that now-rejected theory, the claim is dismissed. The Court will permit Financial Pacific to revise its breach of contract theory in a second amended complaint.

    4.   <u>Illusory Coverage</u>

       RVI America next argues that Financial Pacific's illusory coverage claim should be dismissed. Dkt. No. 47 at 13–14. To recap, Financial Pacific seeks a declaratory judgment that the Policy's coverage is illusory and therefore unenforceable, even if RVI America's interpretation of the Appraised Value (Reproduction Cost New) definition is correct. Dkt. No. 14 at 10. Judge Vaughan found that she could not determine "how or when coverage might exist under the Policy" or "whether coverage under the Policy is illusory" because the Appraised Value (Reproduction Cost New) definition is ambiguous. Dkt. No. 43 at 15. As with Financial Pacific's breach of contract claim, RVI America now contends that any claim for illusory coverage must also fail because the Policy is unambiguous. Dkt. No. 47 at 14. The Court disagrees.

       An insurance policy is illusory if an insured does not receive some benefit (i.e., coverage) in exchange for the insurance premiums it pays, such as when a policy excludes coverage for all occurrences. *Neil Jones Food Co. v. Traveler's Cas. Ins. Co.*, No. 3:15-CV-5459-RJB, 2016 WL 150382, at *3–4 (W.D. Wash. Jan. 13, 2016) (policies were not illusory because they provided coverage "in at least two circumstances, either of which would be legally sufficient on its own");

1    *Quadrant Corp.*, 110 P.3d at 743 ("If the absolute pollution exclusion is so broad that it excludes

2    coverage for all occurrences, then the insurance contract would be illusory because it would render

3    the business liability policy meaningless."). Courts will not give effect to interpretations that would

4    render a contract illusory. *SAK & Assocs., Inc. v. Ferguson Constr., Inc.*, 357 P.3d 671, 675 (Wash.

5    Ct. App. 2015).

6         Financial Pacific alleges that RVI America's calculation of End of Term Value applies a

7    straight-line depreciation of 3.1% per year. Dkt. No. 14 at 9. Thus, at the end of a five-year lease,

8    the railcars' End of Term Value is approximately 84.5% of the original equipment cost. *Id.* The

9    problem is that the Insured Value of the railcars is only 60% of the original equipment cost,

10   meaning "there could never be a covered loss under RVI's calculation of the End of Term Value."

11   *Id.*; *see* Dkt. No. 14 at 46 (defining "Loss" as "the amount, if any, by which the sum of the Insured

12   Values of all Units . . . exceeds the sum of the End of Term Values thereof on the Lease

13   Termination Date[.]"). RVI America counters with a hypothetical situation in which the railcars

14   "might have depreciated along a more normal curve" and resulted in a covered loss. Dkt. No. 23

15   at 26.

16        As a threshold matter, it is unclear where depreciation comes into play in Section 2.01(d).

17   RVI America argues that Endorsement D follows the "cost approach," which "*starts* with the

18   current replacement cost new (or in some circumstances the reproduction cost new) of the property

19   being appraised, and *then* deducts for the loss in value caused by physical deterioration, functional

20   obsolescence, and economic obsolescence." Dkt. No. 57 at 5, 8–9, 12 (emphasis added). But while

21   the cost approach is a common valuation method to "estimate[] the current cost (as if new) of the

22   subject property less all forms of depreciation," Reilly, *Personal Property Appraisal Report*

23   *Guidelines*, 23 Am. Bankr. Inst. J. at 67, nothing in Section 2.01(d) mentions depreciation. Instead,

24   Section 2.01(d) includes only the starting points of the cost approach: replacement cost new and

1    reproduction cost new. Dkt. No. 14 at 59.

2         In any event, Section 2.01(d)'s ambiguity makes it impossible for the Court to determine

3    at this juncture whether the Policy is illusory. Taken as true, Financial Pacific's allegations

4    sufficiently plead a claim for illusory coverage, and nothing in RVI America's objections changes

5    that. Indeed, and as already noted, its objections rely on its failed argument that the Appraised

6    Value (Reproduction Cost New) definition is unambiguous. Dkt. No. 47 at 13–14. The motion to

7    dismiss is denied with respect to this claim.

8         5.    Declaratory Judgment

9         Judge Vaughan's Report and Recommendation does not address Financial Pacific's

10   declaratory judgment claim. *See generally* Dkt. No. 43; Dkt. No. 14 at 10–11; *but see* Dkt. No. 48

11   at 10 (response to objections arguing that declaratory judgment claim should not be dismissed). In

12   its complaint, Financial Pacific contends that it is entitled to "declaratory relief holding that . . .

