1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11    FINANCIAL PACIFIC LEASING INC.,          CASE NO. 2:21-CV-00756-LK

             Plaintiff,                          ORDER ON CROSS-MOTIONS
12                                               FOR SUMMARY JUDGMENT,
         v.                                      MOTIONS TO EXCLUDE EXPERT
13                                               OPINIONS, AND MOTION TO
       RVI AMERICA INSURANCE CO.,                SEAL
14
             Defendant.
15

16         This matter comes before the Court on Plaintiff Financial Pacific Leasing Inc.'s and

17   Defendant RVI America Insurance Co.'s cross-motions for summary judgment, Dkt. Nos. 85, 99,

18   RVI's motions to exclude the expert opinions of William Warfel and Gregg Dight, Dkt. Nos. 79,

19   81, and Financial Pacific's motion to file two exhibits under seal, Dkt. No. 83. For the following

20   reasons, the Court grants in part and denies in part Financial Pacific's motion for partial summary

21   judgment, grants in part and denies in part RVI's cross-motion for summary judgment, grants in

22   part and denies in part RVI's motions to exclude, and denies Financial Pacific's motion to seal.[1]

23   _____

24   [1] Because the Court can decide the matter based on the parties' filings, it denies RVI's request for oral argument. Dkt.
     No. 79 at 1; Dkt. No. 81 at 1; Dkt. No. 99 at 1.

## I.    BACKGROUND

**A.    Financial Pacific's Asset Acquisition**

Financial Pacific is an asset-based lender that acquires assets and then leases them to commercial customers. Dkt. No. 64 at 2; Dkt. No. 86 at 1. This includes acquiring assets from manufacturers that have already been leased to a third party. Dkt. No. 86 at 1. When Financial Pacific engages in these transactions, it considers the risk of whether an asset's value will retain its "residual value" by the end of the lease. Dkt. No. 64 at 2. At times, Financial Pacific will engage in efforts to mitigate the risk of an asset's value falling below its expected residual value through certain financial structures, such as residual value insurance. *Id.* at 1.

At the center of this dispute are 150 Greenbriar C112 Covered Hopper railcars (the "Halliburton Units") that Financial Pacific leased to the Halliburton Company (a party not otherwise featured in this case) in 2015 for a five-year term ending on August 31, 2020. *Id.* at 2, 5. These are specialized railcars used mainly for the transportation of "frac sand" (sand used in hydraulic fracturing to facilitate the production of oil and natural gas), cement, and non-metallic minerals and earths. *Id.* at 7. Financial Pacific purchased these railcars for $81,500 each and expected a residual value of $61,000 per railcar at the end of the lease term. *Id.*

Financial Pacific then initiated the purchase of a Master Residual Value Insurance Policy from RVI—Policy No. 01-01-30-1365 (the "Policy"). Before it would issue a policy for the Halliburton Units, RVI required Financial Pacific to provide a written evaluation detailing key information about the Halliburton Units. Dkt. No. 99 at 11; Dkt. No. 100-3 at 19; Dkt. No. 100-10 at 2–8. In response, Financial Pacific submitted a valuation of the Halliburton Units by Vista Consulting Group ("Vista"), which Financial Pacific had hired at the time it was evaluating Halliburton's lease proposal to determine the "projected . . . future value" for the Halliburton Units at the end of the lease. Dkt. No. 89 at 126; Dkt. No. 100-10 at 3. The Vista appraiser summarized

his methodology for these units in an e-mail to Financial Pacific, which was forwarded to RVI in support of Financial Pacific's application for insurance. Dkt. No. 100-10 at 2–3. According to Vista's appraiser, he utilized the "Cost Approach" method because "there has been limited sales data available for small cubic foot capacity hopper cars." *Id.* at 3; *see also* Dkt. No. 100-4 at 7 (Financial Pacific's Credit Recommendation in which it repeated this rationale for using the cost approach). He explained that the cost approach "starts with the replacement cost []new of a car and is adjusted for (3) forms of depreciation." Dkt. No. 100-10 at 3; *see also* Dkt. No. 100-4 at 7 (Financial Pacific's Credit Recommendation in which it repeated this). "[T]o be more conservative," the appraiser assumed a useful life of 35 years for physical depreciation. Dkt. No. 100-10 at 3. "There was a minor adjustment made for economic obsolescence representing any contingent factor external to the car that could impact value." *Id.*; Dkt. No. 100-4 at 7.

For the year 2020, the appraiser provided three projected values: a fair market value of $67,500, an orderly liquidation value—or OLV[2]—of $63,500, and a net orderly liquidation value of $58,250. Dkt. No. 100-10 at 8. Financial Pacific focused on OLV in its communications. *See, e.g.*, *id.* at 2–3; Dkt. No. 100-4 at 5. In its Credit Recommendation on Halliburton's request for a lease, it reported that the five-year least term "with 77.9% residual position is supported by the economic useful life of 35 years and the [Vista] analysis showing the [end of term] OLV to match the residual value"; specifically, Vista "found that the OLV in year 5 is $63,500 per car which supports the residual position at the [end of term] of $63,500." Dkt. No. 100-4 at 5. Financial Pacific also reported that at the end of term, it would be "essentially at a break-even level when comparing the OLV to the [amortizing balance]" of the Hallburton Units. *Id.* at 7. Noting the fluctuations in the frac sand market and the market for the railcars, Financial Pacific projected that

---

[2] OLV is the amount "that may reasonably be expected for property sold on an as is - where is basis, from a liquidation sale of the Railcars[.]" Dkt. No. 100-19 at 37.

"the near term prospects still look reasonably favorable for the . . . market" despite a potential "pessimistic scenario" where "demand for frac sand drops off, the residential housing and construction market sectors continue to languish, and the industry is stuck with an oversupply of small cube covered [railcars]." *Id.* at 9.

RVI then issued the Policy to Financial Pacific. Dkt. No. 64. The "Insured Value" per railcar is $51,815.08. *Id.* at 5, 62 (total insured value of $7,772,262 for 150 Halliburton Units).

**B.    The Market for Frac Sand Changes**

According to the complaint, frac sand, which is "highly dependent on energy prices, particularly crude oil," accounts for "over one-half and in some cases two-thirds of loadings for C112 Covered Hoppers." *Id.* at 7–8; *see also* Dkt. No. 89 at 104–05. After oil prices dropped in 2016, "there was a dramatic decrease in demand for frac sand and a corresponding dramatic decrease in demand for C112 Covered Hoppers." Dkt. No. 64 at 8.[3] The complaint also avers that starting in 2018, the market for frac sand was further impacted by the use of "in-basin (locally sourced) brown sand" in hydraulic fracturing because in-basin sand "can be delivered to the wellhead for one-third or less of the cost of white silica sand[.]" *Id.*; *see also* Dkt. No. 89 at 105. According to Financial Pacific, the market for C112 Covered Hoppers is now "essentially non-existent," and "[m]any of the large lessees of C112 Covered Hoppers are facing, or have declared, bankruptcy." Dkt. No. 64 at 8; *see also* Dkt. No. 89 at 106. Financial Pacific alleges that because of all this, "the secondary sale market for C112 Covered Hoppers is essentially non-existent and— as a result of the development of in-basin sand—the frac sand market is expected to remain severely depressed even if energy prices recover." Dkt. No. 64 at 8; Dkt. No. 89 at 106–07.

---

[3] At the time Financial Pacific chose to enter into the lease with Halliburton, crude oil prices were "at a 5 year low"— a risk Financial Pacific thought would be mitigated by Halliburton's "strong operating history" and "ab[i]l[ity] to withstand fluctuations in the market." Dkt. No. 100-4 at 5.

1    **C.    Relevant Policy Provisions**

2        The first page of the Policy states, in capitalized bold font, that it is "an indemnity against

3    loss incurred by the insured due to a fortuitous decline in value of a class of asset to which the

4    insured equipment belongs caused by changes in market conditions when such equipment is used

5    and maintained as intended." Dkt. No. 64 at 45. Under Article I, RVI agreed to indemnify Financial

6    Pacific "as of the Lease Termination Date against Loss, if any, which shall be payable on the

7    Settlement Date, in respect of all Units subject to a Lease." *Id.* The Policy further defines "Loss"

8    as "the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease

9    exceeds the sum of the End [o]f Term Values thereof on the Lease Termination Date, as determined

10   in accordance with Article V., reduced by the Deductible." *Id.* at 47. The "Insured Value" of each

11   railcar was $51,815.08, or approximately 60% of the original equipment cost. *Id.* at 3, 5.

12       As for End of Term Value, the Policy states that it must be "defined and determined in

13   accordance with Section 5.02." *Id.* at 46. This is the crux of the parties' dispute. Section 5.02 of

14   the Policy originally required the End of Term Value to be calculated by determining the greater

15   of three sums. *Id.* at 51. Two of those sums are not relevant to the dispute at hand. For current

16   purposes, it suffices to note that one of the three values was "[t]he Appraised Value of the Unit

17   determined under the direction of [RVI] but at the Insured's expense, by a Qualified

18   Inspector/Appraiser selected and approved by [RVI.]" *Id.* And Section 2.01(d) of the Policy

19   originally defined "Appraised Value" as follows:

20       <u>Appraised Value</u>: with respect to a Unit, the fair retail price (not reduced by the
     value of any trade-in, allowances or set-offs) that would result from an arm's-length
21       retail sales transaction, free and clear of mortgages, liens, security interests and
         other encumbrances, between an informed and willing seller under no compulsion
22       to sell and an informed and willing purchaser (other than a user in possession or a
         used equipment dealer) under no compulsion to purchase, who is purchasing the
23       Unit for its own usage (not for resale) with the intent of utilizing the Unit in
         accordance with the Unit's intended usage, such fair retail price being determined:

24

(i)      as of the Lease Termination Date;

(ii)    by a Qualified Inspector/Appraiser in accordance with Section 5.02(a) or Section 6.01(b)(ii), as applicable;

(iii)   with respect to Section 5.02(a), on the basis that such Unit complies with all standards set forth in the Equipment Portfolio Return Conditions Endorsement but with respect to Section 6.01(b)(ii), on the basis of such Unit being in its existing condition;

(iv)   without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(v)    highest and best use without regard to quantity, location or country of registration of such Unit.

*Id.* at 45–46.

However, the railcars were added to the Policy through Endorsement D, *id.* at 60, which deleted Section 5.02 in its entirety and replaced it with the following sentence: "5.02 The End of Term Value of the Unit shall be the Appraised Value (Reproduction Cost New)." *Id.* at 61. It also deleted Section 2.01(d) of the Policy (the original "Appraised Value" definition) and replaced it with the following definition of "Appraised Value (Reproduction Cost New)":

Appraised Value (Reproduction Cost New): with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)    by the cost of substituting another asset of comparable utility;

(ii)   on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e., "reproduction cost new" basis);

(iii)    as of the applicable Lease Termination Date;

(iv)    by a Qualified Appraiser in accordance with Section 5.02 hereof;

(v)    on the basis that such Unit complies with all standards set forth in the Return Condition Endorsement;

(vi)    without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and

(vii)    without regard to quantity, location or country of registration of such Unit.

*Id.* at 60–61.

The parties' dispute implicates two other provisions. First, Article III of the Policy sets forth four conditions precedent to filing a claim. *See id.* at 49. As relevant here, it requires that RVI "must receive the Preliminary Notice of Claim and the Notice of Claim as to all Units subject to a Lease at the times and with the supporting documentation required by Sections 5.01 and 7.03[.]" *Id.*[4] And second, Article V of the Policy establishes a mandatory mechanism for resolving disputes over the End of Term Value. *Id.* at 51. That provision requires the insured to "state in a Preliminary Notice of Claim its opinion of the End Of Term Value of each Unit subject to the

---

[4] The Policy defines "Notice of Claim" and "Preliminary Notice of Claim" as follows:

> <u>Notice of Claim</u>: a written final notice of a Claim executed by the Insured and given to [RVI] which: (i) states the Policy number; (ii) states the amount of the Claim; (iii) identifies the Lease as to which the Claim is made and all the Units subject to the Lease; (iv) states the End Of Term Value of such Units as finally determined in accordance with Article V.; and (v) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 have been satisfied.

> <u>Preliminary Notice of Claim</u>: a written preliminary notice of a Claim executed by the Insured and given to [RVI] which: (i) states the Policy number; (ii) states the estimated amount of the anticipated Claim; (iii) identifies the Lease as to which the Claim may be made and all the Units subject to such Lease; (iv) states the Insured's opinion of the End Of Term Value of each such Unit accompanied by an appraisal of each such Unit performed by a Qualified Inspector/Appraiser; and (iv) is accompanied by a certificate executed by an authorized officer of the Insured certifying that, as of the date of such Notice, the conditions precedent set forth in Section 3.01 will be satisfied.

*Id.* at 47–48.