13   the determination of End of Term Value under the Policy is ambiguous and must be construed to

14   accomplish the purpose of the insurance purchased[.]" Dkt. No. 14 at 10. It similarly requests a

15   judicial declaration that it is "entitled to coverage for the amount by which the sum of the Insured

16   Values of the Hal[l]iburton Units exceeds the fair market value of the units at the Lease

17   Termination Date." *Id.* at 11. This portion of Financial Pacific's declaratory judgment claim is

18   dismissed (with leave to amend) because it relies on the failed argument that Endorsement D's

19   valuation method is set out in the prefatory language. However, Financial Pacific alternatively asks

20   for declaratory relief stating that "RVI's calculation of End of Term Value and covered Loss would

21   render coverage under the Policy illusory and is therefore unenforceable[.]" Dkt. No. 14 at 10.

22   This aspect of its claim survives for the reasons set forth above.

23        6.    Bad Faith

24        Financial Pacific alleges that RVI America breached its duties of good faith and fair dealing

by "denying coverage based on [an] unreasonable, frivolous, [and] unfounded interpretation of the Policy," and "issuing an insurance policy that, under RVI's proffered post-claim interpretation of the applicable policy language, could not (i) transfer risk from Financial Pacific to RVI or (ii) provide coverage consistent with RVI's pre-claim representations to Financial Pacific." Dkt. No. 14 at 11. Although RVI America's motion to dismiss asserts that "FinPac's Third Cause of Action (Insurance Bad Faith) is predicated entirely on FinPac's breach of contract claim," Dkt. No. 23 at 11, the motion does not otherwise mention the bad faith claim, *see generally* Dkt. No. 23. Nor does Judge Vaughan's Report and Recommendation. *See generally* Dkt. No. 43.

The Court declines to dismiss Financial Pacific's bad faith claim in the absence of any argument from RVI America regarding why it should do so.

## 7. CPA and IFCA

RVI America next argues that Financial Pacific's CPA and IFCA claims should be dismissed. Dkt. No. 47 at 14. Here again, the basis for its objection is that the Policy language is unambiguous and, because Financial Pacific's breach of contract claim fails, so too must its extracontractual claims. *Id.* But again the Court disagrees—at least in part.

### a. *CPA Claim*

Financial Pacific bases its CPA claim on RVI America's alleged bad faith (as detailed above) and violations of two insurance regulations. Dkt. No. 14 at 11–12. Specifically, Financial Pacific alleges that RVI America refused to pay its loss claim without conducting a reasonable investigation, *see* Wash. Admin. Code § 284-30-330(4), and failed to promptly provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for denial of its claim, *see id.* § 284-30-330(13). Dkt. No. 14 at 11–12.

To establish a CPA claim, a plaintiff must show that (1) the defendant engaged in an unfair or deceptive act or practice (2) occurring in trade or commerce and (3) impacting the public interest

that (4) injured the plaintiff's business or property and (5) was caused by the defendant. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). Violations of Washington's insurance regulations are per se violations of the CPA. *Truck Ins. Exch. v. Vanport Homes, Inc.*, 58 P.3d 276, 283–84 (Wash. 2002). An insurer's bad faith likewise constitutes a per se violation of the CPA. *Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co.*, 206 P.3d 1255, 1262 (Wash. Ct. App. 2009).

Financial Pacific has pleaded a plausible CPA claim based on RVI America's alleged bad faith, *see supra* Section II.A.6, and on its alleged violation of Section 284-30-330(13) of Washington's insurance regulations. That is not the case, however, with respect to the alleged violation of Section 284-30-330(4) of Washington's insurance regulations.

"An insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a defense that [a] reasonable investigation would have proved to be without merit." *Rizzuti*, 105 P.3d at 1020. It is unfair and deceptive for an insurer to refuse to pay claims without conducting a reasonable investigation. Wash. Admin. Code § 284-30-330(4). But nowhere in its amended complaint does Financial Pacific advance facts that, taken as true, demonstrate a deficiency in RVI America's investigation. Indeed, Financial Pacific takes issue with RVI America's interpretation and application of the Appraised Value (Reproduction Cost New) definition to the facts of the claim, not its predicate investigation. *See Young v. Safeco Ins. Co. of Am.*, No. 20-CV-01816-LK, 2022 WL 4017893, at *15 (W.D. Wash. Sept. 2, 2022) ("[T]he crux of this dispute is not the sufficiency of Safeco's underlying investigation—it is Safeco's application of the vandalism provision to the facts uncovered during that investigation."). This portion of Financial Pacific's CPA claim is dismissed. Financial Pacific will have the opportunity to supply allegations in support of this claim in a second amended complaint.