1    Lease and the basis thereof." *Id.* Once RVI has "all relevant documentation pertaining to the Units

2    in question," it must, "in accordance with Section 5.02, determine the End [o]f Term Value of each

3    such Unit." *Id.* The Policy makes clear that RVI's calculation of the End of Term Value binds the

4    parties unless RVI receives, within 30 days, "a written notice of objection accompanied by the

5    Insured's determination of the End Of Term Value and an appraisal of the Unit performed by a

6    Qualified Inspector/Appraiser." *Id.*

7        If the insured submits a written notice of objection, Article V specifies additional processes

8    for resolving the dispute. *Id.* at 51. The parties thereafter have 30 days to "meet and attempt to

9    arrive at a mutually acceptable determination" and, in the event such attempt fails, they must each

10   choose a Qualified Inspector/Appraiser. *Id.* at 52. Their Qualified Inspectors/Appraisers must then

11   select a third Qualified Inspector/Appraiser. *Id.* "If either party fails to choose a Qualified

12   Inspector/Appraiser within fifteen (15) Business Days after having received a written request from

13   the other party to do so, the other party will choose both Qualified Inspectors/Appraisers, and they

14   will choose the third Qualified Inspector/Appraiser." *Id.* However the third Qualified

15   Inspector/Appraiser is ultimately selected, he or she must "make an independent determination"

16   of the End of Term Value pursuant to the Policy's criteria. *Id.* That determination is "conclusively

17   binding on the parties," although the third Qualified Inspector/Appraiser's determination cannot

18   be "less than the lower of the prior two appraisals nor greater than the higher." *Id.*

19   **D.    Financial Pacific Directs RailSolutions to Perform a "Fair Market Value" Appraisal**

20       In March 2020, Mark Williams, Financial Pacific's Vice President of Asset Management

21   who succeeded the Group Manager responsible for purchasing the Policy, reviewed Financial

22   Pacific's portfolio of leases and concluded that there was a "problem" with the Halliburton lease

23   because "the market value would not support the residual value that was taken on the [Halliburton]

24   Units," which would cause Financial Pacific to suffer a financial loss. Dkt. No. 100-1 at 12, 15;

1    *see also* Dkt. No. 89 at 76. On August 11, 2020, Financial Pacific retained Rob Blankemeyer of

2    RailSolutions LLC to appraise the Halliburton Units. Dkt. No. 100-19 at 4. Williams noted to

3    Blankemeyer that "there [wa]s considerable urgency . . . to get a proper valuation along with the

4    conditions impacting the current values if any," and told Blankemeyer that he "suspect[ed] the

5    most appropriate valuation is the Collateral Value – Current Fair Market Value – Current Orderly

6    Liquidation Value" to determine "what the [fair market value] is now." *Id.* at 5.

7    Blankemeyer estimated that, as of August 14, 2020, the fair market value of each

8    Halliburton Unit would be $28,000. Dkt. No. *Id.* at 17. His report defines "fair market value" as

9    "the amount . . . that may be reasonably expected for property exchanged between a willing buyer

10   and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both

11   fully aware of all relevant, reasonably ascertainable facts." *Id.* at 10, 17. Blankemeyer's appraisal

12   was determined by "us[ing] the market, comparable sales approach (or market approach) and the

13   depreciated replacement cost approach (or cost approach) as the primary methods of valuation

14   along with channel checks of equipment owners." *Id.* at 10. He noted that his appraisal was not

15   based on any actual sales in the secondary market, because "[t]he secondary sale market is non-

16   existent" due to "large surpluses" in inventory resulting from the pandemic and "decline in rail

17   loadings," and the most recent sales were in 2017 and 2018 and were for "$75,000+." Dkt. No.

18   100-19 at 8; *see also* Dkt. No. 100-20 at 4–7.[5]

19   **E.    Financial Pacific's Preliminary Notice of Claim**

20   On August 25, 2020, Financial Pacific submitted a Preliminary Notice of Claim to RVI,

21   identifying an End of Term Value of $28,000 per Halliburton Unit and a total Loss of $3,572,262.

22

23

---

[5] Blankemeyer also attributes this decline in value to a "recent collapse in energy prices" and to recent bankruptcy
24   filings by two major sand producers, both of whom were significant lessees of small cube covered hoppers. Dkt. No.
100-19 at 7–8.

Dkt. No. 100-21 at 2.[6] Financial Pacific stated in its Preliminary Notice of Claim that it "anticipate[d] making a Claim" because it "believe[d] the End of Term Value of the [Halliburton] Units to be $28,000 per Unit." *Id.* It "enclosed a copy of an appraisal of each [Halliburton] Unit performed by a Qualified Inspector/Appraiser as that term is defined in § 2.01(ll) of the Policy." *Id*. In support, Financial Pacific included the August 14 RailSolutions appraisal. *Id*.; Dkt. No. 100-25 at 3. Financial Pacific reiterated its "Loss" claim in its Notice of Claim that it sent to RVI on August 31, 2024. Dkt. No. 100-23 at 2.

On September 11, 2020, RVI acknowledged receipt of both the Preliminary Notice of Claim and the Notice of Claim. Dkt. No. 100-25 at 3; Dkt. No. 100-26 at 2. It noted in its response, however, that the Preliminary Notice of Claim was "untimely and . . . not compliant with the Policy's terms and conditions" because it was not submitted at least 180 days prior to the applicable Lease Termination Date. Dkt. No. 100-25 at 3; *see also* Dkt. No. 64 at 51 ("If [Financial Pacific] wishes to give to [RVI] a Preliminary Notice of Claim as to all Units subject to a Lease, [it] must do so not later than one hundred eighty (180) days . . . prior to the applicable Lease Termination Date."). It also noted that the RailSolutions Appraisal "was not performed in accordance with the terms and conditions required under the Policy and is therefore deficient," in part because it did "not determine the End of Term Value of the units in accordance with the Policy definition" requiring the appraisal to "take into account the Appraised Value (Reproduction Cost New) definition found in Endorsement D." Dkt. No. 100-25 at 4.[7] RVI stated, however, that "[i]n spite

---

[6] While the original appraisal of all 150 Halliburton Units was $4,200,000, Dkt. No. 100-19 at 17, Financial Pacific subsequently reduced its claim to $3,524,631.84 because two of the Halliburton Units "were declared a total loss prior to the termination of the . . . lease[.]" Dkt. No. 64 at 9. Financial Pacific later conceded in discovery that four—not two—Halliburton Units were a total loss and that none of the four should be included in its claim. Dkt. No. 100-24 at 3.

[7] RVI also noted that the RailSolutions appraisal did "not take into account the Equipment Portfolio Return Conditions Endorsement" and was based on the appraisal report date of August 14, 2020 as opposed to the Lease Termination Date of August 31, 2020, as required by the Policy. *Id.* at 4–5.

of these issues" and "subject to [Financial Pacific] providing all relevant documentation relating to the [Halliburton] Units in question," it would "engage a Qualified Inspector/Appraiser . . . to determine the End of Term Value of all [Halliburton] Units as of the Lease Termination Date of August 31, 2020." *Id.* at 5.

Financial Pacific confirmed receipt of RVI's response on September 25, 2020, and noted that it had "provided all of the relevant documents pertaining to the [Halliburton] Units" that RVI asked for. Dkt. No. 100-26 at 2.

On October 20, 2020, RVI retained Ed Biggs of Biggs Appraisal to conduct an appraisal of the Halliburton Units. Dkt. No. 100-27 at 2. RVI sent the Policy to Biggs and advised him that his appraisal must consider "the Appraised Value as defined in Endorsement D," and noted that, pursuant to Endorsement D, "[t]he End of Term Value of the Unit shall be the Appraised Value (Reproduction Cost New)[.]" *Id.* at 3. On November 18, 2020, Biggs provided RVI with his appraisal report of the Halliburton Units. Dkt. No. 100-28 at 2–15. Biggs noted that "[t]here are three generally accepted valuation approaches to determining value, i.e., the cost approach, the income approach, and the market approach." *Id.* at 7. He stated that while "[e]ach valuation approach was considered in preparing" his appraisal report, he elected to use the cost approach because "[a]ll of the subject Rail Equipment are late model cars with no recent sales activity without a lease attached," and therefore "the cost approach provides the best value for this Rail Equipment currently." *Id.* Biggs describes the cost approach as follows:

> Using the cost approach, the appraiser starts with the current reproduction cost new of the property being appraised, then deducts for the loss of value caused by the physical deterioration, functional obsolescence, and economic obsolescence. The logic behind the cost approach is the principle of substitution: a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility.

*Id.* He also stated that his scope of work was to "[d]etermine the Appraised Value (Reproduction

1    Cost New) of the Rail Equipment in accordance with the Appraised Value (Reproduction Cost

2    New) . . . provided by RVI." *Id.* at 4; *see also id.* at 5 (defining "Appraised Value (Reproduction

3    Cost New)" consistent with the Policy). Biggs determined that the End of Term Value was "in the

4    range of $67,500 and $69,500 per car." *Id.* at 6.[8] RVI provided Biggs' appraisal to Financial Pacific

5    on November 20, 2020. Dkt. No. 100-31 at 2.

6        On December 10, 2020, Williams asked Blankemeyer to update RailSolutions' August 14,

7    2020 Appraisal to change the "as of" date to August 31, 2020 and to specify that the appraisal

8    assumed that the Halliburton Units would be returned in the condition required under the Policy.

9    Dkt. No. 100-19 at 19. RailSolutions provided Financial Pacific with a revised appraisal report the

10   next day with the requested changes. *Id.* at 23–39; *see also* Dkt. No. 100-20 at 18 (confirming that

11   the "appraisal and substance" of the two appraisal reports were the same). Also on December 10,

12   Williams asked Blankemeyer to assist Financial Pacific with disputing the Biggs appraisal "on all

13   levels." Dkt. No. 100-19 at 22. The next day, Williams provided Blankemeyer with a copy of

14   Endorsement D and the Biggs appraisal. *Id.* at 38. Blankemeyer refused to assist:

15       [M]y comment to [Williams] was . . . something along the lines of knowing how
16       R.V.I. works, I assumed that somewhere in the policy may have been baked the
         notion that the cost methodology was to be used in determining fair market value.
17       I believe there is an email that I sent . . . saying that if I was to use the same
         methodology, I don't believe I would have a much different opinion than Ed Biggs.

18   Dkt. No. 100-20 at 21.[9]

19

20   ───────────────
     [8] Because there were no sales in 2019 and 2020, Biggs reviewed the most recent sales from 2017 and 2018 to arrive
21   at that amount. Dkt. No. 100-30 at 3–4; Dkt. No. 84 at 5–6. The sales were for between $76,000 and $87,000, and he
     arrived at an $81,000 Current Reproduction Cost New by averaging the "selling prices of the cars when last
     manufactured between 2017 and 2018." Dkt. No. 84 at 5; *see also* Dkt. No. 100-30 at 4; Dkt. No. 100-28 at 5. He then
22   applied a depreciation model. Dkt. No. 84 at 12; Dkt. No. 100-30 at 5. Financial Pacific contends that this model was
     non-linear, Dkt. No. 85 at 2, 7, 18; Biggs and RVI contend that it was not, Dkt. No. 99 at 20; Dkt. No. 100-30 at 5
     (Biggs used a 3.1% depreciation for the first five years, but "[a]s the car ages, the curve flattens out").

23   [9] Blankemeyer was referring to a June 10, 2021 email in which he recounted a conversation with Williams:

         Ed Biggs did an appraisal on behalf of RVI and came up with a very high value when compared to
24       current FMV. [Financial Pacific] showed me the RVI contract and it was a theoretical replacement

On December 17, 2020, Financial Pacific sent RVI a letter objecting to RVI's reliance on the Biggs appraisal on four grounds: (1) because "the cost to produce new Units will necessarily be higher than the Insured Value of the Units, Endorsement D effectively eliminates coverage and fails to provide insurance for 'changes in market conditions' as promised in the opening paragraph of the Policy"; (2) the Biggs appraisal "d[id] not comply with the terms of Endorsement D" because Endorsement D "sets the End of Term Value as the cost to manufacture a new Unit," while the Biggs appraisal used the cost approach method; (3) the Biggs appraisal did not apply the methodology it claimed to use because it "start[ed] with the cost of a new Unit ($81,000) and applie[d] a linear depreciation schedule," and therefore did not take into account the non-linear factors of functional obsolescence and economic obsolescence; and (4) "even if the Biggs Appraisal correctly follow[ed] its stated methodology and that methodology [wa]s consistent with Endorsement D," the linear depreciation method "render[ed] coverage illusory" because "the End of Term Value could never be less than the Insured Value and Financial Pacific would never be entitled to coverage." Dkt. No. 100-33 at 2–4 (emphasis removed). Financial Pacific also enclosed the December 11 RailSolutions appraisal and requested to meet with RVI to resolve this matter in accordance with Section 5.03(a) of the Policy. *Id.* at 4.[10]

On December 21, 2020, RVI acknowledged receipt of Financial Pacific's objections and responded that "[t]he Policy's terms and conditions, including but not limited to Endorsement D, are clear and unambiguous, apply to the fullest extent to [Financial Pacific's] [c]laim, and are

value based upon very specific components and what it would cost a builder to replicate. I advised [Financial Pacific] that I would probably agree with Biggs if I was forced to value under the contract. I also advised that i[n] my opinion that the issue here did not involve FMV but rather the interpretation of the contract terms.