RVI America's motion to dismiss is granted in part and denied in part with respect to

Financial Pacific's CPA claim.

   b.  *IFCA Claim*

   Financial Pacific alleges that RVI America violated IFCA by "unreasonably failing and refusing to cover" its loss claim. Dkt. No. 14 at 12. It further contends that the alleged insurance regulation violations discussed above constitute violations of IFCA. *Id.*

   IFCA authorizes a first-party claimant to an insurance policy "who is unreasonably denied a claim for coverage or payment of benefits by an insurer" to bring an action for damages. Wash. Rev. Code § 48.30.015(1). The statute creates two circumstances under which an insurer may be liable: when it unreasonably denies a claim for coverage or when it unreasonably denies a payment of benefits. *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6, 20 (Wash. Ct. App. 2014). As relevant here, an insurer also violates IFCA when it violates any of the insurance regulations. *See* Wash. Rev. Code § 48.30.015(5)(a). But the Washington Supreme Court has clarified that IFCA "does not create an independent cause of action for regulatory violations" absent an underlying unreasonable denial of coverage or payment of benefits. *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 483 (Wash. 2017).

   Financial Pacific has pleaded a plausible IFCA claim based on RVI America's allegedly unreasonable denial of coverage, *see supra* Section II.A.6, and on its alleged violation of Section 284-30-330(13) of Washington's insurance regulations. However, for the reasons discussed above, the portion of Financial Pacific's IFCA claim predicated on RVI America's violation of Section 284-30-330(4) of the Washington Administrative Code is dismissed with leave to amend. RVI America's motion to dismiss is granted in part and denied in part with respect to Financial Pacific's IFCA claim.

   8.  <u>Mandatory Appraisal Procedure</u>

   According to RVI America, "no 'conclusively binding' determination of the End of Term

Value of the railcars was ever made by a third Qualified Inspector/Appraiser pursuant to Section 5.03(e)." Dkt. No. 34 at 13. It contends that Financial Pacific "does not have a claim under the Policy entitling it to relief" until the appraisal procedure is completed. Dkt. No. 23 at 27; *see* Dkt. No. 34 at 13 ("It is well-established that, where the insurance policy has mandatory appraisal procedures, the insured must complete these appraisal proceedings before it can bring an action against the insurer."). Judge Vaughan rejected this argument on two grounds. First, she reasoned that Financial Pacific sufficiently pleaded compliance with all conditions precedent by alleging that it had submitted a Preliminary Notice of Claim and Notice of Claim to RVI America. Dkt. No. 43 at 17. And second, RVI America could have unilaterally proceeded with the appraisal procedure to obtain a "conclusively binding" End of Term Value without Financial Pacific's participation. *Id.* at 17–18; Dkt. No. 14 at 51 (stating that if either party fails to choose an appraiser within 15 business days after having received a written request from the other party to do so, the requesting party will choose both appraisers, who will then choose a third appraiser to make a conclusively binding End of Term Value determination). Judge Vaughan thus concluded that the failure to secure a conclusively binding End of Term Value was "also the fault of [RVI America]," and the lack of such an appraisal should not bar Financial Pacific's claims. Dkt. No. 43 at 18.

RVI America's objections on this issue are paltry to say the least. It cites to its motion and reply brief and states that, "[f]or the reasons previously argued, the R&R's recommendation is incorrect." Dkt. No. 47 at 15.  The Court disagrees once again.

Appraisal provisions "are universally held to be valid and enforceable, and, if the assured refuses to comply with a demand for appraisal, such refusal may be plead in bar of a recovery." *Keesling v. W. Fire Ins. Co.*, 520 P.2d 622, 626 (Wash. Ct. App. 1974); *accord MKB Constructors v. Am. Zurich Ins. Co.*, No. C13-0611-JLR, 2014 WL 2533286, at *3 (W.D. Wash. June 5, 2014) ("Washington law is generally supportive of appraisal provisions in insurance policies."); *Graham*

1   *v. Country Mut. Ins. Co.*, No. 2:20-CV-00189-SAB, 2021 WL 5239795, at *2 (E.D. Wash. Feb. 9,

2   2021) ("When a party makes a demand for appraisal pursuant to a provision in an insurance policy,

3   a party's refusal to engage in appraisal may serve as a bar to recovery."). Public policy favors

4   enforcement of appraisal provisions because they "provide a plain, inexpensive and speedy

5   determination of the extent of the loss." *Keesling*, 520 P.2d at 625. Courts have accordingly stayed

6   litigation to permit the parties to complete their policy's appraisal process. *See MKB Constructors*,

7   2014 WL 2533286, at *4.