Dkt. No. 100-32 at 3; *see also* Dkt. No. 100-20 at 22.

[10] Section 5.03(a) provides that "[i]f [RVI] receives from [Financial Pacific] a written notice of objection pursuant to Section 5.01, then . . . [t]he respective representatives of [Financial Pacific] and [RVI] will meet and attempt to arrive at a mutually acceptable determination after each gives reasonable consideration to the criteria and reasoning of the other." Dkt. No. 64 at 52.

enforceable." Dkt. No. 100-34 at 2. It also stated that it was "ready and available to meet to attempt to agree upon the End of Term Value of the Units," and requested a date and time in January 2021 for that meeting. *Id.*

The parties met via Zoom on January 14, 2021. Dkt. No. 100-37 at 2; Dkt. No. 100-38 at 2. RVI followed up on the same day, and requested that Financial Pacific "choose a Qualified Inspector/Appraiser in accordance with [Sections] 5.03 (b) and (d) [of the Policy] to continue the process in [Section] 5.03 (c)." Dkt. No. 100-38 at 2. Financial Pacific responded on February 12, 2021, stating that it "object[ed] to any appraisal under Section 5.03 of the Policy that is based on the 'Appraised Value (Reproduction Cost New)' found in Endorsement D" because "the use of the purported 'Appraised Value (Reproduction Cost New)' renders coverage under the Policy illusory[.]" Dkt. No. 100-39 at 2. Financial Pacific refused to "proceed forward under Section 5.03" unless RVI agreed to "proceed with the Section 5.03 appraisal process using the original 'Appraised Value' found in Section 2.01(d) of the Master Policy[.]" *Id.* Financial Pacific "further object[ed] to any effort by RVI to invoke the appraisal process until this fundamental legal issue is determined." *Id.*

## F.    Financial Pacific's Complaint and RVI's Motion to Dismiss

On June 8, 2021, Financial Pacific filed suit against RVI in this Court for breach of contract, declaratory relief, insurance bad faith, and violations of Washington's Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86.020, and Insurance Fair Conduct Act ("IFCA"), *id.* § 48.30.015. Dkt. No. 1 at 10–12; Dkt. No. 14 at 10–12. Financial Pacific contended that "[t]he Policy's definition of Insured Value—specifically including Endorsement D's definition of Appraised Value (Reproduction Cost New)—is ambiguous and RVI's interpretation of Insured Value would defeat the purpose of the insurance provided by the Policy." Dkt. No. 14 at 10. It also sought, among other things, a declaration that it was "entitled to coverage for the amount by which

the sum of the Insured Values of the Haliburton Units exceeds the fair market value of the units at the Lease Termination Date." *Id.* at 11, 13.

On August 23, 2021, RVI moved to dismiss Financial Pacific's claims, arguing that the "Appraised Value (Reproduction Cost New)" definition is clear and unambiguous, and, under a straightforward application of that definition, Financial Pacific did not suffer a Loss and therefore had no claim under the Policy. Dkt. No. 23 at 20–23. It also maintained that any claim for illusory coverage must fail because "there are examples of when using the Appraised Value (Reproduction Cost New) methodology to calculate the End of Term Value would result in a claim payment obligation." *Id.* at 25. RVI also urged wholesale dismissal of Financial Pacific's action on the ground that the parties failed to complete Article V's mandatory End of Term Value dispute process—a condition precedent to asserting a claim under the Policy. *Id.* at 26–27. Finally, RVI contended that Financial Pacific's CPA and IFCA claims should be dismissed because they were premised on an allegedly unreasonable denial of coverage, and RVI's interpretation of the Policy was legally correct. *Id.* at 27.

On July 3, 2023, the Court granted in part and denied in part RVI's motion to dismiss. Dkt. No. 63 at 36. First, the Court held that subsections 2.01(d)(i) and (d)(ii) of Endorsement D rendered the Endorsement ambiguous because the two subsections "call[] for two potentially irreconcilable valuation methods." *Id.* at 17–21. Specifically, the operative language of these subsections "creates a potential conflict because the cost of substituting another asset of comparable utility for a rail car is not necessarily the same as the expense of constructing an exact duplicate of a rail car." *Id.* at 19. Second, the Court dismissed Financial Pacific's breach of contract claim to the extent that it was premised on Financial Pacific's unsuccessful theory that Endorsement D's prefatory language defined the valuation method, but permitted Financial Pacific leave to amend. *Id.* at 21–22. Third, the Court denied RVI's motion to dismiss Financial Pacific's illusory coverage claim because

1    "Section 2.01(d)'s ambiguity makes it impossible for the Court to determine at this juncture

2    whether the Policy is illusory." *Id.* at 22–24. Fourth, the Court dismissed (with leave to amend)

3    Financial Pacific's request for a declaration that it is "entitled to coverage for the amount by which

4    the sum of the Insured Values of the Hal[l]iburton Units exceeds the fair market value of the units

5    at the Lease Termination Date," because it "relie[d] on the failed argument that Endorsement D's

6    valuation method is set out in the prefatory language." *Id.* at 24. However, it denied the motion to

7    dismiss Financial Pacific's alternative claim for declaratory relief that "RVI's calculation of End

8    of Term Value and covered Loss would render coverage under the Policy illusory and is therefore

9    unenforceable[.]" *Id.* (citation omitted). Fifth, the Court denied RVI's motion to dismiss Financial

10   Pacific's bad faith claim because RVI did not put forth argument as to why that claim should be

11   dismissed. *Id.* at 25. Sixth, the Court denied RVI's motion to dismiss Financial Pacific's CPA and

12   IFCA claims except for the portion of those claims alleging that RVI violated Section 284-30-

13   330(4) of Washington's insurance regulations. *Id.* at 26–27; *see also* Wash. Admin. Code § 284-

14   30-330(4) (an insurer's refusal "to pay claims without conducting a reasonable investigation" is

15   an unfair or deceptive act). The Court granted RVI's motion to dismiss the latter claims because

16   Financial Pacific did not advance facts that, taken as true, demonstrated a deficiency in RVI's

17   investigation. Dkt. No. 63 at 26–27. Finally, the Court denied RVI's motion to dismiss Financial

18   Pacific's claims on the basis that Financial Pacific failed to comply with the Policy's dispute

19   process because Financial Pacific complied with its obligations under Section 5.01 of the Policy,

20   and RVI did not exercise its right to complete the process pursuant to Section 5.03(b). *Id.* at 27–

21   30.

22   **G.    The Parties' Cross-Motions for Summary Judgment**

23          On July 24, 2023, Financial Pacific filed a second amended complaint, Dkt. No. 64, which

24   amended its claims to focus on the alleged differential between RVI's valuation of the units and

Endorsement D's definition of Appraised Value (Reproduction Cost New) instead of the differential between RVI's valuation of the units and fair market value (which RVI previously argued was the methodology under Endorsement D's prefatory language). Financial Pacific continues to advance claims for (1) breach of contract; (2) declaratory judgment that "the determination of End of Term Value under the Policy is ambiguous"; that, alternatively, coverage is illusory under RVI's interpretation of Endorsement D, and that "Financial Pacific is entitled to coverage for the amount by which the sum of the Insured Values of the Haliburton Units exceeds the End of Term Value of the units, applying Endorsement D's definition of Appraised Value (Reproduction Cost New), at the Lease Termination Date"; (3) insurance bad faith; (4) violation of the CPA; and (5) violation of IFCA. Dkt. No. 64 at 10–12.

On July 23, 2024, Financial Pacific filed its motion for partial summary judgment on its breach of contract claim and the parties' declaratory judgment claims. Dkt. No. 85 at 16. RVI filed its cross-motion for summary judgment on all claims on August 13, 2024. Dkt. No. 99. Before the parties filed their cross-motions for summary judgment, RVI also filed motions to exclude the opinions of two of Financial Pacific's proposed experts. Dkt. Nos. 79, 81.

## II.    DISCUSSION

The Court first confirms its jurisdiction. It then addresses RVI's motions to exclude Warfel and Dight's opinion before turning to the parties' cross-motions for summary judgment.

### A.    Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between the parties. Financial Pacific is a Washington corporation with its principal place of business in Federal Way, Washington. Dkt. No. 64 at 3. RVI is an insurance company incorporated in Delaware with

its principal place of business in Stamford, Connecticut. Dkt. No. 65 at 2; Dkt. No. 66 at 1.[11]

Financial Pacific is seeking coverage under the Policy for its alleged loss of over $3.5 million. Dkt.

No. 64 at 9.

**B.    RVI's Motions to Exclude the Opinions of Warfel and Dight**

    1.    Legal Standard

Under Rule 702, a trial court may exercise discretion to allow expert testimony if the

proponent "demonstrates to the court that it is more likely than not that" such testimony (1) "will

help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on

sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4) "reflects a

reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–

(d) (2023). "[B]efore admitting expert testimony, the district court must perform a 'gatekeeping

role' to ensure that the testimony is both 'relevant' and 'reliable.'" *United States v. Valencia-*

*Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020) (citation modified). "This gatekeeping obligation

'applies to all (not just scientific) expert testimony.'" *Id.* at 898 (quoting *United States v.*

*Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)). A proponent of expert testimony must always

"demonstrate each of the requirements of Rule 702 by a preponderance of the evidence," and the

court "cannot abdicate its role as gatekeeper, nor delegate that role to the jury." *Engilis v. Monsanto*

*Co.*, No. 23-4201, 2025 WL 2315898, at *6–7 (9th Cir. Aug. 12, 2025) (citation modified).

---

[11] Properly alleging an insurance company's citizenship involves determining whether it should be treated as an incorporated or unincorporated entity based on how the relevant state law treats it. *See Mut. Serv. Cas. Ins. Co. v. Country Life Ins. Co.*, 859 F.2d 548, 550 (7th Cir. 1988) (observing that Texas mutual insurance company was an unincorporated association under Texas law, while Minnesota law treated mutual insurance company as a corporation); *see also e.g.*, *S.P. v. Spinks*, No. 2:20CV995-MHT, 2021 WL 1383233, at *1 (M.D. Ala. Apr. 12, 2021) ("Whether State Farm should be considered a corporation for diversity purposes depends on state law." (citation modified)). An insurance company that is a corporation for diversity purposes is a citizen of not only the state in which it is incorporated, but also the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). An insurance company that is unincorporated for purposes of diversity jurisdiction has the citizenship of each of its members. *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 381 (2016). Here, RVI is listed as a corporation in Delaware's Division of Corporations. *See* State of Delaware Division of Corporations Name Search, https://icis.corp.delaware.gov/ecorp/entitysearch/namesearch.aspx.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook,* 598 F.3d 558, 565 (9th Cir. 2010). And whether testimony is helpful within the meaning of Rule 702 is also "in essence a relevance inquiry." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002).

The reliability inquiry must focus on the basis for the expert's opinion. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). In other words, the inquiry "focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert*, 43 F.3d at 1316). Where, as here, the relevant reliability concerns "focus upon personal knowledge or experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), the inquiry may cover "whether the expert's experience supports the expert's conclusions," whether his "reasoning is circular, speculative, or otherwise flawed," or "whether the expert's reasoning is adequately explained." *Holguin*, 51 F.4th at 854. Although "*Daubert* and *Kumho Tire* may be harder to apply when the expert testimony is 'experience-based' rather than 'science-based,'" any such difficulty "cannot simply lead to a 'that goes to weight, not admissibility' default"; rather, there is "a strong argument that reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *Valencia-Lopez*, 971 F.3d at 898; *see also* Fed. R. Evid. 702, Advisory Committee's Notes to 2023 amendments (decisions holding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. . . . are an incorrect application of Rules 702 and 104(a)").

Finally, although "[a]n opinion is not objectionable just because it embraces an ultimate issue," *see* Fed. R. Evid. 704(a), "an expert witness cannot give an opinion as to [their] legal conclusion, i.e., an opinion on an ultimate issue of law," *Nationwide Transp. Fin. v. Cass Info.*

1    *Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (emphasis omitted) (quoting *Hangarter v. Provident*

2    *Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).