8   　　　　However, as Judge Vaughan observed, Financial Pacific was not alone with respect to

9   appraisal obligations. True, Financial Pacific alleged that it "ha[d] fulfilled its obligations under

10  the Policy and ha[d] satisfied all conditions precedent" at the time it filed its complaint, Dkt. No.

11  14 at 10, and subsequently admitted that the appraisal under Section 5.03 of the Policy never

12  happened, Dkt. No. 31 at 16. But RVI America concedes that Financial Pacific initiated "the claim

13  submission procedures required by the Policy," Dkt. No. 23 at 27; specifically, Financial Pacific

14  adhered to Section 5.01's requirement that an insured submit "a written notice of objection

15  accompanied by [its] determination of the End Of Term Value and an appraisal of the Unit

16  performed by a Qualified Inspector/Appraiser," Dkt. No. 14 at 8, 50. From there, if the parties fail

17  to "agree upon the End Of Term Value," the Policy requires them to either (i) request that their

18  existing appraisers continue to act for them, or (ii) each select a new appraiser and allow those two

19  appraisers to select a third appraiser. *Id.* at 51 (Section 5.03(b)). And, if one of the parties fails to

20  choose an appraiser within 15 days of "a written request from the other party to do so," the

21  requesting party "will" then choose both of the first two appraisers, who "will" choose a third to

22  perform a "conclusively binding" appraisal. *Id.* (Sections 5.03(d)–(e)).

23  　　　　In other words, it is undisputed that Financial Pacific complied with its obligations under

24  Section 5.01, and even assuming for the sake of argument that it failed to request that its existing

appraiser continue to represent it or select a new appraiser under Section 5.03(b), the Policy anticipates such failing and places the onus on RVI America to finish the process. *See* Dkt. No. 14 at 51 ("the other party **will** choose both Qualified Inspectors/Appraisers, and they will choose the third Qualified Inspector/Appraiser" to perform the final appraisal (emphasis added)). Thus, the Court denies RVI America's motion to dismiss on this basis.[7]

9.    Leave to Amend

"A party may amend its pleading with the court's leave, which '[t]he court should freely give . . . when justice so requires.'" *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (alteration in original) (quoting Fed. R. Civ. P. 15(a)(2)). As the language of the rule suggests, the standard for leave to amend is "very liberal." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) ("[T]his policy is to be applied with extreme liberality."). The Court considers five factors when determining whether to grant leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the party has previously amended the complaint. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). "The party opposing amendment bears the burden of showing why leave to amend should not be granted." *Hedglin v. Swift Transp. Co. of Ariz.*, No. C16-5127-BHS, 2016 WL 8738685, at *1 (W.D. Wash. Nov. 15, 2016).

Leave to amend is appropriate here. First, the Ninth Circuit has repeatedly emphasized that "[a] district court abuses its discretion by denying leave to amend unless amendment would be futile or the plaintiff has failed to cure the complaint's deficiencies despite repeated opportunities."

---

[7] The Court's determination on this issue should not be construed as a determination regarding whether either party has waived any of its rights under the Policy. *See Giulietti v. Conn. Ins. Placement Facility*, 534 A.2d 213, 217 (Conn. 1987); *Goldstein v. Nat'l Fire Ins. Co.*, 180 P. 409, 411–12 (Wash. 1919).

*AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012); *accord Heineke v. Santa Clara Univ.*, 812 F. App'x 644, 645 (9th Cir. 2020); *see also Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) ("In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." (cleaned up)). For the reasons discussed above, amendment would not be futile here. An amendment is futile only when "no set of facts can be proved . . . that would constitute a valid and sufficient claim[.]" *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988), *overruled on other grounds by Iqbal*, 556 U.S. at 678. And while Financial Pacific previously amended its complaint, it did so to add an IFCA claim—not to cure an identified deficiency. *Compare* Dkt. No. 1 at 11–12, *with* Dkt. No. 14 at 12. It also did so before RVI America filed an answer or other motion, and only about a month after filing the original complaint.