3        2.    Warfel Opinion

4        The Court first addresses RVI's motion to exclude the testimony of Dr. William Warfel,

5    Financial Pacific's proposed rebuttal expert. Dkt. No. 79. RVI seeks to exclude that testimony for

6    four reasons: (1) "Warfel lacks the requisite qualifications to offer admissible opinions" about

7    residual value insurance, the Policy, and industry custom and practice; (2) his opinions "lack the

8    necessary foundation" under Federal Rule of Evidence 702(b) because he "made no effort to

9    investigate relevant facts, did not provide sufficient facts in support of his opinions, and did not

10   review the documents and evidence that RVI's expert had considered"; and (3) he "proffered

11   inadmissible legal conclusions and interpretations with respect to the Policy." Dkt. No. 79 at 3–5.

12       As Financial Pacific points out, Dkt. No. 106 at 14, it relies on Dr. Warfel's opinion only

13   in a single footnote stating that Dr. Warfel confirmed that "Financial Pacific's interpretation

14   conforms with the Policy as a whole" in his expert report, Dkt. No. 85 at 15 n.3. The footnote goes

15   on to quote the report:

16           "In contrast, however, Financial Pacific Leasing's interpretation, which results in a
             covered loss with the End of Term Value falling below the Insured Value, conforms
17           with the stated purpose in the applicable Residual Value Insurance Policy and
             R.V.I.'s other statements, including statements contained in its website, regarding
18           the purpose of this type of insurance." (Expert Report of Dr. William Warfel, p. 5).

19   *Id.* Whether Financial Pacific's interpretation of the Policy conforms with the stated purpose in

20   the Policy and the parties' intent is a legal question that is not a proper subject of expert testimony.

21   *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("The interpretation of

22   a contract is an issue of law[.] . . . Expert testimony is not proper for issues of law."); *Aguilar v.*

23   *Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (matters of law, such

24   as contract interpretation, are "inappropriate subjects for expert testimony"); *Builders Mut. Ins.*

*Co. v. GCC Constr., LLC*, 711 F. Supp. 3d 899, 921–22 (E.D. Tenn. 2024) (excluding Warfel's opinion that plaintiffs' "claim falls within the ambit of coverage provided under the applicable [policy]" because that opinion "impermissibly interprets the policy at issue"). The Court accordingly excludes this portion of Warfel's testimony and denies as moot RVI's motion to exclude the remainder of his testimony.[12]

3.   Dight Testimony

RVI also seeks to exclude the expert testimony of D. Gregg Dight, Financial Pacific's proposed expert, on four grounds: (1) Dight lacks the requisite qualifications to serve as an expert in this matter, Dkt. No. 81 at 4, 9; (2) he improperly offers legal conclusions, *id.* at 4–5, 10; (3) his "opinions about whether RailSolutions' Appraisal of the C112 covered hopper cards would have changed if RailSolutions actually had a copy of Endorsement D prior to performing its appraisal" lacks foundation and is speculative, *id.* at 5, 11 (emphasis removed); and (4) he did not consider "the RailSolutions work file, Blankemeyer's testimony, the Financial Pacific documents pursuant to which Blankemeyer was instructed to limit his appraisal . . . , or the deposition testimony of Williams[.]" *Id.* at 12.

*(a) The Court excludes most of the opinions in Dight's expert reports*

Even assuming without deciding that Dight is qualified to offer testimony regarding insurance, the Court excludes his opinions regarding Endorsement D and the RailSolutions appraisal. Dight opines that appraisers "must adhere to the appropriate methodologies and approaches that are approved by the governing agencies they obtain their credentials from" and "should never be compelled to limit their analysis to relying on only one approach." Dkt. No. 82-1 at 6; Dkt. No. 82-2 at 3. Dight cites no support for these propositions, nor does his opinion change

---

[12] The Court notes that even if it had considered this portion of Warfel's testimony, it would not change the outcome of this Order.

1    the long-established principle that parties are free to contract to the terms they choose, subject to

2    limitations not applicable here. *See Preferred Contractors Ins. Co. v. Baker & Son Constr. Inc.*,

3    514 P.3d 1230, 1234 (Wash. 2022). In other words, that appraisers "should never be compelled . . .

4    to rely[] on only one approach" does not alter the fact that under the law, parties are free to decide

5    certain valuation approaches, as the parties did here with Endorsement D. *See Portland Gen. Elec.*

6    *Co. v. U.S. Bank Tr. Nat. Ass'n as Tr. for Tr. No. 1*, 218 F.3d 1085, 1090 (9th Cir. 2000) ("[C]ourts

7    play a limited role in construing appraisal agreements, serving only to enforce the parties' bargain,

8    not 'to add gloss to the parties' own language.'" (quoting *Raytheon Co. v. Rheem Mfg. Co.*, 322

9    F.2d 173, 182 (9th Cir. 1963)); *Keesling v. W. Fire Ins. Co. of Fort Scott, Kansas*, 520 P.2d 622,

10   625 (Wash. Ct. App. 1974) ("An appraisal provision provides a method for establishing the dollar

11   value of damage sustained. Such a provision is justified in the expectation that it will provide a

12   plain, inexpensive and speedy determination of the extent of the loss."). Dight's premise, which

13   disregards this principal of law, is likely to confuse or mislead the jury. Fed. R. Evid. 403.

14   Apparently relying on this flawed premise, Dight proclaims in his "Summary of Opinions" section

15   that RailSolutions' appraisal "appropriately considers the three approaches to value and makes

16   reasonable value assessments considering the specific circumstances of these assets." Dkt. No. 82-

17   1 at 3. This proclamation is supported by nothing more than two paragraphs reciting RailSolutions'

18   reputation and qualifications and a sentence announcing in conclusory fashion that "[b]ased on a

19   general review of their report, RailSolutions appropriately considered the three approaches to value

20   and made a reasonable assessment considering the specific circumstances of these assets." *Id.* at

21   7. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

22   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*

23   *Co. v. Joiner*, 522 U.S. 136, 146 (1997)). These opinions are excluded.

24

1    The Court also excludes Dight's rebuttal report regarding the RailSolutions appraisal,

2    which impermissibly speculates that Blankemeyer "would not have changed his opinion of value"

3    if he had received the specific policy language at issue. Dkt. No. 82-2 at 8. Dight bases this upon

4    an unsupported "assum[ption]" that Blankemeyer's knowledge regarding "new equipment pricing

5    and how railcars that have come off lease depreciate in value based on their age" was "taken into

6    account as part of his analysis." *Id.* Not only does Dight fail to explain how such knowledge would

7    translate into equal valuations for fair market value, reproduction cost, and replacement cost; he

8    also did not review Blankemeyer's deposition testimony, in which Blankemeyer stated that the

9    cost approach would be a "completely different methodology and result," Dkt. No. 100-20 at 12,

10   and that if he were "to use the same methodology [as Biggs], [he] d[id]n't believe [he] would have

11   a much different opinion than Ed Biggs," *id.* at 21. Dight's reliance on assumptions alone, coupled

12   with his failure to review key documents that were considered in the report he was rebutting, *see*

13   Dkt. No. 94 at 26, also renders Dight's methodology unreliable. For all of these independent

14   reasons, this opinion is excluded.

15   Dight also opines that subsections (i) and (ii) are "different and irreconcilable valuation

16   concepts for determining the 'fair retail price.'" Dkt. No. 82-1 at 7. He explains on the prior page

17   of his report how "replacement cost" is *different* than "reproduction cost," *id.* at 6—a basic concept

18   that no expert and no party disputes—but he never attempts to explain how these two things are

19   *irreconcilable*, *see generally* Dkt. No. 82-1. Dight's rebuttal report does not correct this deficiency.

20   *See* Dkt. No. 82-2 at 4–5. "The trial court's gatekeeping function requires more than simply 'taking

21   the expert's word for it'"; Dight's unsupported opinion that the valuation concepts are

22   irreconcilable is excluded. Fed. R. Evid. 702, Advisory Committee's Notes to 2000 amendments.

23   The Court further finds that his opinion that the valuation concepts are different is not helpful

24   because that point is undisputed. *See, e.g.*, *Jacobs v. Alexander*, No. 105-CV-01625-SAB-PC,

2016 WL 4440957, at *12 (E.D. Cal. Aug. 22, 2016) (expert's opinion that plaintiff's "initial symptoms after exposure could have been alleviated by flushing the eyes with water or saline is . . . not helpful to the jury because it is undisputed that providing a person with copious amounts of cool water is part of the decontamination process"); *Rich v. Taser Int'l, Inc.*, No. 2:09-CV-02450-ECR, 2012 WL 1080281, at *4 (D. Nev. Mar. 30, 2012) (expert's opinion that plaintiff "had epilepsy and suffered a seizure and subsequent postictal state on January 4, 2008 are undisputed facts in this case, and [the expert's] testimony is therefore not helpful to the trier of fact"). The Court therefore excludes these opinions.

Similarly unhelpful is Dight's opinion that he "would have expected to see something more akin to th[e] term ['Depreciated Replacement Cost'] and its definition within the R.V.I insurance policy." Dkt. No. 82-1 at 7. Neither Dight nor Financial Pacific attempt to explain the relevance of this opinion, and the Court can discern none. Likewise of no help to the jury is the portion of Dight's "rebuttal" to the Oates report titled "What would I do if a client came to me and asked for an appraisal done based only on FMV, without any reference to a designated valuation approach?" Dkt. No. 82-2 at 5–6. This section does not respond to Oates' points and exceeds the scope of a rebuttal report, and is not "substantially justified or harmless," as the time to disclose these opinions was by the due date of the initial report. *See Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (quoting Fed. R. Civ. Proc. 37(c)(1)); *see also, e.g.*, *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 4154284, at *4 (W.D. Wash. Feb. 9, 2016).

Finally, in both his initial and rebuttal reports, Dight criticizes Biggs' assumptions (which were based on an "effective date" of August 31, 2020, the end of the lease, Dkt. No. 100-28 at 4) that the railcars were still under lease and in-use when estimating value, explaining without elaboration that "[b]ased on what has been reported to me, that is no longer the case as the assets

have been in storage for an extended period of time." Dkt. No. 82-1 at 8; *see also* Dkt. No. 82-2 at 9. Dight's reports were written in April 2024 and May 2024, respectively—four years after the end of the lease. Dkt. No. 82-1 at 2, Dkt. No. 82-2 at 2. He does not identify the date the assets were purportedly put into storage, making it impossible to evaluate the basis for his opinion. "In the absence of such an explanation, the district court ha[s] no means to ensure that [Dight's] conclusions [a]re not mere subjective beliefs or unsupported speculation." *In re Incretin-Based Therapies Prods. Liab. Litig.*, No. 21-55342, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022) (citation modified). This portion of Dight's opinion is excluded.

Dight's remaining opinions are (1) his other criticisms of Biggs' appraisal, Dkt. No. 82-1 at 8; Dkt. No. 82-2 at 8–9; (2) his opinion that Oates did not determine Reproduction Cost New, Dkt. No. 82-2 at 7; and (3) his rebuttal to the last "custom and practice" questions addressed by Oates, Dkt. No. 94 at 21–22; Dkt. No. 82-2 at 6. The Court assumes without deciding that these opinions are admissible, as consideration of these opinions does not change the result. The Court therefore grants in part and denies in part RVI's motion to exclude Dight's opinions.

## C.    The Parties' Cross-Motions for Summary Judgment

The Court next considers the parties' cross-motions for summary judgment. Financial Pacific moves for summary judgment on the parties' declaratory judgment claims and its breach of contract claim. Dkt. No. 85. RVI moves for summary judgment on all claims. Dkt. No. 99. For the following reasons, the Court grants in part and denies in part each party's motion.

### 1.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

1    evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

2    sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

3    resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

4    the facts specifically averred by that party contradict facts specifically averred by the movant, the

5    motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

6          When parties file simultaneous cross-motions for summary judgment on the same claim,

7    the Court "must consider the appropriate evidentiary material identified and submitted in support

8    of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous.*

9    *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also*

10   *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court

11   "rule[s] on each party's motion on an individual and separate basis, determining, for each side,

12   whether a judgment may be entered in accordance with the Rule 56 standard" (citation modified)).