As for the remaining three factors—bad faith, undue delay, and prejudice to the opposing party—the Court discerns nothing in the record sufficient to overcome Rule 15(a)'s presumption in favor of leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (prejudice to the opposing party "carries the greatest weight" and, absent prejudice or a "strong showing" under the other factors, there is a presumption in favor of granting leave to amend). RVI America does not argue (and thus has not shown) that Financial Pacific intends to amend its complaint in bad faith or that permitting a second amended complaint will result in undue delay. RVI America's sole ground for opposing amendment is futility—an argument the Court has already rejected. *See* Dkt. No. 34 at 13–14. Moreover, this case is relatively young. Discovery does not close until April 2024, dispositive motions are not due until May 2024, and trial is over a year away. Dkt. No. 62 at 1–2; *see DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187–88 (9th Cir. 1987) (granting leave to amend did not prejudice opposing party because case

1  was "still at the discovery stage with no trial date pending").[8] For these reasons, the Court grants

2  Financial Pacific leave to amend its complaint.

3  **B.      Objections to Order on Discovery Motion**

4          The Court now turns to Judge Vaughan's order denying RVI America's request to stay

5  discovery or, alternatively, for a protective order. Dkt No. 51. Where, as here, a non-dispositive

6  pretrial matter is referred to a magistrate judge, the Court must "modify or set aside any part of the

7  order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); 28 U.S.C.

8  § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter . . . where it has been

9  shown that the magistrate judge's order is clearly erroneous or contrary to law."). The Court

10  reviews Judge Vaughan's factual determinations for clear error, *Nichols v. Geico Gen. Ins. Co.*,

11  No. 2:18-CV-01253-RAJ-MAT, 2020 WL 2832514, at *2 (W.D. Wash. June 1, 2020), a

12  "significantly deferential" standard that "is not met unless the reviewing court is left with a definite

13  and firm conviction that a mistake has been committed," *Fisher v. Tucson Unified Sch. Dist.*, 652

14  F.3d 1131, 1136 (9th Cir. 2011) (cleaned up). As for Judge Vaughan's legal conclusions, the Court

15  reviews those de novo to determine whether they are contrary to law. *Nichols*, 2020 WL 2832514,

16  at *2.

17          RVI America cabins its objections to Judge Vaughan's ambiguity finding. Dkt. No. 52 at

18  2–4; *see id.* at 1 ("[B]ecause the Magistrate Judge's *prior finding* of ambiguity was erroneous, it

19  follows that such reliance on that same *prior finding* in denying the Protective Order Motion is

20  also erroneous."). It points to the Washington Supreme Court's recent decision in *Seattle Tunnel*

21  *Partners*, 516 P.3d 796 (Wash. 2022), as further support for its position that the Policy is

22  unambiguous. Dkt. No. 52 at 5–6, 9–24. RVI America contends that if the Court "reverse[s]" Judge

23

24  ────────────────
[8] The cutoff for amended pleadings is February 23, 2024. Dkt. No. 62 at 1.

Vaughan's Report and Recommendation, "the case will be over, the First Amended Complaint will be dismissed for failure to state a claim, and the Protective Order Motion will be moot." *Id.* at 7. But the Court is not dismissing this case, and Financial Pacific will have the opportunity to file a second amended complaint. RVI America anticipated this outcome. It argues in the alternative that, "if the case remains alive, the Court should still grant the Protective Order Motion because the Policy is unambiguous and discovery into an individual's views about unambiguous insurance policy terms is not appropriate." *Id.*; *see also* Dkt. No. 36 at 8; Dkt. Nos. 37-1, 37-2.

   1. <u>Discovery Stay</u>

  RVI America moved to stay discovery pending the Court's ruling on its motion to dismiss. *See* Dkt. No. 36 at 1–2. Since the Court has now ruled on the motion to dismiss, RVI America's request is denied as moot.

   2. <u>Protective Order</u>

  Although the Court has a different basis for its finding of ambiguity, Judge Vaughan's order denying RVI America's request for a protective order was not contrary to law.

   a. *Legal Standard*

  Parties generally have the right to discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The Court may, however, limit discovery "for good cause . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). Among other options, the Court may protect the resisting party by "forbidding the disclosure or discovery" sought, "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]" Fed. R. Civ. P. 26(c)(1)(A), (c)(1)(D). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