13   The Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences."

14   *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent

15   the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

16   that, where the facts specifically averred by that party contradict facts specifically averred by the

17   movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

18         To establish that a fact cannot be genuinely disputed, the movant can either cite the record

19   or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an

20   adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

21   Once the movant has made such a showing, "the nonmoving party must come forward with specific

22   facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

23   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified). Metaphysical doubt is insufficient, *id.*

24   at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's

job to "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation modified). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2. <u>Financial Pacific's Breach of Contract Claim and the Parties' Declaratory Judgment Claims</u>

As discussed above, Financial Pacific alleges that RVI breached the Policy by "failing to pay for the covered Loss incurred by Financial Pacific, applying Endorsement D's definition of Appraised Value (Reproduction Cost New)." Dkt. No. 64 at 10. Relatedly, its declaratory judgment claim seeks the following declarations:

- the determination of End of Term Value under the Policy is ambiguous, *id.* at 11;

- "alternatively, RVI's interpretation and/or application of Endorsement D's Appraised Value (Reproduction Cost New) would render coverage under the Policy illusory and is therefore unenforceable," *id.*; and

- "Financial Pacific is entitled to coverage for the amount by which the sum of the Insured Values of the Haliburton Units exceeds the End of Term Value of the units, applying Endorsement D's definition of Appraised Value (Reproduction Cost New), at the Lease Termination Date," *id.*

RVI filed a counterclaim for declaratory judgment that (1) the Policy is unambiguous; (2) "Fin[ancial] Pac[ific] has no 'Loss' under the Policy," regardless of "any alleged ambiguity"; (3) "[a]ny new appraisal must be performed in accordance with the Policy," (4) "[t]here is no 'Loss' under the Policy if 'End of Term Value' is determined based only on Section 2.01(d)(i)"; (5) "[t]here is no 'Loss' under the Policy if 'End of Term Value' is determined based only on Section 2.01(d)(ii)"; and (6) "'End of Term Value' is not determined based on considerations of 'market value' or 'fair market value,' as those terms are used in Fin[ancial] Pac[ific]'s Second

1    Amended Complaint." Dkt. No. 65 at 12–13.[13]

2         Financial Pacific argues that it is entitled to summary judgment on its breach of contract

3    and declaratory judgment claims and on RVI's declaratory judgment claims because Endorsement

4    D's "two disparate and irreconcilable valuation methods" constitute an ambiguity that is not

5    resolved through extrinsic evidence, and the Policy must therefore be construed in Financial

6    Pacific's favor, resulting in a covered loss. Dkt. No. 85 at 2, 7; Dkt. No. 106 at 4–5. Financial

7    Pacific also argues that even if Endorsement D could be interpreted as RVI urges, it still should

8    prevail because "under RVI's interpretation, the Policy is illusory." Dkt. No. 85 at 2.

9         RVI contends that the Court should instead grant it summary judgment on all claims

10   because (1) Financial Pacific is seeking summary judgment based on an interpretation of the Policy

11   that "this Court expressly rejected in [its prior] Order"; (2) Financial Pacific did not submit the

12   required appraisal of the Halliburton Units because the RailSolutions appraisal did not conform

13   with Endorsement D; (3) there is no "Loss" under the Policy regardless of whether the Halliburton

14   Units are appraised based on Subsection 2(d)(i), 2(d)(ii), or both; (4) the Policy is not illusory

15   because it provided financial benefits to Financial Pacific and provided protection in the event

16   there was a Loss; and (5) Financial Pacific's extracontractual claims are predicated on a rejected

17   interpretation of Endorsement D, no evidence supports its CPA claim, and Financial Pacific is

18   barred from offering facts in support of its extracontractual claims because it "simply did not

19   answer five separate interrogatories asking it to set forth 'all facts' in support of" those claims.

20   Dkt. No. 99 at 5–6.

21

22

23   _____
     [13] The parties do not address RVI's last claim for declaratory judgment that Financial Pacific "is precluded from
     revising its allegations and filing a Third Amended Complaint to correct deficiencies[.]" Dkt. No. 65 at 12. This is not
24   appropriate subject matter for a declaratory judgment claim, and Financial Pacific is not seeking leave to amend at
     this point. The Court therefore STRIKES this claim. Fed. R. Civ. P. 12(f)(1).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT OPINIONS,
AND MOTION TO SEAL - 28

1          (a) *Contract interpretation in Washington*

2          Under Washington law, "[i]nterpretation or construction of an insurance contract is a

3 question of law and may properly be determined on motion for summary judgment." *Wampold v.*

4 *Safeco Ins. Co. of Am.*, 409 F. Supp. 3d 962, 967 (W.D. Wash. 2019) (quoting *Gerken v. Mut. of*

5 *Enumclaw Ins. Co.*, 872 P.2d 1108, 1112 (Wash. Ct. App. 1994)). "The criteria for interpreting

6 insurance contracts in Washington are well settled." *Quadrant Corp. v. Am. States Ins. Co.*, 110

7 P.3d 733, 737 (Wash. 2005). The "primary goal" is to ascertain and give effect to the parties' intent

8 at the time of the Policy's execution, not "the interpretations the parties are advocating at the time

9 of the litigation." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 399–400 (Wash.

10 2013). The Court therefore "focus[es] on the objective manifestations of the agreement, rather than

11 on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*,

12 115 P.3d 262, 267 (Wash. 2005). This principle is "quite simple": the parties' "[u]nilateral or

13 subjective purposes and intentions about the meanings of what is written do not constitute evidence

14 of [their] intentions." *Lynott v. Nat'l Union Fire Ins. Co.*, 871 P.2d 146, 149 (Wash. 1994). Thus,

15 although "[a]n interpretation of an insurance clause must be reasonable and take into account the

16 purpose of the insurance at issue," *id.* at 152, the "expectations of the insured cannot override the

17 plain language of the contract," *Quadrant Corp.*, 110 P.3d at 737. The Court will "not interpret

18 what was intended to be written but what was written." *Hearst*, 115 P.3d at 267.

19          In doing so, the Court "construe[s the] insurance polic[y] as a whole and give[s] the

20 language a fair, reasonable, and sensible construction as would be given to the contract by the

21 average person purchasing insurance." *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK)*

22 *PLC*, 516 P.3d 796, 800 (Wash. 2022) (citation modified). Undefined terms are given "their

23 popular and ordinary meaning in accord with the understanding of the average purchaser of

24 insurance[.]" *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016). But when the Policy

expressly defines terms, the Court is bound by those definitions. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 327 (Wash. 2002). The Court "will not read ambiguity into a contract where it can reasonably be avoided." *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014) (citation modified); *see also ABCD Marine*, 313 P.3d at 283 ("A court, however, may not interpret a policy in such a way that it creates nonexistent ambiguities that result in the policy being construed in favor of the insured."). The Washington Supreme Court has emphasized that policy language is ambiguous "if, on its face, it is fairly susceptible to two different but reasonable interpretations." *Seattle Tunnel Partners*, 516 P.3d at 800. Ambiguities in the policy are strictly construed against the insurer. *Findlay v. United Pac. Ins. Co.*, 917 P.2d 116, 119 (Wash. 1996).

If "the extrinsic evidence does not resolve [an] ambiguity [in an insurance policy], [courts] construe the ambiguity in favor of the insureds." *Pub. Util. Dist. No. 1 of Klickitat Cnty. v. Int'l Ins. Co.*, 881 P.2d 1020, 1027 (Wash. 1994); *see also Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525, 531 (Wash. 2022) ("[W]here multiple reasonable definitions of an undefined term in an insurance policy exist . . . courts adopt the definition that most favors the insured." (quoting *McLaughlin v. Travelers Com. Ins. Co.*, 476 P.3d 1032, 1037 (Wash. 2020)); *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 882 P.2d 703, 721 (Wash. 1995) ("Unresolved ambiguity in insurance contract language is resolved against the insurer.").

### (b) *Endorsement D is ambiguous*

The parties' dispute continues to center on the meaning of Endorsement D. And for the reasons the Court explained in its prior order, it finds that the text of Endorsement D is ambiguous. Dkt. No. 63 at 17–21.

To recap, the Court rejected any interpretation of Endorsement D's prefatory language as "talismanic language incorporating 'fair market value' into the definition [of fair retail price] and superseding any subsequent language purporting to define the valuation approach." *Id.* at 18.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT OPINIONS, AND MOTION TO SEAL - 30

Instead, the text after the prefatory language (in particular, subsections 2.01(d)(i) and (d)(ii)) defined the specific valuation approach for the "fair retail price." *Id.* at 19. However, subsections 2.01(d)(i) and (d)(ii) created an ambiguity because they seemed to incorporate both "the cost of substituting another asset of comparable utility for a rail car" and "the expense of constructing an exact duplicate of a rail car," and those two values are "not necessarily the same[.]" *Id.*

This decision did not, as Financial Pacific claims, go so far as to definitively conclude that subsections 2.01(d)(i) and (d)(ii) contain "disparate and irreconcilable valuation methods." Dkt. No. 85 at 10; Dkt. No. 106 at 3. The Court instead only observed that the two subsections "call[ed] for two *potentially* irreconcilable valuation methods." Dkt. No. 63 at 20 (emphasis added).

Because the plain text of Endorsement D is ambiguous, the Court turns to extrinsic evidence to determine the parties' intent. *Am. Star Ins. Co. v. Grice*, 854 P.2d 622, 625 (Wash. 1993), *supplemented,* 865 P.2d 507 (Wash. 1994) ("If an ambiguity exists, then the court may attempt to determine the parties' intent by examining extrinsic evidence.").

### (c) Extrinsic evidence does not resolve the ambiguity

The Court begins with textual cues. As discussed above, RVI agreed to indemnify Financial Pacific "as of the Lease Termination Date against Loss, if any, which shall be payable on the Settlement Date, in respect of all Units subject to a Lease." Dkt. No. 64 at 45. The Policy defines "Loss" as "the amount, if any, by which the sum of the Insured Values of all Units subject to such Lease exceeds the sum of the End [o]f Term Values thereof on the Lease Termination Date, as determined in accordance with Article V., reduced by the Deductible." *Id.* at 47. End of Term Value must be "defined and determined in accordance with Section 5.02." *Id.* at 46. Endorsement D added the Haliburton Units to the Policy and simultaneously replaced Section 2.01(d) and Section 5.02 of the Policy as follows (deletions in strikethrough font, additions in red underline):

**ENDORSEMENT D**

**ESTABLISHMENT OF REPRODUCTION COST NEW APPRAISAL METHODOLOGY FOR TWO HUNDRED FIFTY (250) UNITS ONLY**

2.01(d) Appraised Value **(Reproduction Cost New):** with respect to a Unit, the fair retail price (not reduced by the value of any trade-in, allowances or set-offs) that would result from an arm's-length retail sales transaction, free and clear of mortgages, liens, security interests and other encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession or a used equipment dealer) under no compulsion to purchase, who is purchasing the Unit for its own usage (not for resale) with the intent of utilizing the Unit in accordance with the Unit's intended usage, such fair retail price being determined:

(i)    by the cost of substituting another asset of comparable utility;
(ii)   on the basis of the expense necessary to construct an exact duplicate of a subject property considering current prices for identical components, criteria, design, arrangement, and quality meeting current regulatory requirements (i.e. "reproduction cost new" basis);
~~(i)~~(iii)  as of the applicable Lease Termination Date;
~~(ii)~~(iv)  by a Qualified ~~Inspector/~~Appraiser in accordance with Section 5.02~~(a) or Section 6.0l(b)(ii), as applicable~~ hereof;
~~(iii)~~(v)  ~~with respect to Section 5.02(a),~~ on the basis that such Unit complies with all standards set forth in the ~~Equipment Portfolio~~ Return Conditions Endorsement ~~but with respect to Section 6.0l(b)(ii),  on the basis of such Unit being in its existing condition~~;
~~(iv)~~(vi)  without deduction of any costs, fees, commissions, charges or expenses incurred or expected to be incurred with respect to repossession, storage, remarketing, redelivery or de-installation, if applicable, or removal from any location of current use, of such Unit; and
~~(v)~~(vii)  ~~highest and best use~~ without regard to quantity, location or country of registration of such Unit. . . .

5.02: The End Of Term Value of ~~each~~ the Unit shall be ~~calculated by determining . . . [t]he Appraised Value of the Unit determined under the direction of the Company but at the Insured's expense, by a Qualified Inspector/Appraiser selected and approved by the Company[.]]~~the Appraised Value (Reproduction Cost New).

*Compare* Dkt. No. 64 at 45–46, 51, *with id.* at 60–61 (highlighting added for emphasis).

As the highlighting above demonstrates and as the Court previously observed, "the thrust of Endorsement D . . . seems to be that the appraisal value of the rail cars is 'reproduction cost new.'" Dkt. No. 63 at 20. The full title of Endorsement D is "Endorsement D *Establishment of Reproduction Cost New Appraisal Methodology* for Two Hundred Fifty (250) Units Only," Dkt. No. 64 at 60 (emphasis added); subsection (d)'s heading is likewise "Appraised Value (*Reproduction Cost New*)," *id.* (emphasis added); subsection (d)(ii) explains in parentheses that it is a "'reproduction cost new' basis," *id.*; and Endorsement D expressly replaced Section 5.02 of the Policy with this sentence: "The End of Term Value of the Unit shall be the Appraised Value (*Reproduction Cost New*)," *id.* at 61 (emphasis added). But if reproduction cost new was the sole

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT OPINIONS, AND MOTION TO SEAL - 32

1   basis of appraisal intended by the parties, why include subsection 2.01(d)(i)'s reference to

2   substitution rather than reproduction cost? Dkt. No. 63 at 21 ("cases and articles discussing the

3   different valuation methods suggest that substitution (i.e., replacement) cost and reproduction cost

4   are often two different values").[14]

5           While RVI's expert, Professor Angelina, persuasively explains that Endorsement D adopts

6   a "reproduction cost new" approach and "add[s] two clarifying points of 'substitution with

7   comparable utility' and the 'cost and expense to construct an exact duplicate'" such that "[w]hen

8   combining items (i) and (ii) of Endorsement D together, the appraised value is based on a substitute

9   asset (with comparable utility) at the cost to reproduce an exact duplicate considering current

10  prices, etc.," Dkt. No. 100-43 at 33, 39, that does not shed light on the intent of either *party* at the

11  time of contract execution. Nor does it make the text of Endorsement D clear as to how an appraiser

12  should "combine" subsections (i) and (ii). The same is true for all of the parties' expert opinions:

13  such opinions do not reveal what the parties—who do not aver that they were employing any

14  particular expertise at the time they executed the Policy—intended the Policy to mean. *See Kitsap*

15  *Cnty. v. Allstate Ins. Co.*, 964 P.2d 1173, 1178 (Wash. 1998) ("If words have both a legal, technical

16  meaning and a plain, ordinary meaning, the ordinary meaning will prevail unless it is clear that

17  both parties intended the legal, technical meaning to apply.").