To establish good cause for a protective order, "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002). "Under the liberal discovery principles of the Federal Rules, a party seeking a protective order carries a heavy burden of showing why discovery should be denied." *Klopman-Baerselman v. Air & Liquid Sys. Corp.*, No. 3:18-CV-05536-RJB, 2019 WL 5227332, at *2 (W.D. Wash. Oct. 16, 2019) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)). Rule 26(c) thus requires more than broad allegations of harm; the resisting party must supply specific examples and articulated reasoning. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992); *see also Doe v. Trump*, 329 F.R.D. 262, 270 (W.D. Wash. 2018) ("The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections with competent evidence[.]" (cleaned up)).

   b.   *RVI America is Not Entitled to a Protective Order*

As Judge Vaughan noted, RVI America makes no showing that the information Financial Pacific seeks will annoy, embarrass, oppress, or impose an undue burden or expense. Dkt. No. 51 at 5–6. It instead argues that the interrogatories and requested documents target information that is "wholly irrelevant because FinPac's claims for breach of contract and 'illusory' coverage are pure questions of law that are to be decided by the Court based on the clear and unambiguous Policy language." Dkt. No. 36 at 8 ("The requested document discovery and interrogatories seek . . . information that [is] impermissible to show an ambiguity or that coverage is 'illusory.'").

"District courts have broad discretion in determining relevancy for discovery purposes." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005). And information need not be admissible in evidence to be discoverable. Fed. R. Civ. P. 26(b)(1). The party seeking the discovery has the burden of establishing that its requests are relevant. *Doe*, 329 F.R.D. at 270.

Even a cursory glance at the challenged interrogatories reveals that they request information bearing directly on Financial Pacific's surviving claims. They ask RVI America to do the following:

- (No. 1) "describe with specificity the full basis, including any supporting facts, for [its] contention that there is no covered loss under the Policy for the Hal[l]iburton Units" (relevant to all claims);

- (No. 2) "describe with specificity the full basis, including any supporting facts, for [its] contention that the End of Term Value of the Hal[l]iburton Units is between $67,500.00 and $69,500.00" (relevant to all claims);

- (No. 3) "describe . . . what [it] contend[s] the End of Term Value is for the Hal[l]iburton Units and how [it] reached this figure" (relevant to all claims);

- (No. 4) "identify all persons involved in underwriting the Policy for the Hal[l]iburton Units" (at least relevant to illusory coverage, bad faith, and CPA claims);

- (No. 5) "identify all persons involved in the claims handling of Financial Pacific's claim under the Policy related to the Hal[l]iburton Units" (relevant to all claims);

- (No. 6) "identify all persons involved in the appraisal process for Financial Pacific's claim under the Policy related to the Hal[l]iburton Units" (relevant to all claims); and

- (No. 7) "identify specific instances of when RVI paid a loss covered under a residual value insurance policy that contained the same language found in 'Endorsement D' of the Policy" (at least relevant to illusory coverage, bad faith, and CPA claims).

Dkt. No. 37-1 at 6–7.

The challenged document requests are likewise relevant to Financial Pacific's claims. For example, Financial Pacific seeks any documents and communications (No. 3) "comprising the underwriting file for the Policy" (at least relevant to illusory coverage, bad faith, and CPA claims);

(No. 4) "depicting or containing the information [RVI America] considered while underwriting the Policy" (at least relevant to illusory coverage, bad faith, and CPA claims); (No. 5) "that refer or relate to [RVI America's] claim and/or investigation file(s) for any claim made by Financial Pacific that refers or relates to the Hal[l]iburton Units" (relevant to all claims); (No. 6) "that refer or relate to any appraisal of the Hal[l]iburton Units" (relevant to all claims); and (No. 7) "that refer or relate to the application of 'Endorsement D' to the Policy" (relevant to all claims). Dkt. No. 37-2 at 6.

RVI America categorically resisted Financial Pacific's requests based on its belief that the motion to dismiss would wholesale resolve this case and obviate the need for any discovery. Because RVI America's motion for a protective order is based on its now-rejected argument that Endorsement D is not ambiguous, and because Financial Pacific's requests are relevant, the Court overrules RVI America's objections to Judge Vaughan's order.

### III.   CONCLUSION

The Court MODIFES IN PART Judge Vaughan's Report and Recommendation, Dkt. No. 43, and GRANTS IN PART and DENIES IN PART RVI America's Motion to Dismiss, Dkt. No. 23. The Court further OVERRULES RVI America's Partial Objections to the September 9, 2022 Order Denying Motion for a Stay and Protective Order. Dkt. No. 52. Financial Pacific shall file its second amended complaint no later than 21 days from the date of this Order.

Dated this 3rd day of July, 2023.

Lauren King
United States District Judge