18

19  [14] *See also* Robert F. Reilly, *Personal Property Appraisal Report Guidelines*, 23 Am. Bankr. Inst. J. 46, 67
20  (July/August 2004) ("It is essential that the appraiser understand the difference between replacement cost new and
    reproduction cost new. Replacement cost is the current cost of a similar new property having the nearest equivalent
21  utility as the property being appraised, whereas reproduction cost is the current cost of reproducing a new replica of
    the property being appraised using the same, or closely similar, materials." (quoting *Valuing Machinery and*
    *Equipment*, American Society of Appraisers, 2000, p. 46)); James A. Amdur, *Property Taxation of Regulated*
22  *Industries*, 40 Tax Law. 339, 359–60 (1987) ("In theory, functional obsolescence [i.e., loss in value resulting from
    improvements in technology and inadequacy of the property for present needs] is the difference between reproduction
23  cost new and replacement cost new. It reflects the fact that a company ordinarily would not reproduce the property,
    but rather would replace it with a substitute reflecting the current state of the art." (footnote omitted)); *Farmers Union*
    *Cent. Exch. v. FERC*, 584 F.2d 408, 412 n.3 (D.C. Cir. 1978) (differentiating between "the reproduction cost (present
24  cost of reproducing the same physical assets)" and "the replacement cost (present cost of building a like enterprise
    taking advantage of modern technology)").

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT OPINIONS,
AND MOTION TO SEAL - 33

As Financial Pacific argues, Dkt. No. 85 at 7, 10, none of the extrinsic evidence submitted by the parties evidences their intent with respect to Endorsement D. RVI points to evidence that the "principal benefit" to Financial Pacific when entering into the Policy was that it would enable Financial Pacific to obtain accounting and other financial benefits, with a secondary benefit of "guarantee[ing] a portion of the residual." Dkt. No. 99 at 9–10 (citing Dkt. No. 100-3 at 5, 9–12; Dkt. No. 100-7 at 2). Todd Derr—a Group Manager who was "the 'most knowledgeable' person at [Financial Pacific] about residual value insurance and the person responsible for purchasing the Policy," *id.* at 10—further testified that at the time Financial Pacific purchased the Policy, "we did not think that the [Policy] would be necessary to provide us comfort to what the valuation was going to be at the end of the term" because "the [residual] valuations we got back from . . . our appraisers and our experts . . . were higher than what the amount [the Policy] was providing." Dkt. No. 100-3 at 10. While this evidence suggests that Financial Pacific did not have a strong incentive to scrutinize the appraisal methodology prescribed by the Policy, it does not shed light on its understanding of that methodology.

RVI also asserts that it issued Endorsement D "[b]ased on Vista's utilization of the Cost Approach" in the appraisal Financial Pacific initially sent to RVI. Dkt. No. 99 at 12. It cites as support its 30(b)(6) witness's testimony that RVI "received from the client a reproduction cost forecast" and "concluded that if that's the underwriting information [it] had, the policy should reflect that as the method of settlement." *Id.* (quoting Dkt. No. 100-11 at 3) (emphasis removed). But that witness went on to say that RVI actually relied on multiple things: (1) RVI's own appraiser—who was "unable to provide a forecast utilizing another approach"—sent it a "reproduction cost forecast," (2) Financial Pacific submitted a "reproduction cost forecast" (the Vista appraisal), and (3) RVI would also have "used the RailSolutions' guidebook, which includes a forecast of value." Dkt. No. 100-11 at 3. And if RVI were truly basing Endorsement D on Vista's

1    appraisal, it does not explain why Endorsement D includes *reproduction* cost, given that the cost

2    approach used by the Vista appraiser was "the *replacement* cost []new of a car[.]" Dkt. No. 100-

3    10 at 3 (emphasis added). This evidence is not probative of the parties' intent.

4         Finally, RVI submits evidence that when Mark Williams informed RVI in June 2020 that

5    Financial Pacific would "most likely have a claim" with regard to the Halliburton Units, a Manager

6    of Client Services for RVI indicated in RVI's Salesforce activity log that "the settlement is to RCN

7    new, so we should not have a problem." Dkt. No. 100-13 at 2. Although this supports that RVI

8    understood the policy to be based on replacement cost new or reproduction cost new, extrinsic

9    evidence can only provide the meaning of an ambiguous term "where that evidence shows that

10   *both* parties to the policy intended a particular meaning." *Seaway Props., LLC v. Fireman's Fund*

11   *Ins. Co.*, 16 F. Supp. 3d 1240, 1247 (W.D. Wash. 2014) (citing *Am. Nat'l Fire Ins. Co. v. B & L*

12   *Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998)).

13        Likewise unenlightening is Williams' directive to Blankemeyer regarding the "appropriate

14   valuation." Dkt. No. 100-19 at 5. Neither party asserts that this communication reflects Financial

15   Pacific's understanding of the Policy. Indeed, there is no indication that Williams reviewed the

16   Policy before providing the directive to Blankemeyer; Williams' statement that he "suspect[ed]"

17   that "the most appropriate valuation is the Collateral Value – Current Fair Market Value – Current

18   Orderly Liquidation Value" underscores that his directive was based on suspicion rather than

19   anything else. *Id.* Furthermore, Williams testified that these three values are dependent on an arm's

20   length retail sales transaction and are not replacement cost or reproduction cost, and that

21   RailSolutions' appraisal was not performed in accordance with the terms and conditions required

22   under the Policy. Dkt. No. 100-1 at 16–17, 20–21, 23.

23        The Court accordingly concludes that extrinsic evidence does not resolve the ambiguity.

24   Accordingly, the Court grants summary judgment to Financial Pacific on its claim for declaratory

1    judgment that "the determination of End of Term Value under the Policy is ambiguous," Dkt. No.

2    64 at 11, and on RVI's mirror-image declaratory judgment counterclaim, Dkt. No. 65 at 12.

3              (d) *Financial Pacific has failed to carry its burden under the summary judgment*
                  *standard*

4

5        As discussed above, where, as here, extrinsic evidence does not resolve an ambiguity, and

6    multiple reasonable definitions of an undefined term in an insurance policy exist, "courts adopt

7    the definition that most favors the insured." *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515

8    P.3d 525, 531 (Wash. 2022) (quoting *McLaughlin v. Travelers Com. Ins. Co.*, 476 P.3d 1032, 1037

9    (Wash. 2020)). There are three reasonable meanings here, as indicated by the Court's prior order.

10   Dkt. No. 63. Specifically, Endorsement D could reasonably be construed to require that the railcars

11   be appraised based on:

12            1.    Subsection 2(d)(i), i.e., by the cost of substituting another asset of comparable

13                  utility;

14            2.    Subsection 2(d)(ii), i.e., on the basis of the expense necessary to construct an exact

15                  duplicate of a subject property considering current prices for identical components,

16                  criteria, design, arrangement, and quality meeting current regulatory requirements

17                  (i.e. "reproduction cost new" basis); or

18            3.    A combination of the above two approaches.

19       Of the three reasonable meanings, the one that "most favors the insured" is the proper

20   valuation method. *Hill & Stout*, 515 P.3d at 531.

21       Financial Pacific does not dispute that the End of Term Value exceeds the Insured Value

22   under the "Reproduction Cost New" method. *See* Dkt. No. 85 at 18–19. RVI has submitted

23   evidence that if the End of Term Value is based only on "Replacement Cost New," it would be

24   $76,000 (and above the Insured Value of $51,815.08). Dkt. No. 100-19 at 39 (RailSolutions

Guidebook). And RVI has submitted evidence that an appraisal based on Subsections 2(d)(i) and (ii) together results in an End of Term Value of $67,500 to $69,500. Dkt. No. 100-28 at 5–6 (Biggs appraisal). RVI has not submitted evidence of the End of Term Value if such value were based on solely "replacement cost" rather than "replacement cost new."

Because RVI has submitted evidence supporting its claim that there is no Loss under the reproduction cost new method, the replacement cost new method, or a combination of the two, Financial Pacific must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citation modified).  Financial Pacific argues that the railcars' value should be determined based only on Subsection 2(d)(i), because that is the valuation that most favors Financial Pacific. Dkt. No. 85 at 15; *see also* Dkt. No. 106 at 6. It further argues that Subsection 2(d)(i) does not include the concept of "replacement cost *new*" because "new" is never used in its text; thus, that Subsection "sets forth a unique version of replacement cost based on 'the cost of substituting another asset of comparable utility.'" Dkt. No. 106 at 7. Financial Pacific argues that this cost can be identified by "the cost to acquire a different 2015 C112 covered hopper railcar," Dkt. No. 85 at 15, and that the RailSolutions appraisal identifies such cost, Dkt. No. 106 at 6 (citing Dkt. No. 89 at 104–18 (the RailSolutions appraisal)).

But the RailSolutions appraisal does not do so. Instead, it states that "[i]n determining estimates of current fair market and orderly liquidation value, [it] used the market, comparable sales approach (or market approach) *and* the depreciated replacement cost approach (or cost approach) as the primary methods of valuation *along with* channel checks of equipment owners," and "[t]he income approach was used for the purpose of testing the reasonableness of the valuation findings derived from the market and cost approaches." Dkt. No. 89 at 108 (emphasis added). The only values it expressly identifies are "Fair Market Value" and "Orderly Liquidation Value." *Id.* at 117–18. Even assuming that "depreciated replacement cost" is the same as "the cost of

1    substituting another asset of comparable utility," as Financial Pacific urges, the fact that

2    RailSolutions used the depreciated replacement cost approach *along with* the comparable sales

3    approach, channel checks, and an income approach check to arrive at fair market value and orderly

4    liquidation value does not show that the depreciated replacement cost approach *by itself* would

5    result in the same valuation.[15]

6          Even assuming that Endorsement D requires that the railcars be valued based on a "unique

7    version of replacement cost based on 'the cost of substituting another asset of comparable utility,'"

8    Dkt. No. 106 at 7, as Financial Pacific claims, the Court cannot decide that Subsection 2(d)(i) is

9    the most favorable valuation approach for Financial Pacific, or that it would result in a Loss,

10   because Financial Pacific has not provided any valuation under that Subsection. And because

11   Financial Pacific has not submitted any such valuation, it has failed to carry its burden to establish

12   the existence of an essential element to its case—i.e., that it suffered a Loss under the Policy—or

13   a genuine dispute as to whether there was a Loss. Fed. R. Civ. P. 56(c)(1)(B); *Celotex*, 477 U.S. at

14   322. Therefore, the Court grants summary judgment to RVI with respect to Financial Pacific's

15   claim that RVI breached the Policy by "failing to pay for the covered Loss incurred by Financial

16   Pacific, applying Endorsement D's definition of Appraised Value (Reproduction Cost New)," and

17   with respect to Financial Pacific's third declaratory judgment claim. Dkt. No. 64 at 10–11.

18         *(e)  The Policy is not illusory*

19         As noted above, Financial Pacific argues that even if Endorsement D could be interpreted

20   as RVI urges, it still should prevail on summary judgment because "under RVI's interpretation,

21

22   ───────────────────
     [15] The only appraisal that Financial Pacific obtained that was seemingly based only on replacement cost was Vista's
     appraisal in 2015. Dkt. No. 100-10 at 3 ("For the projected opinion of future value, the Cost Approach was utilized,"
     which "starts with the replacement cost []new of a car and is adjusted for (3) forms of depreciation."); *see also* Dkt.

23   No. 100-4 at 7 (Financial Pacific's Credit Recommendation in which it repeated this). But Financial Pacific does not
     cite this appraisal in its arguments, and the Vista appraiser concluded that based on this approach, the railcars would
     have a fair market value of $67,500, an orderly liquidation value of $63,500, and a net orderly liquidation value of

24   $58,250. Dkt. No. 100-10 at 8. All of these values are above the Insured Value of $51,815.08.

the Policy is illusory." Dkt. No. 85 at 2. Specifically, Financial Pacific contends that (1) RVI values the "expense necessary to construct an exact duplicate" of the railcars as $81,000, and without depreciation (which is not mentioned in the policy), there can never be a loss; and (2) even if depreciation is considered, RVI applies a straight-line depreciation method of 3.1% that can never result in a loss. *Id.* at 18–19. RVI responds that the Policy is not illusory because it provided financial benefits to Financial Pacific and provided protection in the event there was a Loss. Dkt. No. 99 at 5–6.

An insurance policy is illusory if an insured does not receive some benefit (i.e., coverage) in exchange for the insurance premiums it pays, such as when a policy excludes coverage for all occurrences. *Neil Jones Food Co. v. Traveler's Cas. Ins. Co.*, No. 3:15-CV-5459-RJB, 2016 WL 150382, at *3–4 (W.D. Wash. Jan. 13, 2016) (policies were not illusory because they provided coverage "in at least two circumstances, either of which would be legally sufficient on its own"); *Quadrant Corp.*, 110 P.3d at 743 ("If the absolute pollution exclusion is so broad that it excludes coverage for all occurrences, then the insurance contract would be illusory because it would render the business liability policy meaningless."). Courts will not give effect to interpretations that would render a contract illusory. *SAK & Assocs., Inc. v. Ferguson Constr., Inc.*, 357 P.3d 671, 675 (Wash. Ct. App. 2015).

Financial Pacific's argument misapprehends the Policy: it relies on the faulty assumption that the starting valuation of $81,000 can never change, but that is precisely the opposite of what the record demonstrates. Whether or not depreciation is factored in, materials costs and other costs could fall during the coverage period such that the cost to either replace or reproduce the railcars falls below the Insured Value. Technological advances or regulatory changes could also effect this result. As RVI's expert, Professor Angelina, explains, technological advances or regulatory changes rendering an asset obsolete can cause a significant decline in both reproduction cost new

and replacement cost, which would result in coverage under the Policy. For example, a personal laptop insured for 3 years that is rendered obsolete by new technology after one year would result in significant decreases in both the cost of substituting another asset of comparable utility (since assets of comparable utility are obsolete) and in reproduction cost new "because the cost to rebuild would utilize many parts that have significantly reduced values (processors, memory, etc.)." Dkt. No. 100-43 at 34. "However, if the reduced value in the personal computer was due to low-cost competitors, or an alternative product (change in customer preferences), there would be no payment as reproduction cost new would be unchanged." *Id.* Significantly, Professor Angelina construes Endorsement D in a manner favorable to Financial Pacific in the event reproduction cost new and replacement cost new conflict: even where reproduction cost new does not decrease over the coverage period, coverage could still result if the asset could not be replaced by another asset with comparable utility. For example, if a regulatory change required all school buses to be electric, coverage would result for a customer who had insured a fleet of diesel school buses, even though the reproduction cost new would remain the same. *Id.* at 35. In an example where regulatory changes required a customer who insured DOT 111 railcars that transported hazardous fuels to retrofit or retire the cars within the coverage period, reproduction cost new remained the same, but because the cars could not be substituted with another asset of comparable utility ("a new DOT 111 tank car <u>cannot</u> be used to transport hazardous fuels" under the regulatory change), coverage would result. *Id.* at 38–39. Contrary to Financial Pacific's arguments, Dkt. No. 106 at 11, Professor Angelina did address coverage for the railcar assets at issue: he explains that "[a] similar claim situation could have occurred in the Fin[ancial] Pac[ific] coverage matter had the cost to reproduce the Halliburton railcars decreased significantly because of technological and production efficiencies or decreased costs of material used in their production." Dkt. No. 100-43 at 38.

Financial Pacific's experts do not contest this. In his deposition testimony, Dr. Warfel acknowledged that Professor Angelina's examples are correct. Dkt. No. 100-44 at 4. Dight's opinion—if the Court were to consider it—also supports this interpretation. He describes replacement cost as "the costs for assets of comparable utility that are currently for sale in the market," and reproduction cost as "the cost of reproducing th[e] asset with the same or closely similar materials." Dkt. No. 82-1 at 6. And assuming without deciding that other parts of Dr. Warfel's opinion are admissible, he similarly describes reproduction cost new as "largely, if not entirely, driven by the cost of inputs in constructing a replica of a C112 Covered Hopper." Dkt. No. 80-1 at 5. Such costs—of inputs and for assets of comparable utility—can fluctuate significantly based on "changes in market conditions," Dkt. No. 64 at 45—for instance, if a drop in materials cost made it much cheaper to produce a Ford F150 in Dight's example, both reproduction and replacement cost could drop precipitously, resulting in coverage. *See, e.g.*, Dkt. No. 82-1 at 6 ("[I]f the asset at issue was a 2017 Ford F150, the appraiser would analyze the cost in the market to replace this vehicle with an asset of comparable utility, such as another 2017 Ford F150 or a similar pickup truck, such as a 2017 Dodge Ram 1500.").

In sum, although Financial Pacific claims that RVI's interpretation of Endorsement D "mathematically[] can never result in a loss," Dkt. No. 85 at 2, Financial Pacific fails to show that math. Although Financial Pacific is unhappy with the result, risks bearing upon reproduction or replacement cost are the particular risks that it chose to insure against. The fact that those risks did not materialize here (or at least Financial Pacific has failed to show that they did) does not mean the Policy was illusory. *R.V.I. Guar. Co. & Subsidiaries v. Comm'r*, 145 T.C. 209, 227 (2015) ("The thrust of respondent's position is that the RVI policies did not transfer enough risk of loss because losses were relatively unlikely to occur. This argument is unpersuasive on both theoretical and evidentiary grounds."). Because no genuine dispute exists here, the Court grants summary

judgment to RVI on Financial Pacific's claim for declaratory judgement that "RVI's interpretation and/or application of Endorsement D's Appraised Value (Reproduction Cost New) would render coverage under the Policy illusory and is therefore unenforceable." Dkt. No. 64 at 11.

### 3. Financial Pacific's Extracontractual Claims

RVI also moves for summary judgment on Financial Pacific's bad faith, CPA, and IFCA claims. Dkt. No. 99 at 41–44. The Court addresses each in turn.

#### (a) Bad Faith Claim

As discussed above, Financial Pacific alleges that RVI acted in bad faith by rejecting Financial Pacific's claim "based on unreasonable, frivolous, or unfounded interpretations of the Policy," and by "issuing an insurance policy that, under RVI's proffered post-claim interpretation of the applicable policy language, could not (i) transfer risk from Financial Pacific to RVI or (ii) provide coverage consistent with RVI's pre-claim representations to Financial Pacific." Dkt. No. 64 at 11. RVI contends that it is entitled to summary judgment on Financial Pacific's bad faith claim because (1) the Court has rejected Financial Pacific's interpretation of the Policy and agreed with RVI that End of Term Value is determined by considering (d)(i) and (d)(ii), and (2) because there is no evidence of any pre-claim representation by RVI. Dkt. No. 99 at 41.

#### (i) Legal standard

"Claims of insurer bad faith are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (citation modified). "[T]o succeed on a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003). Washington courts have repeatedly emphasized that the test for bad faith "is not whether the insurer's interpretation [of the policy] is correct, but whether the insurer's conduct

was reasonable." *Wright v. Safeco Ins. Co.*, 109 P.3d 1, 10 (Wash. Ct. App. 2004); *see also Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000) ("The determinative question is reasonableness of the insurer's actions in light of all the facts and circumstances of the case."). "As long as the insurance company acts with honesty, bases its decision on adequate information, and does not overemphasize its own interests, an insured is not entitled to base a bad faith or CPA claim against its insurer on the basis of a *good* faith mistake." *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 937–38 (Wash. 1998).

Whether the insurer acted reasonably is often a question of fact. *Smith*, 78 P.3d at 1277. But this is not a free ticket to trial, as the insured "has the burden of proof" and "must come forward with evidence that the insurer acted unreasonably." *Id.*; *Overton*, 38 P.3d at 329 ("Claims of bad faith are not easy to establish and an insured has a heavy burden to meet."). The Court will therefore grant summary judgment "if reasonable minds could not differ that [the insurer's] denial of coverage was based upon reasonable grounds." *Smith*, 78 P.3d at 1277. The insurer's ability to point to a reasonable basis for its action is "significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its denial of coverage was justified." *Id.* at 1278.

### *(ii)* The Court grants summary judgment to RVI

With respect to Financial Pacific's claim that RVI acted in bad faith by "issuing an insurance policy that, under RVI's proffered post-claim interpretation of the applicable policy language, could not (i) transfer risk from Financial Pacific to RVI or (ii) provide coverage consistent with RVI's pre-claim representations to Financial Pacific," Dkt. No. 64 at 11, the Court grants summary judgment to RVI. For the reasons stated above, the Policy was not illusory. And Financial Pacific's 30(b)(6) witness explained that the allegation of pre-claim "representations" did not include any representations other than the language of the Policy. Dkt. No. 99 at 42 (citing

Dkt. No. 100-2 at 9); *see also* Dkt. No. 100-24 at 5 (Financial Pacific interrogatory response identifying only "the opening paragraph of the Policy" as the subject of its "pre-claim representations" allegation). Thus, this latter claim is redundant with Financial Pacific's allegation that RVI acted in bad faith by rejecting Financial Pacific's claim "based on unreasonable, frivolous, or unfounded interpretations of the Policy." Dkt. No. 64 at 11.

With respect to the latter claim, Financial Pacific argues that RVI "ignored the Policy's actual language and obtained an appraisal based solely on a reproduction cost new valuation method." Dkt. No. 106 at 12. RVI also "took into account factors that are absent from the Policy, such as depreciation." *Id.* Even assuming without deciding that these things are true, it does not equate to bad faith. This is so because "[a] denial of coverage based on a reasonable interpretation of the policy is not bad faith," even if a court ultimately holds that the interpretation was incorrect. *Transcon. Ins. Co. v. Washington Pub. Utilities Districts' Util. Sys.*, 760 P.2d 337, 347 (Wash. 1988); *see also Spurlock v. State Farm Fire & Cas. Co.*, No. 2:23-CV-00467-JHC, 2024 WL 5008872, at *10 (W.D. Wash. Dec. 6, 2024) ("A denial is not unreasonable simply because the Court determines that the insurer's interpretation of a contract was incorrect.").

Here, the record does not establish that RVI's interpretation was unreasonable, frivolous, or unfounded. As the Court observed in its prior order and observes again here, "the thrust of Endorsement D . . . seems to be that the appraisal value of the rail cars is 'reproduction cost new.'" Dkt. No. 63 at 20. Again:

- The full title of Endorsement D is "Endorsement D *Establishment of Reproduction Cost New Appraisal Methodology* for Two Hundred Fifty (250) Units Only." Dkt. No. 64 at 60 (emphasis added).

- Subsection (d)'s heading is likewise "Appraised Value (*Reproduction Cost New*)." *Id.* (emphasis added).

- Subsection (d)(ii) explains in parentheses that it is a "'*reproduction cost new*' basis." *Id.* (emphasis added).

- Endorsement D expressly replaced Section 5.02 of the Policy with this sentence: "The End of Term Value of the Unit shall be the Appraised Value (*Reproduction Cost New*)." *Id.* at 61 (emphasis added).

Furthermore, the wording of Endorsement D instructs that the fair retail cost should be determined "by the cost of substituting another asset of comparable utility" "*on the basis of* . . . 'reproduction cost new[.]'" *Id.* at 60. Thus, as the Court held above, an interpretation of Endorsement D to require appraisal based only on reproduction cost new is one of three reasonable interpretations. Even so, RVI did not ignore Subsection 2.01(d)(i), as Financial Pacific claims. It provided the full Policy to Biggs, who reiterated the valuation approach of "Appraised Value (Reproduction Cost New)" in his appraisal, including Subsection 2.01(d)(i). Dkt. No. 100-28 at 5.

Finally, even though the text of the Policy does not expressly mention depreciation, (1) it is not unreasonable for RVI to interpret Subsections 2.01(d)(i) and (ii) to inherently include depreciation, *see* Dkt. No. 106 at 6 (Financial Pacific arguing that RailSolutions' appraisal satisfied Subsection 2.01(d)(i) because it considered "the cost approach," i.e., the "depreciated replacement cost" (citing Dkt. No. 89 at 108), and (2) RVI's application of depreciation could only inure to Financial Pacific's benefit.

For these reasons, "reasonable minds could not differ that [RVI's] denial of coverage was based upon reasonable grounds." *Farnes v. Metro. Grp. Prop. & Cas. Ins. Co.*, No. 2:18-CV-1882-BJR, 2019 WL 3501447, at *4 (W.D. Wash. July 31, 2019) (citing *Smith*, 78 P.3d at 1277). The Court accordingly grants summary judgment to RVI on this claim.

### (b) CPA Claim

Financial Pacific bases its CPA claim on RVI's alleged bad faith (as detailed above) and

violations of two insurance regulations. Dkt. No. 64 at 11–12. Specifically, it alleges that RVI refused to pay its loss claim without conducting a reasonable investigation, *see* Wash. Admin. Code § 284-30-330(4), and failed to promptly provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for denial of its claim, *see id.* § 284-30-330(13). Dkt. No. 64 at 11–12. RVI counters that its "claims handling and investigation—including its communications with [Financial Pacific]—were thorough and timely[.]" Dkt. No. 99 at 43.

*(i)* Legal standard

To establish a CPA claim, a plaintiff must show that (1) the defendant engaged in an unfair or deceptive act or practice (2) occurring in trade or commerce and (3) impacting the public interest that (4) injured the plaintiff's business or property and (5) was caused by the defendant. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). Violations of Washington's insurance regulations are per se violations of the first three elements of the CPA. *Hopkins v. Integon Gen. Ins. Co.*, No. C18-1723-MJP, 2020 WL 1467346, at *4 (W.D. Wash. Mar. 26, 2020); *Naxos, LLC v. Am. Fam. Ins. Co.*, No. C18-1287-JLR, 2020 WL 777260, at *22 (W.D. Wash. Feb. 18, 2020). Under Washington's insurance regulations, it is unfair and deceptive for an insurer to "refus[e] to pay claims without conducting a reasonable investigation" or "[f]ail[] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." Wash. Admin. Code § 284-30-330(4), -(13).

*(ii)* Summary judgment is granted to RVI on Financial Pacific's CPA claim

RVI points to record evidence supporting that Financial Pacific "cannot produce admissible evidence to support" its CPA claims. Fed. R. Civ. P. 56(c)(1)(B). One week after receiving Financial Pacific's Notice of Claim, RVI acknowledged receipt and sent Financial Pacific a detailed report addressing specific deficiencies in the submitted claim materials. Dkt. No. 100-25.

RVI then retained Biggs to conduct an independent appraisal "in accordance with the Policy." Dkt. No. 100-27 at 3. One day after RVI retained Biggs, it advised Financial Pacific that it had engaged a qualified appraiser, informed Financial Pacific of the directives RVI had given the appraiser, and told Financial Pacific that RVI would "promptly provide [it] with a copy to review" once RVI received it. Dkt. No. 100-29 at 3. That letter also reiterated the bases for RVI's assessment that Financial Pacific's claim was deficient. *Id.* at 2–3. Two days after RVI received the Biggs appraisal, it sent the appraisal to Financial Pacific along with a cover letter informing Financial Pacific that "the Appraised Value for the Units, $10,125,000 to $10,425,000, exceeds the Insured Value of the Units, resulting in no Loss under the Policy," and that "[p]ursuant to Section 5.01 of the Policy, RVI's determination of the End of Term Value for the Units will be deemed conclusively binding" unless Financial Pacific objected within 30 days. Dkt. No. 100-31 at 2–3. Two days after Financial Pacific objected to the Biggs appraisal, RVI advised Financial Pacific that it was "ready and available to meet to attempt to agree upon the End of Term Value" pursuant to Section 5.03 of the Policy. Dkt. No. 100-34 at 2. And finally, RVI took affirmative steps to implement the Policy's dispute resolution process, and only stopped after Financial Pacific refused to "proceed forward under Section 5.03 . . . until th[e] fundamental legal issue" of appraisal value "[wa]s resolved." Dkt. Nos. 100-36, 100-38, 100-39. Williams, who was the person at Financial Pacific responsible for managing its claim, testified that he had no complaints about the claims handling process (aside from RVI not paying the claim), that RVI representatives always made themselves available for discussions when requested by Financial Pacific, and that RVI communicated its position to Financial Pacific clearly. Dkt. No. 100-1 at 13–14.

    In response, Financial Pacific has not carried its burden to show "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citation modified). It does not deny that RVI took the steps listed above, but instead argues that "[t]hese limited acts fail to show

a meaningful investigation." Dkt. No. 106 at 13. Insurers, however, are only required to "conduct reasonable and prompt investigations," and "need not necessarily investigate every discrete element." *Bridgham-Morrison v. Nat'l Gen. Assurance Co.*, No. C15-927-RAJ, 2016 WL 2739452, at *6 (W.D. Wash. May 11, 2016) (citation omitted), *aff'd*, 739 F. App'x 381 (9th Cir. 2018). "The focus is not on what could have been done, but on what was actually done by the insurer." *Id.* Financial Pacific does not articulate what more would be required to make the investigation "meaningful," and instead simply takes issue with RVI's interpretation and application of the Policy as opposed to its predicate investigation. For example, in response to RVI's interrogatory asking it to "[s]et forth each and every fact in support of the allegation that RVI violated . . . WAC §§ 284-30- 330(4) and 284-30-330(13)," Financial Pacific complained that (1) "RVI failed to make any effort to determine the fair retail price" under the Policy, which is demonstrably false, *see* Dkt. No. 100-28 at 5; (2) "RVI improperly calculated the End of Term Value of the insured Units by applying a straight-line depreciation of 3.1% per year"; and (3) "RVI's position regarding the End of Term Value of the insured Units would render coverage under the Policy illusory[.]" Dkt. No. 100-24 at 3–4. The crux of this dispute is not about RVI's investigation but rather its application of Endorsement D to the facts identified in its investigation. "A denial of coverage based on a reasonable interpretation of the policy . . . even if incorrect, does not violate the Consumer Protection Act if the insurer's conduct was reasonable." *Transcon. Ins. Co.*, 760 P.2d at 347. In response to RVI's record evidence, Financial Pacific has failed to establish a genuine dispute that RVI refused to pay its claim without conducting a reasonable investigation. *See Amini v. Crestbrook Ins. Co.*, No. C21-1377-KKE, 2023 WL 6389341, at *9–10 (W.D. Wash. Oct. 2, 2023) (denying summary judgment to insured where insurer presented evidence that it "regularly communicated" with the insured "both as to the status of his claim and the basis for [the insurer's] respective valuation of said claim"); *Young v. Safeco Ins. Co. of Am.*, No. 20-CV-01816-

LK, 2022 WL 4017893, at *15 (W.D. Wash. Sept. 2, 2022) (granting summary judgment to insurer on bad faith claim where "the crux of this dispute is not the sufficiency of Safeco's underlying investigation—it is Safeco's application of the vandalism provision to the facts uncovered during that investigation.").

Furthermore, Financial Pacific has not rebutted RVI's evidence that it promptly provided a reasonable explanation of the basis in the Policy in relation to the facts for denial of Financial Pacific's claim. Wash. Admin. Code § 284-30-330(13). As discussed above, RVI sent Biggs' appraisal to Financial Pacific two days after Biggs submitted it to RVI. RVI's cover letter explained the basis for its denial of Financial Pacific's claim, and the Biggs appraisal laid out the methodology for the appraised value of the railcars. Dkt. Nos. 100-28, 100-31.

Summary judgment is therefore granted in favor of RVI on Financial Pacific's CPA claim.

### (c) IFCA Claim

IFCA authorizes a first-party claimant to an insurance policy "who is unreasonably denied a claim for coverage or payment of benefits by an insurer" to bring an action for damages. Wash. Rev. Code § 48.30.015(1). The statute creates two circumstances under which an insurer may be liable: when it unreasonably denies a claim for coverage or when it unreasonably denies a payment of benefits. *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6, 20 (Wash. Ct. App. 2014). An insurer also violates IFCA when it violates any of the insurance regulations. *See* Wash. Rev. Code § 48.30.015(5)(a). But the Washington Supreme Court has clarified that IFCA "does not create an independent cause of action for regulatory violations" absent an underlying unreasonable denial of coverage or payment of benefits. *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 483 (Wash. 2017). Because RVI did not unreasonably deny coverage to Financial Pacific, Financial Pacific's IFCA claim lacks merit, and summary judgment is granted to RVI on this claim.

1    **D.    Motion to Seal**

2        Finally, Financial Pacific moves to seal unredacted versions of two exhibits in support of

3    its motion for partial summary judgment: Exhibit 65 – Appraisal Report of Edward Biggs (Dkt.

4    No. 84); and Exhibit 87 – RVI Underwriting Spreadsheet (Dkt. No. 84-1). Dkt. No. 83 at 1. Both

5    documents were designated as "Confidential" by RVI under the parties' Confidentiality

6    Agreement. *Id.*

7        Courts have recognized a "general right to inspect and copy public records and documents,

8    including judicial records and documents." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172,

9    1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978)).

10    Accordingly, when a district court considers a sealing request, "a strong presumption in favor of

11    access is the starting point." *Id.* (citation modified). This presumption, however, "is not absolute

12    and can be overridden given sufficiently compelling reasons for doing so." *Foltz v. State Farm*

13    *Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (citing *San Jose Mercury News, Inc. v.*

14    *U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir. 1999)). Additionally, in this District, parties moving

15    to seal documents must comply with the procedures established by Local Civil Rule 5(g). Under

16    that rule, the party who designates a document as confidential must provide a "specific statement

17    of the applicable legal standard and the reasons for keeping a document under seal, including an

18    explanation of: (i) the legitimate private or public interests that warrant the relief sought; (ii) the

19    injury that will result if the relief sought is not granted; and (iii) why a less restrictive alternative

20    to the relief sought is not sufficient." LCR 5(g)(3)(B).

21        Financial Pacific avers that because RVI "designated the above-referenced documents as

22    'Confidential,' Local Rule 5(g)(3)(B) is not applicable." Dkt. No. 83 at 2. This is not the case.

23    Local Civil Rule 5(g)(3)(B) specifically provides that "[w]here parties have entered a litigation

24    agreement . . . governing the exchange in discovery of documents that a party deems confidential,

. . . the party who designated the document confidential must satisfy subpart 3(B) in its response to the motion to seal or in a stipulated motion." Financial Pacific provides no other support for sealing the exhibits. *See generally* Dkt. No. 83. And although Financial Pacific noted its motion for August 13, 2024 in accordance with the Local Civil Rules, *see id.* at 1, RVI failed to file a response as required by Rule 5(g)(3)(B). Accordingly, the Court DENIES Financial Pacific's motion to seal.

### III.    CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

1.    RVI's Motion to Exclude Opinions of Plaintiff's Proposed Expert William Warfel, Dkt. No. 79, is GRANTED IN PART and DENIED IN PART.

2.    RVI's Motion to Exclude Opinions of Plaintiff's Proposed Expert D. Gregg Dight, Dkt. No. 81, is GRANTED IN PART and DENIED IN PART.

3.    Financial Pacific's Motion for Partial Summary Judgment, Dkt. No. 85, is GRANTED IN PART and DENIED IN PART. Specifically,

   a.    The Court DENIES the motion as to Financial Pacific's breach of contract claim and second and third declaratory judgment claims (illusory coverage and entitlement to coverage for Loss). Dkt. No. 64 at 10–11.

   b.    The Court GRANTS the motion as to Financial Pacific's first declaratory judgment claim that the determination of End of Term Value under the Policy is ambiguous. Dkt. No. 64 at 10–11.

4.    RVI's Cross-Motion for Summary Judgment, Dkt. No. 99, is GRANTED IN PART and DENIED IN PART. Specifically,

   a.    The Court GRANTS the motion as to Financial Pacific's breach of contract claim, second and third declaratory judgment claims (illusory coverage and

entitlement to coverage for Loss), bad faith claim, CPA claim, and IFCA claim. Dkt. No. 64 at 10–12.

b.  The Court DENIES the motion as to Financial Pacific's first declaratory judgment claim that the determination of End of Term Value under the Policy is ambiguous and RVI's mirror-image counterclaim. Dkt. No. 64 at 10–11; Dkt. No. 65 at 12.

c.  The Court further DENIES the remainder of RVI's motion for summary judgment as moot. Dkt. No. 65 at 12–13. Specifically, the remainder of RVI's counterclaims for declaratory judgment are mere "mirror image" counterclaims, and are moot given the rulings above. *See Perez v. Roofing*, No. 3:15-CV-05623-RJB, 2016 WL 898545, at *2 (W.D. Wash. Mar. 9, 2016) (noting that mirror image counterclaims do not serve "any useful purpose" because "they raise no issues not also raised by the [c]omplaint," and because any decision on the complaint's merits "would render the [c]ounterclaims for declaratory judgment moot").

5.  Financial Pacific's Motion to Seal, Dkt. No. 83, is DENIED. The Clerk is directed to unseal docket entries 84 and 84-1.

Dated this 30th day of September, 2025.

_Lauren King_
_____
Lauren King
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO EXCLUDE EXPERT OPINIONS, AND MOTION TO SEAL - 52